# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

DISABILITY RIGHTS COUNCIL OF GREATER
WASHINGTON,
11 Dupont Circle, NW, Suite 400
Washington, DC  20036,

JUSTIN CHAPPELL
16219 Jerald Rd.
Laurel, MD  20707,

VICTOR DESKIN
804 Maple Ave.
Rockville, MD  20850,

MARQUETTE HENDERSON
1201 Palmer Rd., Apt. 3
Fort Washington, MD  20744,

MARSHA JOHNSON
8560 Second Ave. #106
Silver Spring, MD  20910,

VICTORIA SMITH
3410 Dodge Park Rd., Apt. 302
Landover, MD  20785,

MARY WRIGHT
14117 Gullivers Trail
Bowie, MD  20720,

DARNISE HENRY BUSH
2703 Shipley Terr., SE
Washington, DC  20020,

DOROTHY CRAWFORD
3434 Minnesota Avenue, SE
Washington, DC  20019,

MARY WILLIAMS
608 Chaplin St., SE
Washington, DC 20019,

**COMPLAINT**

Civil Action No. _____
(Demand for Jury Trial)

PAMELA AWKERMAN
809 W. Broad St., #23
Falls Church, VA  22046,

EDWARD MCENTEE
6319 Everglades Dr.
Alexandria, VA  22312,

and

MICHELLE VADNAIS
11220 Chestnut Grove Sq. #13
Reston, VA  20190,

individually and on behalf of a class of
similarly situated individuals,

                    Plaintiffs,

          v.

WASHINGTON METROPOLITAN AREA
TRANSIT AUTHORITY,
600 Fifth St., NW
Washington, DC 20001

                    Defendant.

## COMPLAINT

Plaintiffs, by and through their undersigned counsel, on behalf of themselves and all others similarly situated, sue Washington Metropolitan Area Transit Authority ("WMATA"), and allege:

## INTRODUCTION

1.      This is a class action for declaratory and injunctive relief, as well as such other relief as may be just, proper, and equitable, to remedy Defendant's continuing violations of the right of the Plaintiff class to basic and essential transportation services under Title II of the

Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12131 *et seq.*, Section 504 of the

Rehabilitation Act of 1973, 29 U.S.C. § 794, *et seq.* ("Rehabilitation Act"), the regulations

promulgated under these statutes, and 42 U.S.C. § 1983.

2.      Defendant WMATA is a public entity that operates a fixed route system through

its bus and rail systems ("Metrobus" and "Metrorail").  As required by Title II of the ADA,

Defendant provides complementary "paratransit services" to individuals with disabilities, who

due to their disabilities cannot otherwise safely use Metrobus or Metrorail.  The ADA requires

WMATA to provide MetroAccess at "a level of service . . . which is comparable to the level of

designated public transportation services provided to individuals without disabilities using such

system." 42 U.S.C. § 12143(a).  MetroAccess provides services through fleets of vehicles,

operated by contractors, which are dispatched to pick up registered users from any location

within three-quarters of a mile of any fixed route Metrorail or Metrobus stop.

3.      Many individuals with disabilities, including the individual Plaintiffs, must

depend on MetroAccess to conduct crucial aspects of their daily lives.  In many cases,

MetroAccess riders, including Plaintiffs Justin Chappell, Marquette Henderson, Victoria Smith,

Mary Wright, Darnise Henry Bush, Dorothy Crawford, Mary Williams, Pamela Awkerman, Ed

McEntee, and Michelle Vadnais, must rely on MetroAccess to travel to and from their places of

employment.  Many of these Plaintiffs, including Justin Chappell, Dorothy Crawford, Marquette

Henderson, and Victoria Smith, have a standing "subscription" reservation for a MetroAccess

vehicle to pick them up on a regular schedule for their recurring trips to work and back.  If they

cannot rely on MetroAccess, they risk being unable to work and being deprived of their

livelihood and of the personal rewards from being productive members of society.  In many

cases, including Plaintiffs Dorothy Crawford, Victor Deskin, and Ed McEntee, they must depend

on MetroAccess to travel to and from medical appointments, such as dialysis treatments, physical therapy and physician examinations. All MetroAccess users depend on MetroAccess for important personal appointments much as individuals without disabilities rely on their personal automobiles, Metrorail, Metrobus, other transportation facilities and even walking to conduct their personal affairs.

4. Despite the crucial role MetroAccess necessarily plays in the lives of its users, MetroAccess fails to provide even minimally adequate service and is materially inferior to the Metrorail and Metrobus public transportation available to people without disabilities. A substantial portion of rides are late, often very late. Some rides arrive unreasonably early and leave before the scheduled arrival time. Some rides do not appear at all. Some rides are so extended and circuitous (often because the drivers are picking up and dropping off users at widely separated locations) that they last much longer than a reasonably direct trip would. During these trips, riders are denied access to food and water, medicine, and bathroom facilities. MetroAccess's inadequate performance poses a threat to the health of many of its users.

5. The impact of MetroAccess's inadequate service on the lives of its riders is profound. In order to be able to adhere to work schedules or make appointments, riders must schedule rides for several hours before the time they would select if the service were reliable. They must appear at the pickup location well before the scheduled time to guard against a MetroAccess vehicle appearing too early and leaving. Thus, even if a particular ride is on time, MetroAccess users must waste a significant amount of time each day attempting to be on time for important obligations. The unreliability of the MetroAccess service causes serious disruptions to their schedules and erodes the quality of their lives.

6.      In 1990, Congress enacted the ADA to address pervasive discrimination against

persons with disabilities, including discrimination in the critical area of public transportation.

Congress stated that the purpose of the ADA is to provide: "a clear and comprehensive national

mandate for the elimination of discrimination against individuals with disabilities" and "clear,

strong, consistent, enforceable standards addressing discrimination against individuals with

disabilities." 42 U.S.C. § 12101(b)(1)-(2).

7.      Title II of the ADA prohibits discrimination by public entities on the basis of

disability, and specifically provides that no qualified individual with a disability shall be

excluded from participation in or denied the benefits of the services, programs or activities of

such public entity. 42 U.S.C. § 12131, *et seq.* Federal regulations also protect individuals with a

disability from discrimination by a public entity "in connection with the provision of

transportation service." 49 C.F.R. § 37.5(a).

8.      Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 ("Section 504"),

and its implementing regulations prohibit recipients of federal funding from discriminating

against people with disabilities. Section 504 provides, in pertinent part: "[n]o otherwise

qualified individual with a disability . . . shall, solely by reason of her or his disability, be

excluded from the participation in, be denied the benefits of, or be subjected to discrimination

under any program or activity receiving Federal financial assistance . . . ." 29 U.S.C. § 794(a).

9.      Recognizing that the lack of access to reliable transportation is a significant

barrier encountered by persons with disabilities, 42 U.S.C. § 12101(a), the ADA expressly

requires state and public entities that provide public transportation services (known as "fixed

route" services) also to provide complementary "paratransit services" to individuals with

disabilities, like the members of the Plaintiff class, who by virtue of their disabilities cannot

otherwise use the public transportation system.  42 U.S.C. § 12143.  The U.S. Department of

Transportation's regulations established pursuant to the ADA set forth the specific requirements

for paratransit services.  49 C.F.R. §37.121, *et seq.*  Federal regulation also requires a public

entity to ensure that any contractor that provides services on its behalf complies with the ADA.

49 C.F.R. § 37.23(a).

10.     MetroAccess customers are required to telephone to schedule a ride at least one

day in advance of their travel date and must meet the vehicle outside at a curb at a specified

pickup location.  MetroAccess is a shared ride service.  MetroAccess customers pay $2.40 per

ride, regardless of the distance.  Upon information and belief, this year, MetroAccess passengers

are expected to take 1.1 million MetroAccess trips.

11.     MetroAccess riders live in the District of Columbia, Maryland and Virginia.

Upon information and belief, approximately 54 percent of MetroAccess riders live in Maryland,

while 28 percent live in the District of Columbia and 18 percent live in Virginia.  They travel to

and from locations in all three jurisdictions.

