# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

---

**DISABILITY RIGHTS COUNCIL OF GREATER WASHINGTON, et al.,**

**Plaintiffs,**

**v.**

**WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY, et al.,**

**Defendants.**

---

**Civil Action 04-00498  (HHK)**

## MEMORANDUM OPINION AND ORDER

Before the court are defendants' motion to dismiss plaintiffs' second amended complaint [#69], plaintiffs' Rule 23(c) motion for class certification [#12], defendants' motion to strike plaintiffs' exhibits attached to their reply regarding class certification [#81], and defendants' motion for reconsideration of the magistrate judge's order denying their motion for leave to file a third-party complaint [#91].  Upon consideration of the motions, the oppositions thereto, and the record of the case, the court concludes that (1) the motion to dismiss must be granted in part and denied in part; (2) the motion for class certification should be granted in part and denied in part, (3) the motion to strike should be denied; and (4) defendants' motion for reconsideration should be denied.

## I. BACKGROUND

This case involves a series of challenges to the adequacy of paratransit services provided by defendant Washington Metropolitan Area Transit Authority ("WMATA") to persons with disabilities residing in the Washington, D.C., metropolitan area.  WMATA, a public entity

established by compact between Maryland, Virginia, and the United States Congress (acting

pursuant to its governmental authority over the District of Columbia), operates a fixed-route

transportation system of both bus and rail lines for Washington-area passengers. *Souders*

*v. Wash. Metro. Area Transit Auth.*, 48 F.3d 546, 548 (D.C. Cir. 1995). Defendant Jack Requa

is the acting general manager of WMATA.[1] Title II of the Americans with Disabilities Act of

1990 ("ADA"), 42 U.S.C. § 12101 *et seq.*, requires entities operating such systems to provide

paratransit services to persons with disabilities at "a level of service . . . which is comparable to

the level of . . . services provided to individuals without disabilities." 42 U.S.C. § 12143(a). The

Department of Transportation ("DOT") has also issued regulations outlining requirements for

compliance with the ADA. 49 C.F.R. Part 37.

WMATA complies with these requirements by providing a service called "MetroAccess,"

a shared-ride, curb-to-curb paratransit service. MetroAccess maintains fleets of vehicles that are

dispatched to eligible riders on an appointment basis and delivers them to their requested

destinations. Many operational aspects of the program, including reservations, drivers, and

maintenance, are performed by contractors hired by WMATA. From 2000 to 2006, contract

services were provided by LogistiCare, Inc., and from January 2006 to the present, these services

have been provided by MV Transportation, Inc.

Plaintiffs, including the Disabilities Rights Council of Greater Washington and a number

of paratransit-service-eligible individuals, allege that WMATA has failed to maintain a level of

---

[1] When plaintiffs' second amended complaint was filed, it named Daniel Tangherlini, the
then-interim general manager as a defendant. As Tangherlini has been sued in his official
capacity, by rule he is automatically replaced by his successor for purposes of this litigation.
Fed. R. Civ. P. 25(d)(1). In this memorandum opinion, the court will refer to the defendants
collectively as "WMATA," except in certain circumstances which will be self-evident.

paratransit service comparable to that offered via its fixed-route systems.  Specifically, plaintiffs

allege WMATA has engaged in a variety of "operational patterns or practices" that significantly

limit the availability of paratransit services.  *See* 49 C.F.R. § 37.131(f) (prohibiting such patterns

or practices).  These include frequent missed trip appointments, late trips, excessively long trips,

poor customer service, malfunctioning equipment, discourteous vehicle operators, and

reservation system inadequacies.

The second amended complaint brings claims of disability discrimination pursuant to the

ADA, § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq.* ("Rehabilitation Act"),

and § 1983 of Title 42 of the United States Code, and seeks class certification.  WMATA moves

to dismiss the complaint and also moves to strike exhibits filed in support of plaintiffs' class

certification motion.  Finally, WMATA objects to an order, authored by Magistrate Judge John

M. Facciola, denying its motion for leave to file a third-party complaint against LogistiCare, Inc.

## II.  ANALYSIS

**A.      Defendants' Motion to Dismiss**

**1.      The ADA's Abrogation of WMATA's Purported Sovereign Immunity**

The court turns first to the motion to dismiss.  WMATA's primary argument in support of

dismissal is that though the ADA specifically abrogates the states' sovereign immunity as to

claims that its mandates have been violated, *see* 42 U.S.C. § 12202, that abrogation is invalid as

to the class of claims asserted here.

**a.      General Principles**

As a quasi-public entity, WMATA "partakes of the state sovereign immunity conferred

by the eleventh amendment upon Virginia and Maryland."  *Souders*, 48 F.3d at 548.  Given this

immunity, WMATA may only be sued in this court either if WMATA has waived its immunity

or if Congress (pursuant to its enforcement power under § 5 of the Fourteenth Amendment) has

abrogated that immunity.  *Barbour v. Wash. Metro. Area Transit Auth.*, 374 F.3d 1161, 1163

(D.C. Cir. 2004).[2]

     "Congress' power to enforce the [Fourteenth] Amendment includes the authority both to

remedy and to deter violation of rights guaranteed thereunder by prohibiting a somewhat broader

swath of conduct, including that which is not itself forbidden by the Amendment's text." *Univ. of

Ala. v. Garrett*, 531 U.S. 356, 365 (2001) (internal quotation marks and citation omitted).  Where

Congress acts upon this broad power and enacts "prophylactic legislation" proscribing conduct

that does *not* itself violate the Fourteenth Amendment, that legislation "must exhibit 'congruence

and proportionality between the injury to be prevented or remedied and the means adopted to that

end.'"  *Nev. Dep't of Human Res. v. Hibbs*, 538 U.S. 721, 27–28 (quoting *City of Boerne v.

Flores*, 521 U.S. 507, 520 (1997)).  WMATA argues that the ADA sovereign immunity waiver is

valid only as to any conduct on its part that constituted a violation of plaintiffs' "fundamental"

rights, and does not allow plaintiffs to bring claims for conduct not amounting to such a

violation.  Defs.' Mem. in Supp. of Mot. to Dismiss ("Mot. to Dismiss") at 8–12.

     **b.**     **Arguments Presented by the United States**

     Because the ADA's waiver of sovereign immunity has been called into question, the

United States has intervened in this case for the limited purpose of defending that waiver.  The

---

     [2] The WMATA compact waives WMATA's immunity as to torts committed "in the
conduct of any proprietary function," but preserves immunity for torts "occurring in the
performance of a governmental function."  *See* D.C. Code § 9-922(b) (2001).  Additionally,
WMATA has waived its immunity as to any claims brought pursuant to the Rehabilitation Act by
accepting federal transportation funds.  *Barbour*, 374 F.3d at 1170.

United States argues that (1) the court should not reach the question of the ADA's abrogation of WMATA's sovereign immunity, and (2) the abrogation is valid as to the class of cases, such as this one, implicating public transportation.  As to the former, the United States cites the "fundamental and longstanding principle of judicial restraint [which] requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them," *Lyng v. Northwest Indian Cemetery Protective Ass'n*, 485 U.S. 439, 445 (1988), and argues that the plaintiffs' Rehabilitation Act claims necessarily envelop the plaintiffs' ADA claims, since compliance with the Rehabilitation Act, at least as to WMATA, requires full compliance with the ADA and its regulations.  According to this argument, plaintiffs' ADA claims are entirely duplicative of their Rehabilitation Act claims, the latter of which proscribe the same conduct and offer identical remedies.  Given the duplicative nature of the claims under the two Acts, the United States asserts that the ADA claims simply may be dismissed, thus providing an avenue for the constitutional questions regarding abrogation to be avoided.  As to the latter argument, the United States joins plaintiffs in arguing that where the ADA prophylactically proscribes conduct relating to public transportation which is not prohibited by the text of the Fourteenth Amendment, it manifests the requisite congruence and proportionality between the injuries to be prevented and the means adopted to prevent them.