12.     Members of the Plaintiff class are individuals who need reliable and accessible

public transportation to travel to work, medical appointments, religious services, and other

critical life activities.  Because of the nature of their disabilities and the inaccessibility to them of

the general "fixed-route" public transportation system, these Plaintiffs must rely on MetroAccess

as their primary means of transportation.

13.     MetroAccess is materially inferior to the public transportation available to people

without disabilities.  By failing to provide the Plaintiff class with a paratransit system that

complies with federal law, Defendant has unlawfully discriminated against Plaintiffs, unlawfully

excluded them from equal participation in public transportation services, and unlawfully denied

them equal access to public transportation services.  The Plaintiff class is therefore entitled to declaratory, injunctive and equitable relief.

**JURISDICTION AND VENUE**

14.      This Court has jurisdiction under 28 U.S.C. § 1331 because the claims arise under federal law.

15.      This Court has jurisdiction over Plaintiffs' request for declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202.

16.      Venue of this action properly lies in the District of Columbia pursuant to 28 U.S.C. § 1391(a)(1)-(2) because many of the events and omissions giving rise to Plaintiffs' claims are occurring in this district; Plaintiffs Bush, Crawford and Williams reside in the District of Columbia; and Plaintiff the Disability Rights Council and Defendant WMATA have their principal place of business in the District of Columbia.

**PARTIES**

17.      Plaintiff Disability Rights Council Of Greater Washington is a non-profit membership organization that works on behalf of people with disabilities in the Washington, D.C. metropolitan area to ensure that civil rights laws important to people with disabilities are enforced.

18.      Plaintiff Justin Chappell resides in Laurel, Maryland, and uses MetroAccess to commute to and from work and to attend events such as community meetings.  Mr. Chappell is mobility impaired, requiring the use of a wheelchair, and is therefore a "qualified individual with a disability" pursuant to 42 U.S.C. § 12131(2).  He has been eligible for paratransit services from MetroAccess at all times relevant to this Complaint.

19.     Plaintiff Victor Deskin resides in Rockville, Maryland, and uses MetroAccess for transportation to dialysis and medical appointments.  Mr. Deskin is mobility impaired, requiring the use of a wheelchair, and is therefore a "qualified individual with a disability" pursuant to 42 U.S.C. § 12131(2).  He has been eligible for paratransit services from MetroAccess at all times relevant to this Complaint.

20.     Plaintiff Marquette Henderson lives in Fort Washington, Maryland, and uses MetroAccess to get to and from his job, which is located at Bolling Air Force Base in the District of Columbia.  Mr. Henderson is visually impaired and is therefore a "qualified individual with a disability" pursuant to 42 U.S.C. § 12131(2).  He has been eligible for paratransit services from MetroAccess at all times relevant to this Complaint.

21.     Plaintiff Marsha Johnson resides in Silver Spring, Maryland, and uses MetroAccess to attend church and conduct errands.  Ms. Johnson has polio and is mobility impaired, requiring the use of a wheelchair, and is therefore a "qualified individual with a disability" pursuant to 42 U.S.C. § 12131(2).  She has been eligible for paratransit services from MetroAccess at all times relevant to this Complaint.

22.     Plaintiff Victoria Smith resides in Landover, Maryland, and uses MetroAccess paratransit every day of the week to commute to and from work, attend church services, shop, and visit friends.  Ms. Smith is blind, and is therefore a "qualified individual with a disability" pursuant to 42 U.S.C. § 12131(2).  She has been eligible for paratransit services from MetroAccess at all times relevant to this Complaint.

23.     Plaintiff Mary Wright resides in Bowie, Maryland, and uses MetroAccess to commute to and from work, medical appointments, shopping, church, and social visits with friends.  Ms. Wright is legally blind, and is therefore a "qualified individual with a disability"

pursuant to 42 U.S.C. § 12131(2).  She has been eligible for paratransit services from

MetroAccess at all times relevant to this Complaint.

24.     Plaintiff Darnise Henry Bush resides in Washington, D.C. and uses MetroAccess

paratransit to commute to and from work, shopping, church and other activities.  Ms. Bush is

mobility impaired, requiring the use of a cane or scooter, and is therefore a "qualified individual

with a disability" pursuant to 42 U.S.C. § 12131(2).  She has been eligible for paratransit

services from MetroAccess at all times relevant to this Complaint.

25.     Plaintiff Dorothy Crawford resides in Washington, D.C. and uses MetroAccess

five days per week to get to and from work.  Ms. Crawford uses MetroAccess to get to and from

work, medical appointments and errands.  Ms. Crawford has Non-Specific Interstitial

Pneumonitis, a condition that affects her ability to breathe, and she is therefore a "qualified

individual with a disability" pursuant to 42 U.S.C. § 12131(2).  She has been eligible for

paratransit services from MetroAccess at all times relevant to this Complaint.

26.     Plaintiff Mary Williams resides in Washington, D.C., and uses MetroAccess to

commute to and from work, church, medical appointments, shopping and social engagements.

Ms. Williams suffers from lupus, complications from diabetes such as diabetic neuropathy, and

chronic obstructive pulmonary disease, which severely limits her mobility, and she is therefore a

"qualified individual with a disability" pursuant to 42 U.S.C. § 12131(2).  She has been eligible

for paratransit services from MetroAccess at all times relevant to this Complaint.

27.     Plaintiff Pamela Awkerman resides in Falls Church, Virginia, and uses

MetroAccess for transportation to work, medical appointments, civic meetings, shopping, and

individualal engagements.  Ms. Awkerman has low vision, or "tunnel vision," and is therefore a

"qualified individual with a disability" pursuant to 42 U.S.C. § 12131(2).  She has been eligible

for paratransit services from MetroAccess at all times relevant to this Complaint.

28.      Plaintiff Ed McEntee resides in Alexandria, Virginia, and uses MetroAccess for

transportation to work, medical appointments, errands, and social engagements.  Mr. McEntee is

mobility impaired, requiring the use of a wheelchair, and is therefore a "qualified individual with

a disability" pursuant to 42 U.S.C. § 12131(2).  He has been eligible for paratransit services from

MetroAccess at all times relevant to this Complaint.

29.      Plaintiff Michelle Vadnais resides in Reston, Virginia, and uses MetroAccess for

transportation to and from work.  Ms. Vadnais has cerebral palsy and is mobility impaired, and is

therefore a "qualified individual with a disability" pursuant to 42 U.S.C. § 12131(2).  She has

been eligible for paratransit services from MetroAccess at all times relevant to this Complaint.

30.      Defendant WMATA is an instrumentality of Maryland, Virginia, and the District

of Columbia, created by an interstate compact with the consent and approval of Congress to

operate a mass transit system for the District of Columbia and the surrounding area.  Pub. L. No.

89-774, 80 Stat. 1324 (1966) (codified as amended in D.C. Code § 9-1107.01 *et seq.*).

31.      Defendant WMATA is the primary provider of fixed-route and paratransit

transportation in the Washington metropolitan area, and is a recipient of federal financial

assistance.  WMATA provides paratransit service through a contract with a service broker,

Logisticare, Inc., located in Silver Spring, Maryland.  In turn, Logisticare provides service

through subcontracts with eight companies that operate van and sedan service and are assigned to

a primary geographic service area.  Logisticare also has subcontracts with taxi companies to

provide supplementary service.

## CLASS ACTION ALLEGATIONS

32.      Plaintiffs Disability Rights Council Of Greater Washington, Justin Chappell,

Victor Deskin, Marquette Henderson, Martha Johnson, Victoria Smith, Mary Wright, Darnise

Henry Bush, Dorothy Crawford, Mary Williams, Pamela Awkerman, Ed McEntee, and Michelle

Vadnais bring this action on behalf of themselves and all other persons similarly situated,

pursuant to Federal Rules of Civil Procedure 23(a), (b)(1) and (b)(2).  The class members consist

of eligible MetroAccess paratransit riders who are, have been, or will be denied services

comparable to the level of service provided to individuals without disabilities who use

WMATA's fixed-route system.

33.      Each member of the proposed class is a "qualified individual with a disability"

pursuant to 42 U.S.C. § 12131(2).