The court agrees with the United States that it need not — and, as a matter of prudence, should not — address the parties' abrogation-related arguments.  The parties apparently all agree, and the court has not found reason to dispute, that because (1) WMATA has waived its immunity as to plaintiffs' Rehabilitation Act claims, and (2) the DOT regulations governing compliance with the Rehabilitation Act require compliance with all requirements of the ADA (including

those imposed by the applicable DOT regulations), *see* 49 C.F.R. § 27.19 ("Recipients [of federal funding] subject to this part . . . shall comply with all applicable requirements of the Americans with Disabilities Act (ADA) of 1990."), any violations of the ADA by WMATA are necessarily violations of the Rehabilitation Act.  *See Nat'l Latino Media Coal. v. FCC*,  816 F.2d 785, 787–88 (D.C. Cir. 1987) ("A valid legislative rule is binding upon all persons, and on the courts, to the same extent as a congressional statute. When Congress delegates rulemaking authority to an agency, and the agency adopts legislative rules, the agency stands in the place of Congress and makes law.")*.*  Because plaintiffs may enforce these regulations (and thereunder may sue to enforce the ADA), their ADA claims are enveloped by their claims under the Rehabilitation Act.  *See* 29 U.S.C. §§ 794(a), 794a (directing agencies to adopt regulations implementing the Act and authorizing private rights of action); *Alexander v. Sandoval*, 532 U.S. 275, 284 (2001) ("A Congress that intends the statute to be enforced through a private cause of action intends the authoritative interpretation of the statute to be so enforced as well.").  Moreover, the remedies offered by the Rehabilitation Act in the context of this case are identical to those offered by the ADA.  *See* 42 U.S.C. § 12133 (ADA) (incorporating remedies in 29 U.S.C. § 794a (Rehabilitation Act)).  Plaintiffs' ADA claims thus may be fully addressed and remedied via the Rehabilitation Act.  Therefore, the court will dismiss those claims and deem the allegations contained therein as stating substantive ADA claims brought pursuant to the Rehabilitation Act.[3]

---

[3] Given this determination, the court need not address the United States' arguments that (1) WMATA does not in fact enjoy immunity; or that (2) its immunity was statutory in nature and as such was abrogated by the passage of the ADA, not pursuant to Congress's power to enforce the Fourteenth Amendment, but pursuant to its inherent power to revoke the statutory immunity it granted in the first place.

2.      **Standing**

WMATA's second major argument in support of dismissal is that the plaintiffs lack

standing to bring some of their claims.  First, it argues that Plaintiffs's ADA claims fail because

they do not allege any violations of rights the courts have deemed "fundamental" in the context

of Fourteenth Amendment jurisprudence.  Mot. to Dismiss at 8–12.  And, so the argument goes,

Congress's abrogation of sovereign immunity is only valid as to such rights violations.  This

argument is mooted by the court's dismissal of plaintiffs' ADA claims.  Because the full range of

plaintiffs' ADA claims may be addressed via § 504, the court need not consider whether the

alleged violations impinge on fundamental rights.  The identification of rights as fundamental is

only relevant here to the question of the ADA's abrogation of WMATA's sovereign immunity —

a question the court need not consider.

Second, WMATA argues that plaintiffs lack standing because many of the alleged

wrongs about which they complain do not constitute violations of the ADA.  Specifically,

WMATA argues that though plaintiffs complain about "[d]iscourteous drivers, frustrating

treatment by telephone operators, poorly functioning air conditioning and heating controls, and

exposure to the elements," such complaints cannot possibly fall within the scope of the ADA

because they represent matters not governed by DOT regulations.  *Id.* at 15–16.  In WMATA's

view, such complaints are to be distinguished from complaints regarding untimely pickups,

missed trips, or trips of excessive length.  Only these complaints, it argues, are subjects of DOT

regulation and therefore only they may give rise to civil actions under the ADA.

### a.      Whether the Court Should Address WMATA's Standing Arguments Before or After Addressing Class Certification

Before turning to this argument, the court must determine whether to address it prior to or after addressing plaintiffs' motion to certify the proposed class.  In the class action context, the Supreme Court has directed courts to address certain issues of standing *after* certifying (or denying certification of) classes: in *Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997), the Court observed that class certification questions were "logically antecedent" to, and should be addressed before, questions of class standing "which would not exist but for the class action certification."  *Id.* at 612; *see also Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 831 (1999) (citing *Amchem*).  This statement has caused some confusion among the courts, which have struggled to determine how broadly and in what circumstances to delay addressing standing in the class action context.  *See generally* Linda S. Mullenix, *Standing and Other Dispositive Motions After* *Amchem* and *Ortiz: The Problem of "Logically Antecedent" Inquiries*, 2004 Mich. St. L. Rev. 703 (2004) (collecting cases).

This appears to be a question of first impression in this jurisdiction.  In assessing it, the court finds two decisions of the Seventh and Fifth Circuits to be instructive.  The Seventh Circuit has described the statements of *Amchem* and *Ortiz* simply to speak to "the long-standing rule that, once a class is properly certified, statutory and Article III standing requirements must be assessed with reference to the class as a whole, not simply with reference to the individual named plaintiffs."  *Payton v. County of Kane*, 308 F.3d 673, 680 (7th Cir. 2002).  Similarly, the Fifth Circuit has described the Supreme Court's statements as articulating a "limited exception" to the general principle that standing should be assessed before certification, applicable only where the

standing issue would not exist if the complaint were filed as an individual action. *Rivera v. Wyeth-Averst Labs.*, 283 F.3d 315, 319 n.6 (5th Cir. 2002).  Put differently, "the *Ortiz* exception treating class certification as the antecedent consideration does *not* apply if the standing issue would exist regardless of whether the name plaintiff filed his claim alone or as part of a class." *Clark v. McDonald's Corp.*, 213 F.R.D. 198, 204 (D.N.J. 2003) (citing *Ford v. NYLCare Health Plans of Gulf Coast, Inc.*, 301 F.3d 329, 333 n.2 (5th Cir. 2002) (citing *Rivera*, 283 F.3d at 319 n.6)).  The court agrees with the approach of these decisions.  The standing issues raised by WMATA here do not fall within the *Ortiz* exception.   Whether the class is certified will have no bearing on WMATA's argument that the ADA regulations only govern missed, lengthy or untimely paratransit trips, and the question of standing would apply to the individual plaintiffs or to the proposed class of plaintiffs equally.  The court may therefore address WMATA's standing arguments prior to addressing class certification.

### b.       Requirements for Establishing Standing

The party invoking federal jurisdiction bears the burden of demonstrating standing. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).  To establish standing under Article III, a plaintiff must establish (1) that the plaintiff suffered an "injury in fact;" (2) that the injury is "fairly . . . trace[able] to the challenged action of the defendant;" and (3) that the injury will "likely" be "redressed by a favorable decision." *Id.* at 560–61 (citations and internal quotation marks omitted); *see also Animal Legal Defense Fund, Inc. v. Glickman*, 154 F.3d 426, 431 (D.C. Cir. 1998) (en banc).  To qualify as an injury in fact, the interest harmed must be concrete, particularized, and actual or imminent. *Lujan*, 504 U.S. at 560.  Because standing is "an indispensable part of the plaintiff's case, each element must be supported in the same way as any

9

other matter upon which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Id.* at 561.  Thus, "[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss, 'we presum[e] that general allegations embrace those specific facts that are necessary to support the claim.'" *Ibid.* (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 889 (1990)).  As a result, the plaintiff need only allege facts that "demonstrate a realistic danger of [the plaintiff's] sustaining a direct injury."  *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979).  As long as the plaintiff can allege facts that, if true, would result in a cognizable injury, the court should not dismiss the complaint for lack of standing.

### c.     Case Law Regarding The Injury-in-Fact Aspect of the Standing Inquiry

WMATA concedes that plaintiffs have satisfied the causation and redressability aspects of the Article III standing inquiry, and it does not argue that plaintiffs have failed to allege concrete and particularized injuries.  It argues only that plaintiffs have not shown injury-in-fact as to some of the harms they allege because those injuries are not "legally protected."  In making this argument, WMATA relies principally on *Claybrook v. Slater*, 111 F.3d 904 (D.C. Cir. 1997), in which the D.C. Circuit stated that " if the plaintiff's claim has no foundation in law, he has no legally protected interest and thus no standing to sue."  *Id.* at 907.  This statement includes two phrases that warrant careful inquiry: "legally protected interest" and "no foundation in law."

### (i)   "Legally Protected Interest"

As Judge Williams recently noted, the phrase "legally protected," as used in the standing

context, is both puzzling and potentially misleading.  *Judicial Watch, Inc. v. U.S. Senate*, 432

F.3d 359, 363–66 (D.C. Cir. 2005) (Williams, J., concurring).  The phrase has been used

inconsistently by the Supreme Court since its appearance in *Lujan*, *id.* at 363 (noting that only

two post-*Lujan* cases apply the phrase, while two restate the injury-in-fact test without using the

words "legally protected"), and as the D.C. Circuit has observed, "the *Lujan* Court itself found an

interest 'cognizable' for standing purposes (the desire to observe an animal species, even if

purely for aesthetic purposes) with no discussion of any support in any positive law," *id.* (citing

*Claybrook*, 111 F.3d at 907 (citing *Lujan*, 504 U.S. at 562–63)).[4]

Furthermore, as Judge Williams observed in *Judicial Watch*, "the use of the phrase

'legally protected' to require showing of a substantive right would thwart a major function of

standing doctrine — to avoid premature judicial involvement in resolution of issues on the

merits."  *Id.* at 364.  For this reason, the courts have rejected attempts (such as that made by

WMATA here) to require plaintiffs to show that their claims are legally meritorious in order to