34.      The exact size of the class is unknown to the Plaintiffs but on information and

belief the class number is approximately equal to the 11,787 passengers registered to use the

service.  The class is so numerous that joinder of all members is impracticable.

35.      The questions of law and fact that are common to the class include:

(a)      Whether Defendant is violating Title II of the ADA and its implementing

regulations by: failing to provide transportation services that are comparable to the fixed route

system to people with disabilities who rely on paratransit as their sole or primary means of

transportation; failing to provide individuals with disabilities an equal opportunity to access

public transportation; limiting the availability of service to paratransit-eligible individuals by a

pattern and practice of:  a substantial number of significantly late or early pickups; unreasonably

lengthy and circuitous trips; a significant number of driver "no-shows" resulting in missed trips;

discourteous telephone reservation service; inadequate telephone coverage and connections,

including its failure to answer the telephone, placing callers on hold for excessively long periods,

and dropping calls; failing to provide accurate information about location of assigned vehicles; failing to respond to complaints and requests for information; dangerous driving; discourteous drivers insensitive to the needs of riders with disabilities; falsely stating that riders fail to appear for scheduled rides ("false no-shows"); flawed implementation and enforcement of the "No-Show/Late Cancellation Policy," which threatens MetroAccess riders with suspension and revocation of their eligibility for accessible public transportation based on unverified driver accounts of "no-shows"; failing to announce arrival of vehicle to visually-impaired riders; creating of health hazards caused by exposure to the elements due to late pickups and erroneous ride status information; failing to adequately train drivers regarding the need and method for restraining wheelchairs and scooters inside the MetroAccess vehicle; failing to equip vehicles with adequate heat and air conditioning systems, scooter restraints, and operational wheelchair lifts; and other operational problems within the control of WMATA.

(b)     Whether Defendant is violating the equal access and nondiscrimination provisions of Section 504 of the Rehabilitation Act of 1973 by: failing to provide comparable service to people with disabilities who rely on paratransit as their sole or primary means of transportation; failing to provide individuals with disabilities an equal opportunity to access public transportation; and by limiting the availability of service to paratransit-eligible individuals by a pattern and practice of discrimination.

(c)     Whether Defendant, acting under color of state law, has deprived and continues to deprive named and class Plaintiffs of rights secured by federal statute through the acts and omissions alleged herein.

36.     The claims of the named Plaintiffs are typical of the claims of the class, including that Defendant has abridged named and class Plaintiffs' rights under the ADA and the

12

Rehabilitation Act to paratransit service comparable to the service that individuals without disabilities receive on the fixed-route system.

37.     The named Plaintiffs will fairly and adequately represent common class interests and are represented by counsel who are experienced in litigating class actions, and ADA and disability rights issues.

38.     In addition to promoting judicial economy, the prosecution of separate actions by individual members of the class is likely to result in inconsistent adjudications and incompatible standards, and could impair or impede the rights of individual members who are not party to such adjudications.

39.     Defendant has acted or refused to act on grounds generally applicable to the class, thereby making appropriate injunctive and declaratory relief with respect to the class as a whole.

### STANDARDS APPLICABLE TO CLAIMS

40.     Title II of the ADA protects persons from discrimination on the basis of disability by public entities, including state and local governments. 42 U.S.C. § 12131. Federal regulations prohibit public entities from discriminating against individuals with disabilities "in connection with the provision of transportation service." 49 C.F.R. § 37.5(a). Public entities are also required to ensure that any contractor that provides services on its behalf complies with the ADA. 49 C.F.R. § 37.23(a).

41.     Congress identified transportation as one of the critical areas in which individuals with disabilities encounter pervasive discrimination and barriers to their full participation in society. 42 U.S.C. § 12101(a)(3). Recognizing the fundamental importance of transportation services, Title II of the ADA requires every public entity operating a fixed-route public

transportation system to provide a complementary paratransit system to individuals with disabilities who cannot access the fixed-route system.  42 U.S.C. § 12143.

42.    Under Title II of the ADA, a public entity discriminates against individuals with disabilities when it fails to provide them with paratransit services at "a level of service . . . which is comparable to the level of designated public transportation services provided to individuals without disabilities . . . ."  42 U.S.C. § 12143(a).  To fulfill the ADA's minimum requirements of comparable service, a public entity's paratransit system must be comparable to the fixed route system with regard to (1) geographic service area, (2) response time, (3) fares, (4) trip purpose restrictions, (5) hours and days of service, and (6) capacity constraints.  49 C.F.R. § 37.131.

43.    To meet the ADA's requirement of comparable service with respect to response time, "[t]he entity shall schedule and provide paratransit service to any ADA paratransit eligible person at any requested time on a particular day in response to a request for service made the previous day."  49 C.F.R. § 37.131(b).

44.    The ADA's prohibition on capacity constraints means that the paratransit system must be able to fully meet the demand for its paratransit services and cannot limit its obligation to provide services by engaging in practices that discourage participation by eligible riders.  49 C.F.R. § 37.131(f).  This provision specifically prohibits "[a]ny operational pattern or practice that significantly limits the availability of service to ADA paratransit eligible persons," including but not limited to (1) "Substantial numbers of significantly untimely pickups for initial or return trips;" (2) "Substantial numbers of trip denials or missed trips;" and (3) "Substantial numbers of trips with excessive trip lengths."  49 C.F.R. § 37.131(f)(3)(i)(A)-(C).

## FACTS COMMON TO ALL PLAINTIFFS

45.     Defendant's fixed route public transportation system is not fully accessible to many individuals with disabilities.

46.     Defendant has persistently violated its obligation under federal law to provide paratransit service that is comparable to the level of transportation provided to individuals without disabilities.  Defendant has deprived class members of adequate and reliable transportation by subjecting Plaintiffs to: a substantial number of significantly late or early pickups; unreasonably lengthy and circuitous trips; a significant number of driver "no-shows" resulting in missed trips; discourteous telephone reservation service; inadequate telephone coverage and connections, including failure to answer the telephone and placement of callers on hold for excessively long periods; failing to provide accurate information about the location of assigned vehicles; failing to respond to complaints and requests for information; making false assertions that riders fail to appear for scheduled rides ("false no-shows"); flawed implementation and enforcement of the "No-Show/Late Cancellation Policy"; and other operational problems within the control of WMATA.

47.     MetroAccess is dysfunctional and riddled with ADA violations.  Paratransit riders have complained repeatedly about the systemic problems with the paratransit service.  In response, WMATA has denied that the problems exist or dismissed them as isolated incidents.  To this date, WMATA continues to operate an illegal, discriminatory system and plans to carry it forward without meaningful improvement.

48.     Many paratransit users repeatedly have attempted to use WMATA's own complaint process to address their concerns and problems.  These efforts have been to no avail as WMATA consistently has been non-responsive to the complaints it has received.

49.     Due to MetroAccess's substantial ADA violations and consistently inadequate

service, Plaintiffs have missed work, medical appointments, religious services and other

important events and activities.  Plaintiffs have been forced to wait for hours outside in inclement

weather, endangering their health.  MetroAccess's violations have subjected Plaintiffs to much

frustration, substantial inconvenience, stress, anxiety, and fear, and have impacted their lives in

major ways.

## FACTS CONCERNING NAMED PLAINTIFFS

### Disability Rights Council Of Greater Washington

50.     Plaintiff Disability Rights Council of Greater Washington (DRC) is a non-profit

membership organization incorporated under the laws of the District of Columbia with its

principal place of business at 11 Dupont Circle, N.W., Suite 400, Washington, D.C.  20036.  The

DRC's membership is composed of individuals from the Washington, D.C. metropolitan area

and elsewhere who have a direct interest in protecting the rights of persons with disabilities.

Many of these members have disabilities that render them unable to utilize traditional public

transportation.

51.     The DRC's goals are to eliminate discrimination on the basis of disability, to

assist individuals with disabilities in addressing civil rights issues related to their disabilities, and

to educate the public regarding the rights of individuals with disabilities.  Consistent with these

goals, the DRC actively promotes equal access to public accommodations, public entities, and

public transportation for persons with disabilities.  The DRC pursues these objectives through

various means, including research, public education, counseling, and conciliation.