---

[4] Moreover, Judge Williams wrote, "the cases that *Lujan* itself purports to recapitulate . . . seem to demand only that the injury be 'cognizable.'" 432 F.3d at 363 (citing *Allen v. Wright*, 468 U.S. 737, 755–56 (1984) ("stigmatic injury" of racial discrimination "not judicially cognizable"); *Warth v. Seldin*, 422 U.S. 490, 514 (1975) ("judicially cognizable injury"); *Sierra Club v. Morton*, 405 U.S. 727, 740 (1972) (the injury-in-fact requirement does not "prevent any public interests from being protected through the judicial process")).  Judge Williams also observed that "the Court appears to use the 'legally protected' and 'judicially cognizable' language interchangeably."  *Id.* (citing *Bennett v. Spear*, 520 U.S. 154, 167 (1997) (substituting "judicially cognizable" for "legally protected" in articulating the standard from *Lujan*); *Raines v. Byrd*, 521 U.S. 811, 820 (1997) (describing inquiry as whether the injury is "personal, particularized, concrete, and otherwise judicially cognizable"); *United States v. Hays*, 515 U.S. 737, 746 (1995) (finding injury not "cognizable")).

demonstrate that they have standing.  In *Data Processing Service Organizations, Inc. v. Camp*, 397 U.S. 150 (1970), for example, the Supreme Court rejected the notion that to establish standing, a plaintiff must allege an invasion of a "legal right."  A court should ask not whether a "legal right" was invaded, the Court observed, but rather whether the plaintiff has suffered an "injury in fact" — i.e., an injury to an interest, rather than to a "right" — and, where alleged statutory rights are involved, whether the interest the plaintiff seeks to protect is within the "zone of interests" protected or regulated by the statute in question.  *Id.* at 153; *see also Elk Grove Unified School Dist. v. Newdow*, 542 U.S. 1, 12 (2004).  The Court reasoned that an inquiry into the existence of a legal right "goes to the merits," and that "[t]he question of standing is different."  397 U.S. at 153.  Likewise, the D.C. Circuit has recently held that if phrase "legally protected" allowed for the consideration of legal arguments, courts "would effectually be deciding the merits under the guise of determining the plaintiff's standing."  *Info. Handling Servs., Inc. v. Defense Automated Printing Servs.*, 338 F.3d 1024, 1030 (D.C. Cir. 2003).

### (ii)    "No Foundation in Law"

The phrase "no foundation in law" likewise could be misused.  WMATA equates the phrase with simply being wrong as a matter of law.  *Claybrook* does not support such a reading.  First, in *Claybrook*, the D.C. Circuit observed that "[w]hether a plaintiff has a legally protected interest (and thus standing) does not depend on whether he can demonstrate that he will succeed on the merits.  Otherwise, every unsuccessful plaintiff will have lacked standing in the first place."  111 F.3d at 907.  Unsurprisingly, then, the holding in *Claybrook* was not that the plaintiffs had the law wrong, but rather that the plaintiff lacked standing because the particular

question he presented was committed to agency discretion, and therefore the court was "left with

no law to apply to Claybrook's claims." 111 F.3d at 909.[5]

Moreover, WMATA's broad reading of *Claybrook*'s "no foundation" language runs

contrary to the approach articulated in later decisions by the D.C. Circuit.  In these cases, the

court has inquired not whether plaintiffs' legal interpretations are *correct*, but rather whether they

are *frivolous*.  *See Louisiana Energy and Power Auth. v. FERC*, 141 F.3d 364, 368 (D.C. Cir.

1998) ("To be sure, claims that are 'entirely frivolous' or have 'no foundation in law' are

insufficient to establish standing.  LEPA's allegations, however, cannot be characterized as

frivolous, and FERC does not suggest otherwise." (citing *Steel Co. v. Citizens for a Better Env't*,

523 U.S. 83, 97 n.2 (1998); *Claybrook*, 111 F.3d at 907)); *Info. Handling Servs.*, 338 F.3d at

1030 ("[A] plaintiff's non-frivolous contention regarding the meaning of a statute must be taken

as correct for purposes of standing.").  The court has established this standard for the same

reason that animated (1) the rejection of the "legal interest" standard in *Data Processing*, and

(2) the court's narrow interpretation of the phrase "legally protected interest" in *Information

Handling Services*: a court applying a more rigorous inquiry "would effectively be deciding the

merits under the guise of determining the plaintiff's standing." 338 F.3d at 1030.

### c.    Application

With these guiding principles in mind, the court concludes that plaintiffs have standing to

bring their claims.  WMATA's argument, essentially, is that the ADA regulations only prohibit a

transit provider from creating "capacity constraints," and say nothing about — and therefore do

---

[5]  In this case, the court does have law to apply.  *See* 42 U.S.C. § 12143;
49 C.F.R. § 37.131.

not prohibit — some of the harms alleged in the complaint, including rude customer service, inadequate telephone reservation service, failure to respond to complaints, dangerous driving, and "false no-shows."  2nd Am. Compl. ¶ 139.

Title II of the ADA requires operators of fixed-route public transportation systems to provide paratransit services:

> that are sufficient to provide to such individuals a level of service (1) which is comparable to the level of designated public transportation services provided to individuals without disabilities using such system; or (2) in the case of response time, which is comparable, to the extent practicable, to the level of designated public transportation services provided to individuals without disabilities using such system.

42 U.S.C. § 12143.  Comparability is the key component of the statute's requirements, and DOT regulations set forth the service criteria for determining whether a paratransit system satisfies this requirement.  *See* 49 C.F.R. § 37.131(f); *see also id.* § 37.121(b) (comparability to be measured by compliance with regulations setting forth paratransit requirements).  The paratransit services must be comparable in a number of areas, including geographic areas, response time, fares, trip restrictions, hours and days of service, and "capacity constraints."  *Id.* § 37.131.  Both sides focus their attention on the "capacity constraints" requirements.  Subsection 37.131(f), which deals with these constraints, prohibits any of the following:

(1) Restrictions on the number of trips an individual will be provided;

(2) Waiting lists for access to the service; or

(3) Any operational pattern or practice that significantly limits the availability of service to ADA paratransit eligible persons.

    (i) Such patterns or practices include, but are not limited to, the following:

        (A) Substantial numbers of significantly untimely pickups for initial or return trips;

(B) Substantial numbers of trip denials or missed trips;

(C) Substantial numbers of trips with excessive trip lengths.

*Id.* § 37.131(f).[6]

WMATA argues that this subsection definitively limits the types of "patterns or practices" about which plaintiffs can complain in this suit.  In WMATA's view, because the regulations only prohibit those patterns or practices enumerated in subsections (3)(i)(A) through (3)(i)(C), any other patterns or practices inherently are *not* prohibited.  And because those practices are not prohibited in the regulations, there is no law to apply, and standing is lacking under *Claybrook*.

Plaintiffs, in contrast, read Title II and the applicable DOT regulation to encompass their claims.  This reading is not frivolous, and plaintiffs therefore have standing to sue.  *Info. Handling Servs.*, 338 F.3d at 1030.  As plaintiffs point out, the plain language of the regulation arguably contradicts WMATA's arguments.  First, the regulation prohibits "*[a]ny* operational pattern or practice that significantly limits the availability of service."  49 C.F.R. § 37.131(f)(3) (emphasis added).  Moreover, subsection (3)(i), which articulates the examples of impermissible patterns or practices on which WMATA rests its argument, notes that impermissible patterns or practices "include, but are not limited to" the examples it sets forth.  *Id.* § 37.131(f)(3)(i). Finally, while the regulation describes *prohibited* practices in these expansive terms, it *excludes* from the class of prohibited patterns a narrow set of "operational problems" which includes *only* those problems "attributable to causes beyond the control of the entity."  *Id.* § 37.131(f)(ii).

---

[6]  A pattern or practice violation is elsewhere defined as "regular, or repeated actions, not isolated, accidental, or singular incidents." 49 C.F.R. pt. 37, App. D, at 578 (2005).

Under plaintiffs' colorable reading, the DOT regulation contemplates an expansive variety of impermissible patterns or practices, not limited to those articulated by the regulation itself. This expansive language manifests an intent to focus on the impact on the users of the system, not on any particular list of prohibited conduct. "[A]vailability of service" is the animating principle, and "any pattern or practice" that significantly limits that availability constitutes a violation of Title II. 49 C.F.R. § 37.131(f).

The Appendix to the DOT regulations underscores this interpretation of § 37.131. It reiterates the prohibition against "*any* operational pattern or practice that significantly limits the availability of service." 49 C.F.R. Part 37, App. D, at 578 (emphasis added). It also emphasizes that the list of capacity constraint problems appearing in subsections (3)(i)(A) through (3)(i)(C) "is not exhaustive," and cites numerous examples of patterns and practices that could either directly or indirectly result in a significant limitation on the availability of service. *Id.* at 579.