52.     Many members of the DRC rely on MetroAccess on a regular basis.  DRC

functions are frequently delayed, cut short, or members and participants are unable to attend, due

16

to the unreliability of MetroAccess services.  Moreover, DRC employees are on occasion required to take time from their duties to accompany members to and from Metrorail, or escort them in riding Metrorail, so that the members can thereby use Metrorail and avoid the delays in the MetroAccess system.

53.     For example, on November 25, 2003, MetroAccess caused Dennis Christopher Butler to be extremely late for a press conference at the offices of the DRC to announce the filing of a complaint against Washington Hospital Center for discrimination against persons with disabilities.  Mr. Butler is a plaintiff with the DRC in that suit and his presence at the press conference was indispensable to carrying out a successful news conference.  Mr. Butler relies on MetroAccess for his transportation needs.  He is quadriplegic and is therefore a "qualified individual with a disability" pursuant to 42 U.S.C. § 12131(2).

54.     Even though Mr. Butler scheduled a MetroAccess ride in advance to pick him up at work at 11:30 a.m., a full hour before the press conference was scheduled to begin, his ride did not arrive until 12:30 p.m., an hour late.  At 1:00 p.m., at the same time that Mr. Butler arrived at his destination, the driver for his scheduled return trip arrived.  The MetroAccess driver would not assist Mr. Butler in rescheduling his return ride and said he would wait only 15 minutes for Mr. Butler.  Mr. Butler made several unsuccessful attempts to reach the MetroAccess reservation department to reschedule his return trip.  Mr. Butler joined his press conference 45 minutes late. His inability to arrive on time to the press conference negatively impacted the DRC, forcing it to delay the initiation of the press conference.

55.     After the press conference, Mr. Butler was forced to take Metrorail back to his place of employment.  Because Mr. Butler is unable to operate the Metro elevators without

assistance, an employee of the Disability Rights Council escorted Mr. Butler to the nearest Metrorail station.

56.     Defendant's continuing discrimination against individuals with disabilities has harmed and will continue to cause distinct, palpable and perceptible harm to DRC by, among other things:

(a)     frustrating the DRC's mission of promoting equal opportunities for persons with disabilities with respect to the use of public transportation;

(b)     forcing the DRC to incur costs and divert resources from other issues vital to its membership, including the investigation of complaints and counseling of members regarding MetroAccess's continuing obligations under the ADA and the Rehabilitation Act.  In particular, DRC has devoted significant time, money and energy to counseling members who have been injured by MetroAccess's discrimination, and assisting these individuals in resolving problems related to injuries caused by such discrimination; and

(c)     damaging DRC's day-to-day operations by, among other things, causing staff and members to be delayed in attending (or missing completely) meetings, hearings, and other events that are critical to DRC's goal of eliminating disability discrimination.

### Justin Chappell

57.     Plaintiff Justin Chappell resides in Laurel, Maryland, and uses MetroAccess to commute to and from work and to attend events such as community meetings.  Mr. Chappell is mobility impaired, requiring the use of a wheelchair, and is therefore a "qualified individual with a disability" pursuant to 42 U.S.C. § 12131(2).  He has been eligible for paratransit services from MetroAccess at all times relevant to this Complaint.

58.     Mr. Chappell is employed in Washington, D.C. and uses MetroAccess to commute to and from work five days a week.  Mr. Chappell has consistently experienced problems with MetroAccess's lack of punctuality.  As a result, he is frequently late for work, and in particular is late for a meeting every Wednesday morning with his supervisors.  He believes his tardiness is negatively affecting his relationships with his co-workers.  Mr. Chappell must make up missed time at work at his own expense.  In addition, when the MetroAccess van is extremely late, Mr. Chappell sometimes must pay for a lift-equipped taxicab to get to or from work.

59.     The problems caused by MetroAccess's lateness are greatly compounded by the failure of the dispatchers to provide accurate information.  In the past, Mr. Chappell has been told that a driver was twenty minutes away when in fact either no driver had been assigned, or the driver was waiting in another location.  MetroAccess dispatch will often tell Mr. Chappell that his late ride is nearby, when, in fact, it is not, causing him to wait outside in the cold for long periods of time.

60.     MetroAccess's timeliness problems are further compounded for Mr. Chappell by the fact that MetroAccess sometimes sends a taxicab without a wheelchair lift or a van without an operational lift to pick up Mr. Chappell.  Mr. Chappell cannot use a taxicab without a wheelchair lift because he cannot transfer between the wheelchair seat and the taxicab seat, and his wheelchair will not fit in the trunk of a taxi cab.  As a result, Mr. Chappell often has to wait another several hours for a replacement van.

61.     Mr. Chappell is often required to share rides with other passengers who are picked up and dropped off at locations that are nowhere near Mr. Chappell's pick up or drop off points.  As a result, Mr. Chappell's forty-five minute commute sometimes takes in excess of two hours.

On September 11, 2003, September 24, 2003, and October 1, 2003, Mr. Chappell's rides from his place of employment to his home took over two and a half hours.

62.     When Mr. Chappell calls MetroAccess's Quality Control Officer to complain about his inadequate service, he often reaches a voicemail box and does not receive a response to the messages he leaves. Mr. Chappell has also submitted two written complaints to WMATA in the past year, one in May 2003 and the other in December 2003. Mr. Chappell's MetroAccess service remains unreliable despite these complaints and Mr. Chappell's best efforts to work with WMATA.

**Victor Deskin**

63.     Plaintiff Victor Deskin resides in Rockville, Maryland, and uses MetroAccess for transportation to dialysis and medical appointments approximately four times per week. Mr. Deskin is mobility impaired, requiring the use of a wheelchair, and is therefore a "qualified individual with a disability" pursuant to 42 U.S.C. § 12131(2). He has been eligible for paratransit services from MetroAccess at all times relevant to this Complaint.

64.     Mr. Deskin has a subscription reservation for MetroAccess rides to receive dialysis treatment three times a week and to see a physician on a fourth day each week. These appointments are all located in Wheaton, Maryland, approximately five miles from his home. Despite this short distance and set schedule, approximately 50 percent of Mr. Deskin's MetroAccess rides are more than fifteen minutes late. Some pickups are as much as two hours late. Because Mr. Deskin experiences serious discomfort and pain after dialysis treatment, waiting for a late MetroAccess ride is exceptionally difficult and trying for him after dialysis, particularly when the weather is cold or damp, which aggravates his condition.

65.     Between September 26, 2003 and November 25, 2003, Mr. Deskin took 17 MetroAccess rides, 71 percent of which failed to meet applicable standards.  Forty-two percent of those rides arrived more than 15 minutes late, 18 percent arrived more than 30 minutes late, one ride was over an hour late, and one ride never arrived.

66.     Mr. Deskin has also repeatedly been on rides that require him to travel substantially out of his way, so that drivers could attempt to pick up passengers from locations that are far from his route.  Between traffic and other delays, these unrealistically circuitous routes turn what would under normal circumstances be a half-hour trip into a two-hour ordeal.

67.     Mr. Deskin finds that the employees who answer the MetroAccess dispatch and reservation telephone lines are often rude and discourteous when he calls to find out when a late ride is going to arrive.  On February 10, 2004, Mr. Deskin's ride was two hours late.  When he called the MetroAccess dispatch office to discuss the location of the vehicle, the MetroAccess employee he was speaking with intentionally hung up on him.

68.     In addition, Mr. Deskin must instruct most of his MetroAccess drivers about how properly to tie down his wheelchair in the vehicle for safety.  In Mr. Deskin's experience, MetroAccess drivers are not adequately trained to tie down properly the wide variety of wheelchair models.

### Marquette Henderson

69.     Plaintiff Marquette Henderson lives in Fort Washington, Maryland, and uses MetroAccess to get to and from his job, which is located at Bolling Air Force Base in the District of Columbia.  Mr. Henderson is visually impaired and is therefore a "qualified individual with a disability" pursuant to 42 U.S.C. § 12131(2).  He has been eligible for paratransit services from MetroAccess at all times relevant to this Complaint.