The court concludes with little trouble that plaintiffs' reading of Title II to prohibit the patterns or practices alleged by plaintiffs, including rude customer service, inadequate telephone reservation service, failure to respond to complaints, dangerous driving, "false no-shows," untimely pick-ups, missed trips, and denied trips, is not frivolous. *See Martin v. Metro. Atlanta Rapid Transit Auth.*, 225 F. Supp. 2d 1362, 1380–81 (N.D. Ga. 2002) (on review of a motion for a preliminary injunction, holding that plaintiffs alleging patterns of unreliable reservations systems, excessive telephone hold times, false no-shows, and discourteous treatment were substantially likely to succeed at showing violations of § 37.131(f)). WMATA's argument that plaintiffs do not have standing is therefore rejected.

16

### 3.     The "Primary Jurisdiction" Doctrine

WMATA next argues that the questions presented by plaintiffs' claims lie within the primary jurisdiction of the Federal Transit Administration.  The primary jurisdiction doctrine applies where a court has jurisdiction over a claim or set of claims, but adjudication of those claims "requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body; in such a case the judicial process is suspended pending referral of such issues to the administrative body for its views." *United States v. W. Pac. R. Co.*, 352 U.S. 59, 63–64 (1956).  The doctrine may be invoked and the matter may be referred to an administrative agency when the agency is "best suited to make the initial decision on the issues in dispute, even though the district court has subject-matter jurisdiction." *Am. Ass'n of Cruise Passengers v. Cunard Line, Ltd.*, 31 F.3d 1184, 1186 (D.C. Cir. 1994).  Dismissal is not required.  Rather, the court may "suspend the matter pending agency resolution." *Lipton v. MCI Worldcom, Inc.*, 135 F. Supp. 2d 182, 190 (D.D.C. 2001).  The doctrine should be invoked sparingly.  *United States v. McDonnell Douglas Corp.*, 751 F.2d 220, 224 (8th Cir. 1984).

There is "no fixed formula" for application of the primary jurisdiction doctrine.  *W. Pac. R. Co.*, 352 U.S. at 64.  This court has generally considered four factors: "(1) whether the issue is within the conventional expertise of judges; (2) whether the issue lies within the agency's discretion or requires the exercise of agency expertise; (3) whether there is a substantial danger of inconsistent rulings; and (4) whether a prior application to the agency has been made." *APCC Servs., Inc. v. WorldCom, Inc.*, 305 F. Supp. 2d 1, 13 (D.D.C. 2001).

The central question that WMATA argues the court should not address is whether various patterns or practices not matching those enumerated in the DOT regulation governing capacity constraints (untimely pickups, denials or missed trips, excessive trip lengths) constitute patterns or practices that "significantly [limit] the availability of service to ADA paratransit eligible persons." 49 C.F.R. § 37.131(f)(3). WMATA argues that when DOT promulgated its regulation prohibiting such practices, and in that regulation stated that such practices "include, but are not limited to" missed trips, untimely pickups, and excessive trip lengths, the agency functionally reserved determination of which unenumerated practices fall within the ambit of the "include, but not limited to" language to itself.

The court declines to apply the doctrine. First, the court disagrees with WMATA regarding the implication of the regulatory language. Rather than manifesting a reservation of issues to the agency, the court reads the "include, but not limited to" and "any operational pattern or practice" language as manifesting agency intent that the regulations be read and applied both broadly and *without* agency involvement. Second, application of the factors this court has traditionally considered favors the court's retention of the claims. Whether or not a practice limits the availability of a public service, particularly when availability is measured from the perspective of the user — as it must be measured here — is a question that can be answered by reference to the knowledge and experience of lay persons, including judges.[7] It requires no

---

[7] Comparability of transit services, the lodestar of compliance with Title II, should not be viewed as a technical construct, to be assessed from the perspective of a technician, administrator, or even a policymaker. The ADA is designed to remedy discrimination against persons with disabilities, and in particular to remedy the harms felt by such persons — to ameliorate the subjective experience of living with disabilities in what has been a historically unaccommodating society. 42 U.S.C. § 12101 (listing the ADA's fundamental purposes and stating Congress's findings regarding the nation's history of discrimination against persons with

particular technical, policy, or administrative expertise.  "[W]hen the agency's position is sufficiently clear or nontechnical . . . courts should be very reluctant to refer . . . .  [Additionally, t]he court must always balance the benefits of seeking the agency's aid with the need to resolve disputes fairly yet as expeditiously as possible."  *Mississippi Power & Light Co. v. United Gas Pipe Line Co.*, 532 F.2d 412, 419 (5th Cir. 1976).  Moreover, this dispute is not currently pending before an administrative body, as plaintiffs have acted within their statutory rights to bring an action before this court.  Finally, the court sees little danger of inconsistent rulings on the questions presented here.  Satisfied that agency expertise is not required to resolve the questions before it, the court sees no need to create further delay by referring this matter for agency resolution.

**4.      Whether Plaintiffs Can Bring Their Claims Under Both § 1983 and the Disability Statutes**

In addition to their ADA and Rehabilitation Act claims, plaintiffs also seek injunctive relief against defendants pursuant to § 1983 of Title 42.  2nd Am. Compl. ¶¶ 153–154.  This count must be dismissed as to WMATA because it is not a "person" and therefore cannot be sued under the statute.  *Lucero-Nelson v. WMATA*, 1 F. Supp. 2d 1, 7–8 (D.D.C. 1998).[8]  As to Requa,

---

disabilities).  It is from the perspective of persons with disabilities, whose interests the Act seeks to serve, that comparability should be measured, and a court is just as capable of assessing comparability from that perspective as is a federal agency.

[8] Plaintiffs apparently concede this point, albeit via an erroneous statement in their opposition that the second amended complaint does not include a § 1983 claim against WMATA. Pls.' Opp'n at 43 n.13; 2nd Am. Compl. ¶ 153 (alleging a cause of action under § 1983 against "Defendants").  Plaintiffs also concede that only injunctive relief is available against Requa, albeit via a similar erroneous statement that the complaint does not seek damages.  Pls.' Opp'n at 43; 2nd Am. Compl. ¶ 153 (seeking compensatory damages and injunctive relief).

he argues that the ADA provides an exclusive remedy for violations thereof, therefore precluding § 1983 claims against him.

Claims under § 1983 are "generally and presumptively available . . . for claimed violations of federal law." *Livadas v. Bradshaw*, 512 U.S. 107, 133 (1994).  Such claims may be precluded, however, where Congress either has expressly precluded them or has established, for a given federal law, a "comprehensive enforcement scheme that is incompatible with individual enforcement under § 1983." *Blessing v. Freestone*, 520 U.S. 329, 341 (1997).

A plaintiff suing pursuant to § 1983 bears an initial burden of demonstrating that the federal statute she claims has been violated creates an individually enforceable right.  *Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 120 (2005).  This showing creates a "rebuttable presumption" that the right identified is enforceable under § 1983.  *Blessing*, 520 U.S. at 341. "The defendant may defeat this presumption by demonstrating that Congress did not intend that remedy for a newly created right." *Rancho Palos Verdes*, 544 U.S. at 120.  To do so, the defendant must make "the difficult showing that allowing § 1983 actions to go forward in these circumstances 'would be inconsistent with Congress' carefully tailored scheme.'" *Blessing*, 520 U.S. at 346 (quoting *Golden State Transit Corp. v. Los Angeles*, 493 U.S. 103, 107 (1989)); *see also Wright v. City of Roanoke Redev. & Housing Auth.*, 479 U.S. 418, 423–24 (1987) ("'We do not lightly conclude that Congress intended to preclude reliance on § 1983 as a remedy' for the deprivation of a federally secured right." (quoting *Smith v. Robinson*, 468 U.S. 992, 1012 (1984))).  Whether a defendant can successfully defeat the presumption may depend on whether and in what manner the statute in question provides its own remedies.  The Supreme Court has held that where "an express, private means of redress in the statute" in question exists, an

"ordinary inference" arises "that the remedy provided in the statute is exclusive." *Rancho Palos Verdes*, 544 U.S. at 121–22.  This inference may be overcome by evidence of congressional intent that the remedy not be exclusive. *Ibid.*  "The crucial consideration" in determining whether individual enforcement via § 1983 is available "is what Congress intended." *Id.* at 120 (quoting *Robinson*, 468 U.S. at 1012).  In making this determination, courts "look first, of course, to the statutory language, particularly to the provisions made therein for enforcement and relief.  Then [they] review the legislative history and other traditional aids of statutory interpretation to determine congressional intent." *Middlesex County Sewerage Auth. v. Nat'l Sea Clammers Ass'n*, 453 U.S. 1, 13 (1981).[9]