70.     Mr. Henderson has a subscription for pickup at 6:45 each morning, Monday through Friday, so that he can arrive at his job by 8:00 a.m.  Even though Mr. Henderson's subscription reservation allows an hour and fifteen minutes for a drive that takes approximately 20 minutes if driven directly, Mr. Henderson is significantly late to work two or three times each week.  Nearly all of his MetroAccess rides arrive more than 15 minutes late.  In January 2004, Mr. Henderson was written up for tardiness by his employer and he worries that he is in danger of being terminated from his job because of his inability to arrive at work on time.  In addition, Mr. Henderson's bonuses have been discontinued and his wages have been reduced as a direct result of his poor attendance and punctuality.  Mr. Henderson's income is critical to his family's financial stability.  On approximately four days per week, the arrival of Mr. Henderson's ride home from work is an average of 60 minutes late.

71.     On January 20, 2004, Mr. Henderson did not arrive at work until 10:00 a.m., two hours late.  When his cab finally arrived at his home at approximately 8:30 a.m., the driver initially refused to drive him because he said he had already informed the MetroAccess dispatch that Mr. Henderson was a "no-show."  The driver counted Mr. Henderson as a "no-show" even though Mr. Henderson had been on the phone with MetroAccess dispatch since 7:00 a.m. trying to secure a ride and despite the fact that the driver had just arrived at Mr. Henderson's apartment a few minutes earlier.  Mr. Henderson was finally allowed to board the cab after dispatch was called to correct the mistake.

72.     On January 21, 2004, Mr. Henderson arrived at work 30 minutes late.  On January 23, 2004, MetroAccess did not arrive until after 12:00 p.m.—over five hours late.

73.     Mr. Henderson has complained via the MetroAccess telephone complaint line on a number of occasions and submitted a written complaint to WMATA on January 28, 2004.

Previously, Mr. Henderson complained on each occasion that MetroAccess caused him to arrive late at work, but he does not call to complain anymore because the MetroAccess employees who answer the complaint line are rude and unhelpful, often hang up on Mr. Henderson, or leave him on hold for extended periods of time.

### Marsha Johnson

74.      Plaintiff Marsha Johnson resides in Silver Spring, Maryland, and uses MetroAccess to attend church and conduct errands. Ms. Johnson has polio and is mobility impaired, requiring the use of a wheelchair, and is therefore a "qualified individual with a disability" pursuant to 42 U.S.C. § 12131(2). She has been eligible for paratransit services from MetroAccess at all times relevant to this Complaint.

75.      Ms. Johnson finds that using MetroAccess is sometimes a harrowing experience, entailing constant worry that she is going to be stranded. Her fear is justified based on past experiences.

76.      In addition, a significant number of Ms. Johnson's MetroAccess rides are late. From October 30, 2003 until December 20, 2003, Ms. Johnson took twelve MetroAccess rides, 58% of which were late. Five of the 12 rides were more than 30 minutes late and two were more than an hour late. This inability to schedule reliable service requires Ms. Johnson to build a substantial amount of time into any pickup schedule to increase the likelihood that she will obtain service. This typically entails ordering rides substantially before they are needed, in order to increase the likelihood that she will be on time for her appointments even when her MetroAccess ride is significantly late.

77.      Ms. Johnson has also attempted to build extra time into her MetroAccess transportation schedule in order to reduce the possibility that her rides will leave and report her

as a "no show."  For example, on August 23, 2003, Ms. Johnson ordered a ride for 9:45 p.m.,

approximately one hour and fifteen minutes after her inbound train was scheduled to arrive at

Union Station.  She provided this substantial margin just in case the train was delayed.  After she

arrived by train at 8:30 p.m. (on time), she called MetroAccess and received repeated assurances

that her ride was on its way.  At 10:10 p.m., Ms. Johnson eventually resorted to finding alternate

transportation because she was fearful for her safety waiting outside the train station in the dark.

She was later advised that despite her repeated calls to the dispatcher, she had been reported as a

"no-show" because she had given up and left, and therefore was not at Union Station when the

driver finally arrived at 11:22 p.m., over an hour and a half late.

78.      To avoid being counted as a "no show," Ms. Johnson often must wait outdoors for

the MetroAccess vehicle when the service is late.  Because Ms. Johnson's condition is

exacerbated by exposure to extreme weather conditions, including high and low temperatures,

she risks her health each time MetroAccess is late.

### Victoria Smith

79.      Plaintiff Victoria Smith resides in Landover, Maryland, and uses MetroAccess

paratransit every day of the week to commute to and from work, attend church services, shop,

and visit friends.  Ms. Smith is blind, and is therefore a "qualified individual with a disability"

pursuant to 42 U.S.C. § 12131(2).  She has been eligible for paratransit services from

MetroAccess at all times relevant to this Complaint.

80.      Ms. Smith estimates that 50 percent of her MetroAccess rides over the last five

years have been late and that her average waiting time is approximately forty-five minutes to one

hour.  As a result, Ms. Smith has been docked pay by her employer several times for tardiness.

81.     On February 13, 2004, Ms. Smith's ride from work to a social club meeting scheduled for 5:00 p.m. arrived one hour and forty-five minutes late. When Ms. Smith arrived at the location of the meeting at 7:15 p.m., the meeting had concluded. Ms. Smith had to schedule another MetroAccess ride home because her return trip had already left before she arrived.

82.     Ms. Smith often experiences problems with drivers who pull up near her apartment complex but do not inform her of their arrival. Because she is blind, Ms. Smith needs to be informed when a ride is pulling up for her. For visually impaired riders, MetroAccess drivers are required to blow the vehicle's horn or call the rider to announce their arrival. Many drivers, however, fail to notify Ms. Smith of their presence and then leave without her. In many of these cases, the drivers then erroneously count Ms. Smith as a "no-show."

### Mary Wright

83.     Plaintiff Mary Wright resides in Bowie, Maryland, and uses MetroAccess to commute to and from work, medical appointments, shopping, church, and social visits with friends. Ms. Wright is legally blind, and is therefore a "qualified individual with a disability" pursuant to 42 U.S.C. § 12131(2). She has been eligible for paratransit services from MetroAccess at all times relevant to this Complaint.

84.     Ms. Wright's place of employment is located about a 25 minute drive from her home. Despite this relatively short distance, Ms. Wright is consistently forced to wait an unreasonable and often unpredictable period of time for a MetroAccess vehicle. Although Ms. Wright could leave her house a half hour before she must arrive at work if she could depend on reliable transportation services, she is forced to schedule her morning pickup time two hours early to allow for MetroAccess's consistent lateness.

85.     Ms. Wright's MetroAccess rides often require her to travel substantially out of her way, so that drivers can pick up passengers from locations that are far from her route.  Ms. Wright has been advised that this is because drivers often have multiple pickups scheduled for the same time for people who live a great distance from one another.  Regardless of whether such far-flung routes occur by design or neglect, the failure to schedule rides along realistic and logical routes frequently results in additional delays to Ms. Wright and the other passengers on her rides.

86.     Because Ms. Wright does not work a consistent schedule, she must schedule each of her trips separately.  To reduce the number of scheduling errors by MetroAccess, she calls to confirm the time and location of each of her rides in advance.  Despite these efforts, the lack of reliable paratransit service has caused Ms. Wright enormous stress about transportation to and from work.  She asks her friends, neighbors and family members to provide her with transportation so that she does not have to endure the interminable delays she experiences when she uses MetroAccess.

87.     Many of Ms. Wright's MetroAccess drivers are rude to her and generally exhibit a lack of professionalism.

### Darnise Henry Bush

88.     Plaintiff Darnise Henry Bush resides in Washington, D.C. and uses MetroAccess paratransit to commute to and from work, shopping, church and other activities.  Ms. Bush is mobility impaired, requiring the use of a cane or scooter, and is therefore a "qualified individual with a disability" pursuant to 42 U.S.C. § 12131(2).  She has been eligible for paratransit services from MetroAccess at all times relevant to this Complaint.