---

[9]  The opinion of the Court in *Rancho Palos Verdes*, the most recent decision addressing these issues, does not include legislative history as a source to which courts may look to discern Congress's intent.  It says instead that "[o]ur cases have explained that evidence of congressional intent may be found directly in the statute creating the right, or inferred from the statute's creation of a comprehensive enforcement scheme."  544 U.S. at 120.  This statement, however, is made not in the context of answering a question of law, but rather as a review of the holdings of prior cases, including *National Sea Clammers*, which explicitly directs courts to "legislative history and other traditional aids of statutory interpretation" for purposes of this analysis.  453 U.S. at 13.  Later, the Court states that "[t]he ordinary inference that [a judicial] remedy provided in the statute is exclusive can surely be overcome by *textual indication, express or implicit*, that the remedy is to complement, rather than supplant, § 1983."  544 U.S. at 122 (emphasis added).  While the implications of this statement standing alone may be debated (may the inference *only* be overcome by express or implicit "textual indication," or is textual indication one of many ways in which contrary congressional intent may be shown?), any reading of this language as a categorical limitation to "textual indication[s]" of intent (as opposed to extra-textual manifestations of intent, such as legislative history), is undercut by the concurrences in *Rancho Palos Verdes.*  Three Justices joined Justice Breyer, who wrote that "context, not just literal text, will often lead a court to Congress' intent," *id.* at 127–29, and looked to the legislative history of the statute in question to make the intent determination.  Justice Stevens also wrote separately to state that a court must examine "all relevant evidence that sheds light on the intent of the enacting Congress" and that "it is appropriate not only to study the text and structure of the statutory scheme, but also to examine its legislative history."  *Id.* at 129.  A numerical majority of the Court, then, explicitly rejected any implied limitation to "textual indication[s]" of congressional intent, and functionally affirmed the exhortation of *National Sea Clammers* to look not only to the text of a given statute, but also to its legislative history.  The court therefore will

Title II of the ADA does not manifest an intent to preclude use of § 1983 to remedy violations of its mandates.  First, the court determines that the ADA contains an "express private means of redress in the statute itself."  *See Rancho Palos Verdes*, 544 U.S. at 121.[10]  The Act incorporates into its scheme the enforcement provisions of the Rehabilitation Act.  *See* 42 U.S.C. § 12133 (citing 29 U.S.C. § 794a).  In turn, the Rehabilitation Act incorporates the rights and remedies provided in Title VI of the Civil Rights Act of 1964.  29 U.S.C. § 794a(a)(2) (citing 42 U.S.C. §§ 2000d *et seq.*).  And though Title VI does not contain an "express private means of redress in the statute itself" — the private right of action under Title VI  is implied (*see Sandoval*, 532 U.S. at 279–80) — the court may presume that when Congress incorporated Title VI's remedies into the Rehabilitation Act and the ADA, it did so with the intent that these remedies include the private right of action which courts had previously (and consistently) held to exist under Title VI.  *See Cannon v. Univ. of Chicago*, 441 U.S. 677, 696 (1979) (reciting pre-1973 decisions finding an implied private right of action under Title VI, and relying on the existence of those decisions in finding an implied private right of action for violations of Title IX);[11] *Blitz v. Donovan*, 740 F.2d 1241, 1245 (D.C. Cir. 1984) ("Congress is deemed to know the . . . judicial gloss given to certain language and thus adopts the existing interpretation unless it affirmatively acts to change the meaning." (quoting *Florida National Guard v. FLRA*, 699 F.2d 1082, 1087 (11th Cir. 1983))).  The court therefore deems § 12133 as setting forth an "express

---

read *Rancho Palos Verdes* as including no such implied limitation.

[10] That the ADA and the Rehabilitation Acts create individual rights is not disputed.  The burden, therefore, is on Requa to show that Congress did not intend to allow parallel remedies under § 1983.  *Rancho Palos Verdes*, 544 U.S. at 120.

[11] The enforcement provisions of Title IX were patterned after those of Title VI.  *Cannon*, 441 U.S. at 694–96.

private means of redress." Accordingly, an ordinary inference arises that Congress intended for the means of redress in the statute to be exclusive. *Rancho Palos Verdes*, 544 U.S. at 121–22.

The court must next determine whether evidence of Congress's intent, either textual or extratextual, exists that sufficiently overcomes this inference. It does. Section 501(b) of the ADA states: "Nothing in this chapter shall be construed to invalidate or limit the remedies, rights, and procedures of any Federal law . . . that provides greater or equal protection for the rights of individuals with disabilities than are afforded by this chapter." 42 U.S.C. § 12201(b). Also, as plaintiffs point out, the legislative history of the ADA confirms that this provision was intended in part specifically to ensure that remedies under § 1983 were available to redress violations of the Act. The House Judiciary Committee Report states that this section "provides that the ADA does not preempt other applicable or greater protection. For Title II, like Section 504 of the Rehabilitation Act, this includes *remedies available under 42 U.S.C.* [*§*] *1983* and under state law claims." H.R. Rep. No. 101-485, Part III (1990) at 52 (emphasis added); *see also* H.R. Rep. No. 101-485, Part II (1990) at 135 ("[A]ll of the rights, remedies and procedures that are available to people with disabilities under other federal laws . . . are not preempted by this Act.").[12] Given these manifestations of Congressional intent to preserve the availability of remedies under § 1983, the court holds that a private right of action is available under that

---

[12] Plaintiffs also note that when Congress amended the Education for All Handicapped Children Act to overturn the Supreme Court's decision in *Smith v. Robinson* (which held that § 1983 was not available to remedy violations of the EHA), the provision it added was essentially identical to the later-enacted § 501(b) of the ADA, further manifesting Congress's intent that the ADA should not preclude suits under § 1983. *Compare* 20 U.S.C. § 1415(f) *with* 42 U.S.C. § 12201(b).

provision for violations of the ADA, in addition to the right of action arising from the statute itself.

The Rehabilitation Act contains no provision similar to § 501(b) of the ADA.  As noted, § 505 of the Act simply incorporates "[t]he remedies, procedures, and rights set forth in title VI of the Civil Rights Act of 1964" for persons harmed by § 504 violations.  29 U.S.C. § 794a(a)(2).  The legislative history of this provision, which was adopted in 1978, five years after the initial enactment of the Act, is unilluminating.  *See* H.R. Rep. No. 95-1149, at 21, 41 (1978); H.R. Conf. Rep. No. 95-1780 (1978).  Absent any evidence of congressional intent apart from § 505 itself, the court must conclude that the ordinary inference raised by the statute's incorporation of an express private means of redress has not been overcome.  The private right of action provided for by § 505 therefore is exclusive.  Plaintiffs' § 1983 claims, insofar as they allege violations of the Rehabilitation Act, are dismissed.[13]

---

[13] The court observes that the holding that private citizens may sue under § 1983 for ADA violations but *not* for similar violations of the Rehabilitation Act may seem bizarre at first blush, particularly in light of the similarities between (and the interrelatedness of) the two Acts.  The court is constrained, however, by the Rehabilitation Act's silence regarding the exclusivity of its remedies: where Congress spoke in the text and in the legislative history of the ADA regarding the availability of remedies, it said nothing in enacting the Rehabilitation Act enforcement provision.  Accordingly, the available remedies under the two statutes differ.

The court also notes that its holding is contrary to case law decided prior to *Rancho Palos Verdes*, in which courts have properly emphasized the comprehensiveness of the Rehabilitation Act's remedial scheme but, lacking the guidance later provided in *Rancho Palos Verdes*, have not focused on the particular import of the Act's creation of an express private remedy.  *See, e.g.*, *Smith v. Barton*, 914 F.2d 1330, 1333–35 (9th Cir. 1990) (holding that the Rehabilitation Act's remedial scheme is not sufficiently "comprehensive" to manifest congressional intent to preclude § 1983 claims).

Finally, the court is aware that Congress, when it enacted the ADA in 1990, believed that § 1983 *was* available to remedy violations of the Rehabilitation Act.  *See* H.R. Rep. No. 101-485, Part III at 52 ("[L]ike Section 504 of the Rehabilitation Act, [available remedies under the ADA include those] available under 42 U.S.C. 1983 and under state law claims.").  This manifestation of Congress's views in 1990 is of little value, however, for purposes of determining Congress's

B.      **Class Certification**

The court now turns to the question of class certification.  Before addressing the factors to be considered in assessing this question, the court must address two issues raised by WMATA's submissions.  First, WMATA argues that class certification is unnecessary because the class claims may be fully redressed by available injunctive relief.  Second, WMATA moves to strike exhibits filed with plaintiffs' opposing papers.