89.     Ms. Bush consistently has found that a significant number of her rides fail to arrive within fifteen minutes of the pickup time assigned by the MetroAccess dispatcher. Between November 1, 2003 and January 13, 2004, Ms. Bush took 40 MetroAccess rides, 38% of which failed to meet applicable standards.  Of the 40 rides, two never arrived, three arrived more than 25 minutes early, two were over two hours late, seven were more than 30 minutes late, and one was approximately 15 minutes late.

90.     Ms. Bush is employed in Washington, D.C. and has a 6:00 p.m. reservation every Monday through Friday for a MetroAccess ride from her place of employment to her home. Even when her 6:00 ride arrives on time, she often waits in the MetroAccess vehicle for 30 to 45 minutes before the vehicle leaves the pickup location so that the same driver can pick up other MetroAccess riders who have scheduled a ride at 6:30 or 6:45 from the same location.

91.     The inconvenience Ms. Bush experiences due to MetroAccess's lack of punctuality is further compounded by her inability to get reliable information from the MetroAccess dispatch office regarding when her ride will arrive.  For example, on October 7, 2003, Ms. Bush called MetroAccess to inquire about a 6:25 a.m. ride to work, which was already approximately a half hour late.  She was told that the driver was late due to heavy traffic and several accidents and was asked to wait a few extra minutes.  After waiting for another thirty minutes, Ms. Bush called and was told that the driver was still running late and asked if she could switch to a MetroAccess taxicab.  Ms. Bush agreed and was told to wait by the phone.  At 7:25 Ms. Bush was told that a taxi was on its way.  At 7:55 Ms. Bush was again instructed to wait by the phone and told that a taxi would be available shortly.  Finally, at 9:10—almost three hours after her original pickup time—Ms. Bush was told that no taxis were available and that

MetroAccess could not provide a pickup time.  At that point, Ms. Bush was forced to cancel her trip and miss a day of work.

92.     When Ms. Bush uses her scooter, the MetroAccess drivers do not have the proper equipment to tie down her scooter inside the vehicle.  The available equipment is designed to tie down manual wheelchairs rather than power scooters.  The MetroAccess drivers ask Ms. Bush to rely on her scooter's brakes to prevent movement within the vehicle during the trip or transfer from the scooter to a seat within the vehicle.  Riding on a scooter in a moving vehicle without the proper restraints is a danger to Ms. Bush's personal safety.

### Dorothy Crawford

93.     Plaintiff Dorothy Crawford resides in Washington, D.C. and uses MetroAccess five days per week to get to and from work.  She has a subscription reservation to pick her up at her home at 7:00 a.m. and at work at 5:30 p.m., Monday through Friday.  Ms. Crawford also uses MetroAccess to get to medical appointments and for errands.  Ms. Crawford has Non-Specific Interstitial Pneumonitis ("NSIP"), a condition that affects her ability to breathe, and she is therefore a "qualified individual with a disability" pursuant to 42 U.S.C. § 12131(2).  She has been eligible for paratransit services from MetroAccess at all times relevant to this Complaint.

94.     On Monday, December 15, 2003 Ms. Crawford waited over an hour outside for her evening pickup from work.  On that evening there was light snow and the temperature reached a low of 28 degrees.  Ms. Crawford's evening MetroAccess ride was over 45 minutes late again on Wednesday, December 17 of the same week.  Ms. Crawford also waited for this ride outside, where the temperature reached a low of 30 degrees.  In neither instance was she informed of MetroAccess's tardiness so that she could wait inside and protect herself from the cold.  Prolonged exposure to the cold and wind (or extreme heat) leads to wheezing, shortness of

breath, and uncontrollable coughing fits in people with NSIP.  These two long waits in the cold, and the proximity of the incidents, caused Ms. Crawford to experience asthma-like symptoms. She was admitted to Providence Hospital for treatment of her symptoms and remained there from Thursday, December 18 until Sunday, December 21, 2003.  The episode was diagnosed as a bronchial spasm and she was instructed by her physician to stay home from work the following week.  Ms. Crawford was hospitalized for four days and missed an entire week of work as a direct result of MetroAccess's late service and failure to provide notice of the driver's lateness.

95.     Ms. Crawford relies on an oxygen tank to ease her breathing.  In September 2003, she ran out of oxygen because her MetroAccess ride was approximately an hour late and unduly long in duration.  Ms. Crawford realized she was running low on oxygen when she boarded the vehicle after the lengthy wait and warned the driver about the situation.  Instead of adjusting his route to drop her off more quickly, the driver continued following his normal schedule.  The ride took approximately 45 minutes (whereas her ride from work to home normally takes 20 minutes) because the driver picked up and dropped off another passenger before taking Ms. Crawford home.  By the time the driver reached Ms. Crawford's destination, her supply of oxygen had run out.  Ms. Crawford experienced difficulty breathing and broke out in coughing fits when she got out of the vehicle and walked up the steps to her apartment.  Ms. Crawford has come close to running out of oxygen on several other occasions in the past year while waiting for MetroAccess, and reasonably fears that she will suffer serious harm if she runs out of oxygen again.

96.     On January 30, 2004, Ms. Crawford's evening ride from work to her home did not arrive until 6:20 p.m., which is 50 minutes late.  When she boarded the vehicle, she asked the driver why he was so late.  The driver indicated that his manifest showed 6:00 as the scheduled pickup time, even though she has a subscription for a 5:30 ride every Monday through Friday.

Ms. Crawford saw the manifest and confirmed that it had erroneously listed 6:00 as her scheduled pickup time. She never received notice of the half hour postponement. On one other occasion in January 2004, Ms. Crawford's reservation time was postponed by a half hour without notice to her.

97.     Ms. Crawford is unable to get accurate information from MetroAccess dispatch about when a MetroAccess vehicle will arrive when her rides are late. On February 6, 2004, when her 7:00 a.m. pickup to take her to work had not arrived by 7:15 a.m., Ms. Crawford called to find out about the status of the ride and was put on hold. She waited on hold for 45 minutes without getting any further information or talking to anyone. At 8:00 she was compelled to hang up and asked a neighbor to take her to work.

98.     The inability to get accurate information about when a vehicle will arrive forces Ms. Crawford to wait outside, exposed to the elements, which is a danger to her health due to her lung condition. Because the building in which she works is not directly adjacent to the curb, Ms. Crawford must wait outside for her ride. On February 6, 2004 her 5:30 p.m. subscription ride did not show up until about 6:50. Ms. Crawford had to wait outside in the cold and rain from 5:30 until 6:50 because MetroAccess did not inform her that her ride would be late, and MetroAccess dispatch told her several times over the phone, erroneously, that the vehicle would be there soon. The low temperature on February 6, 2004 was 26 degrees.

**Mary Williams**

99.     Plaintiff Mary Williams resides in Washington, D.C., and uses MetroAccess to commute to and from work, church, medical appointments, shopping and social engagements. Ms. Williams suffers from lupus, complications from diabetes such as diabetic neuropathy, and chronic obstructive pulmonary disease, and is therefore a "qualified individual with a disability"

pursuant to 42 U.S.C. § 12131(2). She has been eligible for paratransit services from MetroAccess at all times relevant to this Complaint.

100.    Ms. Williams estimates that MetroAccess is approximately one hour late about 15% of the time.

101.    On August 22, 2003, Ms. Williams had non-refundable tickets for a cruise on a boat, for which she had paid in excess of $100. Ms. Williams reserved a MetroAccess ride at 6:00 p.m., one hour in advance of the time she needed to arrive at the pier, which is near her home. Beginning at 6:10 p.m., Ms. Williams called MetroAccess dispatch every ten minutes to find out when a vehicle would arrive. Dispatch kept telling her that the vehicle would be there in 15 minutes. A MetroAccess vehicle finally arrived at 7:00 p.m., one hour late, and Ms. Williams missed the cruise. Had MetroAccess truthfully informed Ms. Williams that her ride would be one hour late, she could have arranged to take a taxicab and would not have missed the cruise.