1.      **The "Necessity Doctrine"**

The first of these arguments relies on a consideration, often cited by courts but not appearing in Rule 23, as to whether class certification is "necessary" in cases involving injunctive claims against the government, given the prospect that any such relief would inure equally to all potential plaintiffs.  The court is unpersuaded by this argument.  As numerous courts have observed, whether certification is "necessary" is not a question Rule 23 directs the courts to consider.  *See Fujishima v. Board of Educ.*, 460 F.2d 1355, 1360 (7th Cir. 1972); *Littlewolf v. Hodel*, 681 F. Supp. 929, 937 (D.D.C. 1988), *judgment aff'd*, 877 F.2d 1058 (D.C. Cir. 1989); *Borowski v. City of Burbank*, 101 F.R.D. 59, 62 (N.D. Ill. 1984).   Indeed, as this court has previously written, "[w]ere class certification inappropriate if 'unnecessary,' it would be inappropriate whenever only injunctive relief is sought, as the proposed relief would apply to all persons, whether class members or not.  Thus, the idea that a class may be certified only if 'necessary' flies in the face of the Federal Rules."  *Littlewolf*, 681 F. Supp. at 937;

---

intent in 1978:  "the pronouncements of a subsequent Congress, here [12] years after the passage of [§ 505], are notoriously unreliable indicators of the intent of Congress at the time of passage, and [courts] give very little weight to such revisionist legislative history."
*Bridgestone/Firestone, Inc. v. Pension Ben. Guar. Corp.*, 892 F.2d 105, 110 n.5 (D.C. Cir. 1989).

*see also* 32B Am. Jur. 2d Fed. Courts § 1964 (2006) (collecting cases and noting numerous

policy reasons against employing a "need" assessment where injunctive relief is sought); 7AA

Wright, Miller & Kane, *Federal Practice and Procedure* § 1785.2 (3d ed. 2006) (discussing the

doctrine).

  Even assuming "necessity" is a valid consideration, the court, in the exercise of its

discretion, declines to apply it here because injunctive relief granted only in favor of the named

plaintiffs may prove inadequate (in comparison to litigation on a class basis) for the other

putative class members.  For example, injunctive relief against WMATA arising from the named

plaintiffs' claims would not likely provide the unnamed class members the benefit of nonmutual

collateral estoppel, whereas estoppel would be available to all members of a successful class.

*See United States v. Mendoza*, 464 U.S. 154, 162 (1984) (nonmutual collateral estoppel

unavailable against the federal government); *Milton S. Kronheim & Co., Inc. v. Dist. of

Columbia*, 91 F.3d 193, 205 (D.C. Cir. 1996) (Silberman, J., concurring) (noting that the rule of

*Mendoza* "may very well apply to the states"); Daniel Tenny, Note, *There Is Always a Need: The

"Necessity Doctrine" and Class Certification Against Government Agencies*, 103 Mich. L. Rev.

1018, 1033–34 (2005).  Nor could the putative class members take advantage of judicial

estoppel, which is generally unavailable as to government litigants.  *New Hampshire v. Maine*,

532 U.S. 742, 755 (2001) ("Ordinarily the doctrine of estoppel or that part of it which precludes

inconsistent positions in judicial proceedings is not applied to states." (quoting *Illinois ex rel.

Gordon v. Campbell*, 329 U.S. 362, 369 (1946)); Tenny, *supra*, at 1036–37.  These enforcement-

related concerns would not be mitigated even were the government to make good on its offer to

stipulate that any injunctive relief would be binding as to all putative class members.  A stipulation is of little value to a person left without means to enforce it.

### 2.      Defendants' Motion to Strike

In its motion to strike, WMATA challenges the submission of various exhibits by plaintiffs with their reply in support of their motion for class certification.  Specifically, WMATA argues that (1) many of the submitted documents are inadmissable under the Federal Rules of Evidence, and that (2) these documents lack either relevance or probative value. Plaintiffs argue that admissibility is not relevant to the Rule 23 class certification inquiry and that the documents are probative.  Plaintiffs are correct.

Evidence need not be admissible at trial in order to be submitted for purposes of a class certification inquiry.  *In re Rand Corp.*, No. 02-8007, 2002 WL 1461810, at *1 (D.C. Cir. July 8, 2002) ("[T]he propriety of a district court's refusal to scrutinize for admissibility and probative value evidence proffered to demonstrate that the requirements of Federal Rule of Civil Procedure 23(a) are satisfied is well-settled." (citing *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177–78 (1974) (a Rule 23 determination is "of necessity . . . not accompanied by the traditional rules and procedures applicable to civil trials)).  Accordingly, the court need not and will not review plaintiffs' submissions for admissibility.  WMATA's argument that the documents lack probative value is likewise misguided.  *In re Rand Corp.*, 2002 WL 1461810, at *1.  To the extent these documents are arguably irrelevant or lacking in probative value, the court will assess them in conjunction with, rather than prior to, its "rigorous analysis" of plaintiffs' class certification claims under Rule 23.  *Gen. Tel. Co. v. Falcon*, 457 U.S. 147, 161 (1982).

### 3.      Plaintiff's Motion for Class Certification

These preliminary questions being settled, the court must now determine whether to certify the class.  As the party moving for class certification, plaintiffs bear the burden of establishing that the requirements set forth in Rule 23 of the Federal Rules of Civil Procedure have been satisfied.  *See Amchem Prods.*, 521 U.S. at 614.  First, plaintiffs must show that they satisfy all four prerequisites of Fed. R. Civ. P. 23(a).  These requirements are: (1) that the class is so numerous that joinder of all members is impracticable; (2) that there are questions of law or fact common to the class; (3) that the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) that the representative parties will fairly and adequately protect the interests of the class.  Fed. R. Civ. P. 23(a).  In addition, plaintiffs also bear the burden to show that the class falls within at least one of the three categories set forth in Rule 23(b), which categories are discussed in detail below.  A district court exercises broad discretion in deciding whether plaintiffs have carried their burden.  *Hartman v. Duffey*, 19 F.3d 1459, 1471 (D.C. Cir. 1994).

The question of class certification is a preliminary question distinct from the merits of the case.  *Eisen*, 417 US at 178.  When "determining the propriety of a class action, the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met."  *Ibid.* (internal quotation omitted).  While courts may not conduct a preliminary inquiry into the merits of a suit in order to determine whether it may be maintained as a class action, *id.* at 177, the court may consider matters beyond the pleadings to ascertain whether the asserted claims or defenses are susceptible of resolution on a class-wide basis, *McCarthy v. Kleindienst*, 741 F.2d 1406, 1413 n.8 (D.C. Cir. 1984).

### a.    Existence of a Class

Although not an explicit requirement under Rule 23, this court has recognized the "common-sense requirement" that plaintiffs establish the existence of a class. *Pigford v. Glickman*, 182 F.R.D. 341, 346 (D.D.C. 1998); *see also Franklin v. Barry*, 909 F. Supp. 21, 30 (D.D.C. 1995). While "not designed to be a particularly stringent test," plaintiffs must at least establish that "'the general outlines of the membership of the class are determinable at the outset of the litigation.'" *Pigford*, 182 F.R.D. at 346 (quoting 7A Wright, Miller & Kane, *supra*, § 1760).

Plaintiffs seek to certify the following class:

> Eligible MetroAccess paratransit riders who are, have been, or will be denied services comparable to the level of service provided to individuals without disabilities who use WMATA's fixed route system.

Pls.' Mem. in Supp. of Mot. to Certify at 3. All class members meeting this definition are individuals with disabilities who by definition meet readily defined eligibility criteria for paratransit services. *Ibid.* (proposed class includes "[e]ligible MetroAccess paratransit riders"); 42 U.S.C. § 12143(c)(1); 49 C.F.R. § 37.123 (establishing eligibility criteria). These well-defined contours render the proposed class sufficiently discrete and identifiable so as to make management of the class administratively feasible.

### b.    Rule 23(a) Requirements

#### (i)    Numerosity

As noted, the first express prerequisite for certification under Rule 23 is that the putative class be so large that joinder of all class members would be impracticable. Fed. R. Civ. P. 23(a)(1). There is no specific threshold that must be surpassed in order to satisfy the numerosity

requirement; rather, each decision turns on the particularized circumstances of the case. *Franklin*, 909 F. Supp. at 30.  That said, courts in this jurisdiction have observed that a class of at least forty members is sufficiently large to meet this requirement.  *Thomas v. Christopher*, 169 F.R.D. 224, 237 (D.D.C. 1996).

WMATA concedes that plaintiffs have met this requirement.  Plaintiffs estimate the size of the proposed class at approximately 12,000 eligible registered MetroAccess riders, plus an unknown number of eligible but unregistered persons.  The numerosity requirement is easily satisfied here.

### (ii)     Commonality

Next, Rule 23(a)(2) requires that there be questions of fact or law common to the class. Fed. R. Civ. P. 23(a)(2).  This rule "does not require commonality on each fact or every issue" of law.  *Franklin*, 909 F. Supp. at 30.  Rather, "[t]he commonality test is met when there is at least one issue, the resolution of which will affect all or a significant number of the putative class members."  *Coleman v. Pension Benefit Guar. Corp.*, 196 F.R.D. 193, 198 (D.D.C. 2000) (internal quotation omitted).  Because the commonality requirement may be satisfied by a single common issue, courts have noted that it is "often easily met."  *In re Vitamins Antitrust Litig.*, 209 F.R.D. 251, 259 (D.D.C. 2002).  Additionally, proposed class actions seeking injunctive and declaratory relief, such as this one, "by their very nature" present common questions of law and fact.  7A Wright, Miller & Kane, *supra*, § 1763.