102.    On September 11, 2002, Ms. Williams was physically injured in a MetroAccess van operated by the MetroAccess subcontractor Battle Transportation. As Ms. Williams was reaching for her seatbelt and before she was seated in the vehicle, the driver accelerated at a high rate of speed. Due to this dangerous driving, a muscle in her right arm snapped from the tendon and she was treated immediately at Providence Hospital. This injury has resulted in a condition known as "Popeye's Syndrome," which causes her a great deal of pain and prevents her from lifting heavy items with her right hand, which is her dominant hand. Ms. Williams reported the accident immediately to MetroAccess, but when she attempted to report the accident to Battle Transportation, they would not return her calls. As a result, Ms. Williams also filed a claim for this injury with the Washington Area Metropolitan Transit Commission. This resulted in a

phone call from Battle Transportation's insurance provider, but because the driver denied her version of the facts, her claim was denied.

**Pamela Awkerman**

103.    Plaintiff Pamela Awkerman resides in Falls Church, Virginia, and uses MetroAccess for transportation to work, medical appointments, civic meetings, shopping, and personal engagements.  Ms. Awkerman has low vision, or "tunnel vision," and is therefore a "qualified individual with a disability" pursuant to 42 U.S.C. § 12131(2).  She has been eligible for paratransit services from MetroAccess at all times relevant to this Complaint.

104.    Ms. Awkerman's place of employment is located within Falls Church and she relies on MetroAccess to commute to and from her job on the three days per week she is employed.

105.    Ms. Awkerman has consistently found her MetroAccess rides to be problematic. From October 24, 2003 until December 19, 2003, 15 percent of Ms. Awkerman's rides were late. Of the 34 rides Ms. Awkerman took with MetroAccess during that period, two never arrived, two were more than thirty minutes late, and one arrived more than 25 minutes early.  These untimely rides require Ms. Awkerman to wait for an extended period of time, make costly alternative last-minute travel arrangements, or simply abandon her social and professional obligations.  Because of the chronic lateness of her rides, Ms. Awkerman schedules her rides to arrive well in advance of the time she would if the service were reliable.

106.    These transportation "options" are made even more difficult given Ms. Awkerman's inability to get reliable information from the MetroAccess dispatcher as to when her ride will actually arrive.  For example, on July 23, 2003, Ms. Awkerman attempted to make plans to leave a restaurant with several friends who live near her home and also rely on

MetroAccess for transportation.  After being advised that she would have to wait for a separate vehicle that would be arriving within minutes, Ms. Awkerman was repeatedly given progressively later estimated times of arrival, and was eventually picked up over an hour and a half late.  This required Ms. Awkerman to wait outside the closed restaurant in the dark and the rain, fearing for her personal safety.

107.    The inability to obtain reliable service is particularly egregious when Ms. Awkerman is required to wait hours on end for rides that are needed to transport her over relatively short distances.  Because of these scheduling nightmares, she either waits hours beyond the agreed upon pickup time, thereby missing her engagement, or she attempts to walk the route at grave danger to her safety.

108.    Ms. Awkerman's complete inability to plan for when she might actually arrive at work or other appointments is also compounded by MetroAccess's attempt to pick up other passengers who are located far from her pick up or drop off points.  Such circuitous routes frequently transform a twenty-minute ride into a two-hour search for additional MetroAccess passengers.

**Edward Mcentee**

109.    Plaintiff Edward McEntee resides in Fairfax County, Virginia and uses MetroAccess for transportation to and from his job in Arlington, Virginia, and also for medical appointments, social engagements and errands.  Mr. McEntee is mobility impaired, requiring the use of a wheelchair, and is therefore a "qualified individual with a disability" pursuant to 42 U.S.C. § 12131(2).  He has been eligible for paratransit services from MetroAccess at all times relevant to this Complaint.

110.    From November 7, 2003 until January 12, 2004, Mr. McEntee took 82 MetroAccess rides, 28 percent of which were late or never arrived.  Of the 82 rides, five were more than 15 minutes late, nine were more than 30 minutes late, five were more than an hour late, two were more than 25 minutes early, and two never arrived.

111.    On October 23, 2003, Mr. McEntee had a ride scheduled for 7:45 a.m. to take him to work.  When the ride did not appear, Mr. McEntee called MetroAccess to find out which carrier had been assigned to his ride and was told that Red Top Cab was scheduled to pick him up.  He called the Red Top Cab dispatch directly and was told Red Top Cab had no record of his trip.  Mr. McEntee had to ask MetroAccess to fax a ride request to Red Top before Red Top could send out a vehicle.  The cab did not arrive until 8:45, an hour after the ride was scheduled.  The same scheduling error occurred on October 24, 2003, the very next day.

112.    On October 31, 2003, MetroAccess was scheduled to pick up Mr. McEntee at 9:15 a.m. to take him to a dentist appointment.  When the vehicle did not show up, Mr. McEntee called MetroAccess to inquire about the status of his ride and was told that the driver had arrived and left.  Mr. McEntee's wife had to drive him to his appointment instead so that he would not incur the dentist's fee for canceling without prior notice.  A return trip with MetroAccess was scheduled for 11:15 a.m., but when Mr. McEntee inquired about its status, MetroAccess dispatch stated that it had not sent a vehicle for this ride.  MetroAccess dispatch stated that it had recorded Mr. McEntee as a "no-show" 45 minutes before the actual pickup time based on the fact that he had missed his earlier MetroAccess ride.  After waiting on hold for an hour and a half, Mr. McEntee was told that a van would be there to pick him up at 12:05 p.m.  A vehicle did not arrive until 12:40.  MetroAccess's mistakes and tardiness resulted in Mr. McEntee's need to abandon the rest of his errands scheduled for the afternoon.  Accordingly, he had to cancel

another MetroAccess trip he had scheduled for later in the afternoon.  Rather than recognizing their errors, MetroAccess penalized Mr. McEntee for canceling his final reservation for that day. Thus, in a single day, Mr. McEntee was charged with two strikes towards revocation of his MetroAccess eligibility under MetroAccess's "No Show/Late Cancellation Policy."  Both violations were the direct result of MetroAccess's own actions.

### Michelle Vadnais

113.    Plaintiff Michelle Vadnais resides in Reston, Virginia, and uses MetroAccess for transportation to and from work.  Ms. Vadnais has cerebral palsy and is mobility impaired, and is therefore a "qualified individual with a disability" pursuant to 42 U.S.C. § 12131(2).  She has been eligible for paratransit services from MetroAccess at all times relevant to this Complaint.

114.    Ms. Vadnais is employed in Reston, Virginia, three days per week.  Ms. Vadnais has found that a substantial number of her rides either arrive substantially early, fail to arrive within the fifteen minute allowable window of the scheduled pickup time, or simply never show up.  For example, between September 29, 2003 and November 4, 2003, Ms. Vadnais took 15 rides, 40 percent of which were late or "no shows."  Of the 15 rides she took during that period, three never arrived and three were more than 15 minutes late.  On February 16, 2004, the MetroAccess ride Ms. Vadnais had scheduled for 9:00 a.m. arrived at 8:10 a.m.  Ms. Vadnais was forced to take the ride 50 minutes early because the vehicle would not wait until the correct time and MetroAccess would not send another vehicle.  The unpredictability of her rides are particularly frustrating because her job is only a five-minute drive from her home.  The lack of reliable paratransit service has caused Ms. Vadnais emotional stress.

115.    Because her work schedule is not flexible, Ms. Vadnais does not have the option of waiting for extended periods of time for her MetroAccess ride.  For example, on September

24, 2003, when MetroAccess did not arrive on time, Ms. Vadnais called the dispatch office to find out the status of her ride. She was informed that a vehicle would be there shortly. After twenty more minutes, Ms. Vadnais called MetroAccess dispatch again and was told that she was a "no-show." When Ms. Vadnais asked to speak to a supervisor, she was placed on hold and then disconnected. Ms. Vadnais had to take a taxi to work at her own expense. Ms. Vadnais's need to substitute taxi service for her MetroAccess ride on a regular basis is costly and is therefore not a realistic solution.