WMATA argues that plaintiffs have not satisfied either this or the typicality requirement. Its argument draws primarily from cases assessing class eligibility where the plaintiffs have alleged discrimination in violation of federal law.  *See*, *e.g.*, *Falcon*, 457 U.S. 147; *Love v.*

*Johanns*, 439 F.3d 723 (D.C. Cir. 2006).  In such a case, "plaintiffs must make a significant showing to permit the court to infer that members of the class suffered from a common policy of discrimination."  *Hartman*, 19 F.3d at 1472.  Put differently, plaintiffs alleging discrimination against a class must "show (i) discrimination (ii) against a particular group (iii) of which the plaintiff is a member, *plus* (iv) some additional factor that 'permit[s] the court to infer that members of the class suffered from a common policy of discrimination.'" *Love*, 439 F.3d at 728 (quoting *Hartman*, 19 F.3d at 1472).

The reasons for these requirements in the discrimination context are easily seen.  A complaint that one has been discriminated against, such as by being passed over for a promotion or denied a loan, is inherently individualized.  Such a claim is conceptually distinct from a claim that an entity or individual has discriminated against a broad group of people as a class.  *Falcon*, 457 U.S. at 157.  While in a certain sense, discrimination against a member of a group "is by definition class discrimination," *ibid.*, it does not necessarily follow from the existence of a particular act of discrimination by a defendant against one individual, that the same defendant likewise discriminates against others with the same characteristics in a way resulting in a common injury.  There must be, therefore, some showing that the individual discrimination complained of by a plaintiff was likewise suffered by a class of similarly situated persons, as a result either of a defendant's practices or its policies.  *Love*, 439 F.3d at 728.

While this case presents a scenario like the typical discrimination case in many ways, in others it is fundamentally different.  The gravamen of the complaint, under each law allegedly violated here, is that WMATA has failed to provide a comparable paratransit service to its fixed-route services.  This is a universal claim, the metric for which is systemic, rather than specific:

either the *system* provided to the putative class members is comparable, or it is not.  Unlike the typical discrimination claim, the individualized claims are not so much that the plaintiffs have suffered targeted, personalized discrimination, but rather that they have been individually discriminated against via systems-level violations of the ADA (and, derivatively, the Rehabilitation Act and § 1983).  This distinction cautions against following in lockstep the analyses of decisions like *Love* and *Falcon*.  Moreover, the court notes that imposing (at this or at any other stage in this litigation) an obligation that plaintiffs identify a "policy" giving rise to their ADA claims would actually go beyond the ADA's legal requirements for establishing a violation of the Act: under DOT regulations, *any operational pattern or practice* that limits availability of paratransit services, whether resulting from a formal policy or not, constitutes a violation of the Act's comparability requirement.  49 C.F.R. § 37.131(f).

　　As with any proposed class, the key consideration in determining commonality is whether the individual claims present questions of fact or law that are common to the class.  Fed. R. Civ. P. 23(a)(2).  Put differently, commonality is established by "a common issue the resolution of which will advance the litigation,"  *Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 397 (6th Cir. 1998) (cited by *Love*, 439 F.3d at 729–30), but is lacking where the case would "turn on a series of individualized inquiries," *Love*, 439 F.3d at 730.  This case presents a common issue: whether MetroAccess is comparable to WMATA's fixed-route service, as measured by WMATA's compliance with the ADA's prohibition against patterns or practices that "significantly [limit] the availability of service to ADA paratransit eligible persons."  49 C.F.R. § 37.131(f); *see also id.* § 37.121(b) (comparability to be measured by compliance with regulations setting forth paratransit requirements).  Moreover, the resolution of this issue will not involve a series of

individualized inquiries.  Evidence regarding individual experiences with the MetroAccess service will be produced, but that evidence will be assessed in the context of a comprehensive inquiry into WMATA's systems, patterns, and practices.  And, as the plaintiffs seek primarily broad-based injunctive relief, this issue is particularly appropriate for class action litigation.

WMATA makes much of a purported failure on plaintiffs' part to "bridge the gap" between their individual and systemic claims.  Defs.' Opp'n at 14.  In WMATA's view, under *Falcon* and *Love*, plaintiffs are obligated but have failed to make a "significant showing" to bridge this gap, either by expert testimony, statistical evidence, or via direct evidence of flawed policies, that MetroAccess suffered from systemic failures.  *Ibid.*  It argues that plaintiffs failed to show that the individual experiences of the named plaintiffs were manifestations of system-wide inadequate WMATA policies and practices, rather than isolated incidents of poor service.  WMATA's arguments are unpersuasive.  First, for the reasons stated above, the "significant showing" language from the individual-discrimination cases does not squarely apply to this case.  Strictly speaking, there is no gap to bridge here.  Second, WMATA's arguments misrepresent the case law.  Most glaringly, WMATA asserts that plaintiffs cannot rely solely on anecdotal evidence to satisfy the commonality requirement, when, in fact, *Love* specifically rejects this notion.  439 F.3d at 730 ("We hasten to emphasize that we do not hold that anecdotal evidence alone is inherently insufficient to justify class certification.").

Finally, the court is satisfied that even were plaintiffs required to make some extra showing of macro-level inadequacies at MetroAccess, they have done so.  The alleged experiences of the named plaintiffs with frustrating and unreliable services, which experiences have been too frequent and similar to be deemed isolated instances, suggest the existence of

patterns or practices which significantly limit the availability of the MetroAccess service.  Other evidence submitted by the plaintiffs likewise shows the existence of system-wide problems that could, if true and sufficiently pervasive, give rise to violations of the ADA's comparability requirement.  *See*, *e.g.*, Pls.' Ex. A at v-viii, 13, 18, 21–28, 40–41 (Transportation Planning Board Report); B at 2–3 (Metro Electronic Action Document); E (Van Hollen Ltr. to Tangherlini).  In assessing this evidence, the court notes that whether the alleged problems are pervasive enough to establish liability is a question that goes to the merits of the case and is better resolved at a later stage of the litigation process.  *See Eisen*, 417 U.S. at 177–78 ("[I]n determining the propriety of a class action, the question is not whether the . . . plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met.").  For purposes of Rule 23, the court concludes that plaintiffs have adequately shown questions of law and fact which are both common to the class and appropriate for class litigation.

### (iii)   Typicality

The third requirement under Rule 23(a) is that plaintiffs establish that the claims of the class representatives are typical of those of their class. Fed. R. Civ. P. 23(a)(3).  This requirement is intended to ensure that "the class representatives have suffered injuries in the same general fashion as absent class members." *In re Vitamins Antitrust Litig.*, 209 F.R.D. at 260 (internal quotation omitted).  It is satisfied if "each class member's claim arises from the same course of events that led to the claims of the representative parties and each class member makes similar legal arguments to prove the defendant's liability." *Pigford*, 182 F.R.D. at 349 (citing *Baby Neal v. Casey*, 43 F.3d 48, 58 (3d Cir. 1994)).  Courts have liberally construed this

requirement.  *In re Vitamins Antitrust Litig.*, 209 F.R.D. at 260.  Finally, courts have also noted

that "[t]he commonality and typicality requirements of Rule 23(a) tend to merge."  *Falcon*, 457

U.S. at 157 n.13.

Plaintiffs contend that the named plaintiffs' claims are essentially identical to those of the

class, as all claims focus on alleged systemic failures to provide adequate paratransit services.  In

response, WMATA argues that the plaintiffs are diverse, both with regard to their use of

MetroAccess and their individual experiences, and that the named plaintiffs accordingly do not

present typical claims.  The court agrees with plaintiffs.  That the proposed class is diverse says

nothing, in and of itself, about wether the named plaintiffs' claims are typical.  The question is

whether the *claims* are typical.  Here, while the factual claims among various plaintiffs may

differ, the legal theories are all fundamentally the same.  *See Chang v. United States*, 217 F.R.D.

262, 272 (D.D.C. 2003) ("Typicality focuses on the similarity of the legal and remedial theories

behind the claims of named representatives and those of the putative class."); *Neff v. VIA Metro.

Transit Auth.*, 179 F.R.D. 185, 194 (W.D. Tex. 1998) (observing that the typicality assessment

"does not focus as much on the relative strengths of the cases of the named an unnamed plaintiffs

as it does on the similarity of the legal and remedial theories behind their claims") (internal

quotation omitted); *see also Baby Neal*, 43 F.3d at 58 ("[E]ven relatively pronounced factual

differences will generally not preclude a finding of typicality where there is a strong similarity of

legal theories.").  The court does not hesitate to conclude that the named plaintiffs' claims are

typical of the class.