116.    Ms. Vadnais's need to rely routinely on a private cab service to get to work on time has resulted in numerous drivers reporting that she is a "no show" when they finally arrive late to pick her up. While Ms. Vadnais appreciates the need to keep track of MetroAccess customers (and drivers) who fail to show up for rides, the practice of shifting and misrepresenting scheduled arrival times and punishing customers who can no longer wait for a late ride by counting them as "no shows" completely misrepresents reality and attempts to shift the blame for MetroAccess's inability to provide timely service to the riders. Ms. Vadnais fears that these incidents will cause MetroAccess to cancel her eligibility under its "No Show/Late Cancellation" policy.

## CLAIMS

### First Claim For Relief

(Violations of the Americans with Disabilities Act)

117.    Plaintiffs reallege and incorporate by reference all facts set forth in the previous paragraphs, and further allege:

118.    At all relevant times, named and class Plaintiffs are and have been "qualified individuals with a disability" within the protection of Title II of the ADA, 42 U.S.C. § 12131.

119.    Defendant has discriminated against the named and class Plaintiffs in violation of Title II of the ADA, 42 U.S.C. 12143(a), by failing to provide transportation services to individuals with disabilities, including individuals who are mobility impaired, that are sufficient to provide these individuals a level of service that is comparable to the level of designated public transportation services provided to individuals without disabilities.

120.    Defendant is a "public entity" under Title II of the ADA.  MetroAccess is a program or activity of a public entity.

121.    Defendant has unlawfully failed to meet required service criteria for their complementary paratransit system. 49 C.F.R. § 37.131.  Specifically, Defendant has permitted an operational pattern and practice that significantly limits service to ADA paratransit-eligible persons.  49 C.F.R. § 37.131(f)(3).

122.    Defendant has engaged in a continuing and pervasive pattern and practice that have caused substantial numbers of untimely pickups for initial and return trips and substantial numbers of trip denials or missed trips.  49 C.F.R. § 37.131(f)(3).  These violations of the ADA and its implementing regulations are also evidenced by:  unreasonably lengthy and circuitous trips; a significant number of driver "no-shows" resulting in missed trips; discourteous telephone reservation service; inadequate telephone coverage and connections, including failure to answer the telephone, placing callers on hold for excessively long periods, and dropped calls; failing to provide accurate information about the location of assigned vehicles; failing to respond to complaints and requests for information; dangerous driving; discourteous drivers insensitive to the needs of disabled riders; recording a large number of "false no-shows"; flawed implementation and enforcement of the "No-Show/Late Cancellation Policy"; failing to announce the arrival of the vehicle to visually-impaired riders; creating health hazards caused by

exposure to the elements due to late pickups and erroneous ride status information; failing to adequately train drivers regarding the need and method for restraining wheelchairs and scooters inside the MetroAccess vehicle; failing to equip vehicles with adequate heat and air conditioning systems, scooter restraints, and operational wheelchair lifts; and other operational problems within the control of WMATA.

123.    Defendant has denied named and class Plaintiffs equal participation in its transportation system because of their disabilities, denied Plaintiffs the benefits of the services, programs, and activities of WMATA because of their disabilities, and discriminated against Plaintiffs because of their disabilities.

124.    Defendant's failure to provide named and class Plaintiffs with equal, meaningful access to the benefits of the facilities, programs, services, and activities of WMATA violates the ADA, 42 U.S.C. § 12131, *et seq.*, and its implementing regulations, 49 C.F.R. Part 37.

125.    Defendant's acts and omissions constitute ongoing and continuous violations of Title II of the ADA, and, unless restrained and enjoined from doing so, Defendant will continue to violate Title II.  Defendant's act and omissions, unless enjoined, will continue to inflict an immediate threat of irreparable injuries for which named and class Plaintiffs have no adequate remedy at law.

126.    In engaging in the conduct described above, Defendant has either intentionally discriminated against named and class Plaintiffs or been deliberately indifferent to the strong likelihood that the pursuit of its policies would result in violations of federally protected rights.

**Second Claim For Relief**

(Violations of the Rehabilitation Act)

127.    Plaintiffs reallege and incorporate by reference all facts set forth in the previous paragraphs and further allege:

128.    Named and class Plaintiffs are "qualified individual[s] with a disability" under Section 504 of the Rehabilitation Act of 1973.  29 U.S.C. § 794.  They are also "handicapped person[s]" within the meaning of 49 C.F.R. § 27.5.

129.    Defendant operates a "program or activity receiving Federal financial assistance" under Section 504 of the Rehabilitation Act.

130.    Defendant has denied named and class Plaintiffs equal participation in WMATA's transportation services and made their participation unduly burdensome solely by reason of Plaintiffs' disabilities in violation of section 504 of the Rehabilitation Act of 1973 and its implementing regulations.  49 C.F.R. Part 27.

131.    Defendant has denied named and class Plaintiffs the benefits of the service, programs, and activities of its transportation services.

132.    Defendant has subjected named and class Plaintiffs to discrimination solely by reason of their disabilities.

133.    These violations of Section 504 by Defendant establish a claim for declaratory and injunctive relief and compensatory damages against Defendant pursuant to Section 505 of the Rehabilitation Act, 29 U.S.C. § 794a(a)(2).

134.    In engaging in the conduct described above, Defendant has either intentionally discriminated against named and class Plaintiffs or been deliberately indifferent to the strong likelihood that the pursuit of its policies would result in violations of federally protected rights.

**Third Claim For Relief**

(Violations of the Civil Rights Act)

135.    Plaintiffs reallege and incorporate by reference all facts set forth in the previous paragraphs, and further allege:

136.    Defendant's violations of 42 U.S.C. § 12132, *et seq.*, and Section 504 of the Rehabilitation Act, as set forth in Plaintiffs' first and second claims for relief, establish a cause of action under 42 U.S.C. § 1983 for declaratory and injunctive relief and compensatory damages against Defendant.  Specifically, Defendant, acting under color of state law, has violated the rights of the named and class Plaintiffs under the ADA and Section 504 of the Rehabilitation Act.

137.    In engaging in the conduct described above, Defendant has either intentionally discriminated against named and class Plaintiffs or been deliberately indifferent to the strong likelihood that the pursuit of its policies would result in violations of federally protected rights.

**PRAYER FOR RELIEF**

WHEREFORE, named and class Plaintiffs pray for the following relief:

(a)    For a declaratory judgment declaring that Defendant's actions, omissions, policies, and practices violate rights guaranteed to the named and class Plaintiffs under the ADA and Rehabilitation Act;

(b)    For a permanent injunction on behalf of the named and class Plaintiffs ordering Defendant to immediately cease its discrimination and provide individuals with disabilities full, equal and reliable access to the benefits of its facilities, programs, services, and activities;

(c)      For an injunction on behalf of the named and class Plaintiffs ordering Defendant to develop and implement a remedial plan, complying with the requirements of the ADA and Rehabilitation Act, and subject to approval by this Court, ending the unlawful policies, practices, acts, and omissions complained of herein, and to submit this plan to the Court and to the attorneys for Plaintiffs' counsel for their review and approval;

(d)      For the Court to retain jurisdiction during implementation of the plan;

(e)      For compensatory damages to Plaintiffs;

(f)      For Plaintiffs' attorneys fees and costs of this proceeding, pursuant to 42 U.S.C. § 1988, 29 U.S.C. § 794(a), and 42 U.S.C. § 12133; and

(g)      For such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury of all issues triable of right by a jury, pursuant to Federal Rule of Civil Procedure 38(b).

Respectfully submitted,

WILEY REIN & FIELDING LLP

By: _____

Thomas W. Brunner #170480
Todd Bromberg #472554
Alysa B. Wakin #468517
Melissa A. Reed #465456
WILEY REIN & FIELDING LLP
1776 K Street NW
Washington, D.C.  20006
TEL: 202.719.7000
FAX: 202.719.7049

By: _____
     E. Elaine Gardner #271262
     WASHINGTON LAWYERS'
     COMMITTEE FOR CIVIL RIGHTS AND
     URBAN AFFAIRS
     11 Dupont Circle, NW, Suite 400
     Washington, D.C.  20036
     TEL: 202.319.1000
     FAX: 202.319.1010

     Attorneys for Plaintiffs

Dated: March 25, 2004