### (iv)      Adequacy of Representation

The final prerequisite under Rule 23(a) is that the named representatives must "fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23(a)(4).  The prerequisite "necessitates an inquiry into the adequacy of representation, including the quality of counsel, any disparity of interest between class representatives and members of the class, communication between class counsel and the class and the overall context of the litigation." *Pigford*, 182 F.R.D. at 350 (citing *Twelve John Does v. District of Columbia*, 117 F.3d 571, 575 (D.C. Cir. 1997)).  The adequacy of representation here is not contested.

### c.      Rule 23(b) Requirements

In addition to satisfying the four prerequisites stated in Rule 23(a), plaintiffs must also establish that the action falls within one of three categories of class action suits described in Rule 23(b).  Fed. R. Civ. P. 23(b).  Plaintiffs seek certification under Rule 23(b)(1) and/or 23(b)(2).  The court concludes that the requirements of Rule 23(b)(2) are satisfied and will certify the class as to the liability aspects of plaintiffs' claims.

### (ii)      Rule 23(b)(2)

Rule 23(b)(2) requires plaintiffs to show that "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." Fed. R. Civ. P. 23(b)(2).  Under this rule, two elements must exist: (1) the defendant's action or refusal to act must be "generally applicable to the class"; and (2) plaintiffs must seek final injunctive relief or corresponding declaratory relief on behalf of the class.  7AA Wright, Miller & Kane, *supra*, § 1775; *Bynum v. District of Columbia*, 217 F.R.D. 43, 48 (D.D.C. 2003).  Plaintiffs have

satisfied both factors.  First, WMATA's alleged action — failure to provide comparable paratransit services to eligible persons with disabilities — constitutes an action "generally applicable to the class."  Second, plaintiffs seek declaratory and injunctive relief.[14]

That plaintiffs's claims fall within the stated parameters of Rule 23(b) does not end the certification inquiry.  Where plaintiffs seek to certify claims for both injunctive relief and damages under Rule 23(b)(1) or (b)(2), certain issues arise. Most notably, the fact that such certifications create "mandatory" classes (from which individual plaintiffs may not be able to opt-out) raises due process concerns.  *See Ortiz*, 527 U.S. at 846 (noting that certification of a mandatory class that includes a claim for monetary relief may compromise the individual claimants' due process and Seventh Amendment rights); *Ticor Title Ins. Co. v. Brown*, 511 U.S. 117, 121 (1994) (it "is at least a substantial possibility" that class actions seeking money damages can only be certified under Rule 23(b)(3)); *Eubanks v. Billington*, 110 F.3d 87, 93 (D.C. Cir. 1997) (reviewing commentary advocating "opt-out" rights under Rule 23(b)(1) and (b)(2)). Sensitive to these concerns, the D.C. Circuit has said that "where both injunctive and monetary relief are sought, the need to protect the rights of individual class members may necessitate procedural protections beyond those ordinarily provided under (b)(1) and (b)(2)."  *Eubanks*, 110 F.3d at 95.

---

[14] Plaintiffs do not "improperly" seek injunctive relief, as did the plaintiff in *Richards v. Delta Airlines*, 453 F.3d 525, 530–32 & n.8 (D.C. Cir. 2006).  In *Richards*, the D.C. Circuit affirmed the denial of a motion to certify a class under Rule 23(b)(2).  There, the request for injunctive relief was itself an indirect request for money damages: the plaintiff sought an injunction ordering payment of money damages, in an apparent attempt to take advantage of the less stringent requirements of Rule 23(b)(2), in an attempt to avoid the stricter requirements of Rule 23(b)(3).

Such protections include "at least" the following two approaches to certification: First, the district court may (1) "conclude that the assumption of cohesiveness for purposes of injunctive relief that justifies certification as a (b)(2) class is unjustified as to claims that individual class members may have for monetary damage," and then (2) "adopt a 'hybrid' approach, certifying a (b)(2) class as to the claims for declaratory or injunctive relief, and a (b)(3) class as to the claims for monetary relief." *Id.* at 96.   Second, "the court may conclude that the claims of particular class members are unique or sufficiently distinct from the claims of the class as a whole, and that opt-outs should be permitted on a selective basis." *Ibid.*   Neither of these approaches is applicable here.   The court cannot conclude at this stage of the case that the "assumption of cohesiveness" is unjustified as to plaintiffs' monetary claims.   Indeed, the opposite appears to be true.   Pls.' Class Reply at 15 ("Any monetary damages sought by plaintiffs are . . . not intended to redress the specific injury each member of the class has suffered.").   Nor does the court have any basis to conclude that the claims of particular putative class members are unique.   The claims alleged here are fairly uniform, as is made apparent by the nature of the plaintiffs' legal claims, which target systems-level deficiencies with MetroAccess, rather than any individualized acts of discrimination.   *Id.*; 2nd Am. Comp. ¶¶ 45–51(claiming a failure to provide comparable paratransit services).

Because the two approaches explicitly approved of in *Eubanks* are not available, the court will take a third path, one which it has taken in previous cases.   The court will "certify the entire class initially under Rule 23(b)(2), [but] bifurcate the trial so that the defendant[s'] liability potentially for both forms of relief is determined initially, and reconsider the class certification category if the plaintiffs and the class are successful at the liability stage." *Eubanks*, 110 F.3d at

96 n.14 (noting without approval the possibility of this approach, and quoting 1 Herbert Newberg & Alba Conte, *Newberg on Class Actions* § § 4.14, at 4-51 to 4-52 (3d ed.1992)); *Does I through III v. Dist. of Columbia*, 232 F.R.D. 18, 29–30 (D.D.C. 2005); *Keepseagle v. Veneman*, No. 99-3119, 2001 WL 34676944, at *14 (D.D.C. Dec. 12, 2001); *Pigford*, 82 F.R.D. at 351. This approach will allow the litigation to move forward efficiently without compromising any class members' potential due process rights as to their claims for money damages.  It will also allow for a more robust record to be developed, which will assist the court in its later assessment of the certification question as to plaintiffs' legal remedies.[15]

## C.    Defendants' Objections to the Magistrate Judge's Denial of Their Motion to File a Third-Party Complaint

Finally, WMATA has filed a motion for reconsideration of Magistrate Judge Facciola's order denying leave to file a third-party complaint.[16]  On review of orders referred for determination under Local Rule 27, "the magistrate judge's decision is entitled to great deference" and should be affirmed absent a "definite and firm conviction that a mistake has been

---

[15] Because the court concludes that certification is proper under Rule 23(b)(2), it need not determine whether certification under Rule 23(b)(1) would be appropriate.  The court notes that as both subsections create mandatory classes, the due process concerns informing the court's decision to bifurcate the determinations of liability and certification as to plaintiffs' legal remedies would be present under either subsection.  The court also need not address WMATA's argument that plaintiffs' claims for money damages "predominate" over those for injunctive and/or declaratory relief.  *See* Fed. R. Civ. P. 23 (advisory committee notes to 1966 amendment) (Rule 23(b)(2) certification "does not extend to cases in which the appropriate final relief relates exclusively or predominantly to money damages"); *see also Richards*, 453 F.3d at 531 n.8 (noting a split among the circuits regarding how to determine whether monetary relief predominates in a rule 23(b)(2) suit, but taking no position on the applicable standard to be applied in this circuit).

[16] The motion is erroneously styled as "Defendants' Objections" to the magistrate judge's order.  LcvR 72.2(b) (allowing for filing of a motion for reconsideration of a magistrate judge's order).

committed." *Virtual Dev. and Defense, Int'l, Inc. v. Republic of Moldova*, 133 F. Supp. 2d 9, 20 (D.D.C. 2001). Moreover, resolution of the motion on the merits was committed to the sound discretion of the magistrate judge. 6 Wright, Miller, & Kane, *supra*, § 1443. The court sees no reason to overturn the magistrate judge's exercise of that discretion. WMATA filed its motion for leave well after the filing of the original complaint and it will not be prejudiced by the denial of its motion. The court will not modify or set aside the order.

### III. CONCLUSION

For the forgoing reasons, and as set forth in this memorandum opinion and order, it is this 9th day of December, 2006, hereby

**ORDERED** that defendants' motion to dismiss the second amended complaint [#69] is **GRANTED** in part and **DENIED** in part; and it is further

**ORDERED** that plaintiffs' motion to certify [#12] is **GRANTED** in part and **DENIED** in part; and it is further

**ORDERED** that defendants' motion to strike [#81] is **DENIED**; and it is further

**ORDERED** that defendants' motion for reconsideration [#91] is **DENIED**; and it is further

**ORDERED** that Jack Requa shall be substituted for Daniel Tangherlini as a defendant in this case; and it is further

**ORDERED** that defendants' amended motion to dismiss [#52] is **DENIED** as moot; and it is further

**ORDERED** that on or before December 22, 2006, the parties shall file a proposed case management plan including deadlines that shall govern the future proceedings in this action.  If the parties are unable to agree, each shall file its own proposed case management plan and deadlines.


Henry H. Kennedy, Jr.
United States District Judge