**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**EQUAL RIGHTS CENTER**, *et al.*,

**Plaintiffs**

          **v.**                                 **CA 04-0498 (HHK) (JMF)**

**WASHINGTON METROPOLITAN AREA**
**TRANSIT AUTHORITY**, *et al.*

**Defendants.**

<u>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF JOINT MOTION**
**FOR PRELIMINARY APPROVAL OF SETTLEMENT AGREEMENT**</u>

## TABLE OF CONTENTS

Page

BACKGROUND.................................................................................................3

I. THE COURT PREVIOUSLY REJECTED SOME OF
WMATA'S LEGAL DEFENSES ........................................................3

II. PLAINTIFFS WOULD HAVE SUBMITTED SUBSTANTIAL EVIDENCE TO
SUPPORT THE ALLEGATIONS OF ITS COMPLAINT ....................................4

   A. Plaintiffs Have Submitted Evidence of Systemic Deficiencies with
   MetroAccess Service ..........................................................4

   B. Plaintiffs Presented Numerous Individual Instances of Unsatisfactory
   Service in Support of their Systemic Allegations.....................................7

III. WMATA WOULD HAVE INTRODUCED SUBSTANTIAL EVIDENCE OF
PROGRESS TOWARDS SOLVING PROBLEMS WITH THE METROACCESS
SYSTEM IN ADDITION TO THE LEGAL ISSUES IT PRESENTED. ..............14

IV. THE COURT SHOULD CONFIRM A SETTLEMENT CLASS UNDER
FED. R. CIV. P. 23(B)(2). ..............................................................17

   A. The Proposed Class Meets the Standards of Rule 23(a)......................18

   B. Plaintiffs' claims satisfy the requirements of Rule 23(b)(2) ..................20

   C. A Settlement Class Is Appropriate under Rule 23(b)(2). ......................23

V. THE SETTLEMENT AGREEMENT COMPRISES A REASONABLE AND
FAIR BALANCE OF THE RISKS AND BENEFITS OF FURTHER
LITIGATION...............................................................................24

   A. The Settlement Agreement Provides Comprehensive Retroactive and
   Prospective Relief to the Class. ...........................................24

      1. Class Members will Receive Coupons for Free Rides  to
      Compensate for Alleged Poor Service .....................................24

         a. Free Rides For Alleged Past Service Deficiencies ..........24

         b. Free  Coupons for Future Poor Service...........................25

      2. WMATA will contractually require  specific performance
      standards and implement numerous recommendations to improve
      performance. ..............................................................25

      3. A comprehensive Monitoring and Compliance Program will be
      Implemented at WMATA's expense...........................................28

         a. Retention of Independent  Experts ...............................28

         b. MetroAccess Task Force.................................................29

         c. Floating Reserve ..........................................................29

              d.      Extra Board Vehicles .......................................................29

              e.      Monitoring Costs and Expenses......................................30

      4.      WMATA Will Provide Monetary Compensation to those involved in the Litigation...............................................30

      5.      WMATA Will Pay Some of  Plaintiffs Attorneys Fees and Expenses ...................................................................30

  B.    THE SETTLEMENT AGREEMENT PROPERLY BALANCES THE PARTIES' RESPECTIVE RISKS OF LITIGATION. .....................31

  C.    THE PROPOSED NOTICE REQUIREMENTS MEET THE REQUIREMENTS OF RULE 23 ..........................................................34

VI.   CONCLUSION.................................................................................35

# FEDERAL CASES

*Access Now, Inc. v. Ambulatory Surgery Center Group, Ltd.*,
197 F.R.D. 522 (S.D. Fla. 2000) ................................................................ 22

*Alexander A v. Novello*,
210 F.R.D. 27 (E.D.N.Y. 2002) .................................................................. 22

*Amchem Products, Inc. v. Windsor*,
521 U.S. 591 (1997) .................................................................................. 24

*Anderson v. Department of Public Welfare*,
1 F. Supp. 2d 456 (E.D. Pa. 1998) ........................................................... 22

*Arnold v. United Artists Theatre Circuit, Inc.*,
158 F.R.D. 439 (N.D. Cal. 1994) .............................................................. 22

*Associate for Disabled Americas v. Amoco Oil Co.*,
211 F.R.D. 457 (S.D. Fla. 2002) ............................................................... 22

*Ball v. AMC Entertainment, Inc.*,
315 F. Supp. 2d 120 (D.D.C. 2004) .......................................................... 31

*Blackman v. District of Columbia*,
454 F. Supp. 2d 1 (D.D.C. 2006) .............................................................. 32

*Boeing Company v. Van Gement*,
444 U.S. 472 (1980) .................................................................................. 31

*Brown v. Artery Organization, Inc.*,
No. 86-3285, 1987 WL 9044 (D.D.C. Mar. 19, 1987) ............................... 23

*Chang v. United States*,
217 F.R.D. 262 (D.D.C. 2003) .................................................................. 23

*In re Chicken Antitrust Litigation*,
560 F. Supp. 957 (N.D. Ga. 1980) ............................................................ 34

*Civic Association of Deaf v. Giuliani*,
915 F. Supp. 622 (S.D.N.Y. 1996) ........................................................... 22

*Colorado Cross-Disability Coalition v. Taco Bell Corp.*,
184 F.R.D. 354 (D. Colo. 1999) ................................................................ 22

*DeBoer v. Mellon Mortgage Co.*,
64 F.3d 1171 (8th Cir. 1996) .................................................................... 23

*Disability Rights Council v. WMATA,*
239 F.R.D. 9 (D. D. C. 2006) ................................................................*passim*

*Duprey v. Connecticut Department of Motor Vehicles,*
191 F.R.D. 329 (D. Conn. 2000) ........................................................... 22

*Eubanks v. Billington,*
110 F.3d 87 (D.C. Cir. 1997) ............................................................... 22

*General Telephone v. Falcon,*
457 U.S. 147 (1982), *aff'd,* 815 F.2d 317 (5th Cir. 1987)............................. 19, 20

*Guckenberger v. Boston University,*
957 F. Supp. 306 (D. Mass. 1997).......................................................... 22

*Kathleen S. v. Department of Public Welfare,*
No. 97-6610, 1998 U.S. Dist. LEXIS 2027 (E.D. Pa. Fed. 25, 1998)................. 22

*Los Angeles v. Lyons,*
461 U.S. 95 (1983) ............................................................................ 14

*Marcus v. Kansas Department of Revenue,*
206 F.R.D. 509 (D. Kan. 2002) ............................................................. 22

*McKay v. County Election Commissioners,*
158 F.R.D. 620 (E.D. Ark. 1994)........................................................... 22

*National Organization on Disability v. Tartaglione,*
No. 01-1923, 2001 WL 1258089 (E.D. Pa. Oct. 22, 2001) ................................ 22

*Neff v. VIA Metropolitan Transit Authority,*
179 F.R.D. 185 (W.D. Tex. 1998) ......................................................... 23

*Oppenheimer v. Standard Oil Co.,*
64 F.R.D. 597 (D. Colo. 1974) ............................................................. 32

*Pigford v. Glickman,*
182 F.R.D. 341 (D.D.C. 1998) ............................................................. 23

*Siddiqi v. Regents of University of California,*
*No.C 99-0790,* 2000 WL 33190435 (N.D. Cal. Sept. 6, 2000)........................... 22

*Taylor v. District of Columbia Water & Sewer Authority,*
205 F.R.D. 43 (D.D.C. 2002) .............................................................. 23

*Thomas v. Christopher,*
169 F.R.D. 224 (D.D.C. 1996) ............................................................. 22

*Thrope v. Ohio,* 173 F.R.D. 483 (S.D. Ohio 1997)........................................ 22, 23

*In re Veneman*,
309 F.3d 789 (D.C. Cir. 2002) ........................................................................... 21

*In re Vitamins Antitrust Litigation*,
305 F. Supp. 2d 100 (D.D.C. 2004) .................................................................... 31

## STATUTES AND RULES

49 C.F.R. § 37.121(b) ........................................................................................ 19

49 C.F.R. § 37.131(f) .................................................................................... 19, 21

49 C.F.R. § 37.131(f)(3) ..................................................................................... 3

Fed. R. Civ. P. 23(a) ........................................................................................ 18

Fed. R. Civ. P. 23(b) ........................................................................................ 17

Fed. R. Civ. P. 23(b)(2) ............................................................................... 1, 20

Fed. R. Civ. P. 23(c) ........................................................................................ 36

## MISCELLANEOUS

3 Newberg on Class Actions § 11:51 at 158 (2002) .......................................... 34


7A Charles Alan Wright & Arthur R. Miller,
Federal Practice and Procedures § 1763, at 226 (3d ed. 2005) ........................ 19

7AA Charles Practice and Procedure & Arthur R. Miller,
Federal Practice and Procedures § 1775, at 61-70 (3d ed. 2005) ...................... 23

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **EQUAL RIGHTS CENTER, *et al.*,** | |
| **Plaintiffs** | |
| **v.** | **CA 04-0498 (HHK) (JMF)** |
| **WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY, *et al.*** | |
| **Defendants.** | |

<u>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF JOINT MOTION
FOR PRELIMINARY APPROVAL OF SETTLEMENT AGREEMENT**</u>

The parties have filed a joint motion requesting that the Court approve a

proposed Settlement Agreement resolving all issues in this class action, pursuant  to

Rule 23(e), following a Fairness Hearing, that it approve the plaintiffs' attorneys' fess

and expenses agreed-upon in the proposed settlement, that it certify the class as

proposed under Rule 23(b)(2), Fed. R. Civ. P, and that it approve a proposed notice to

class members concerning the class certification, the procedure for filing of comments

or objections on the proposed settlement and the scheduling for  a Fairness Hearing on

the proposed settlement.

This action was initiated on March 29, 2004, when Plaintiffs Disability Rights

Center[1] and 13 named plaintiffs filed this putative class action against the Washington

---

[1]    During the course of the litigation, the Disability Rights Council merged into the Equal Rights Center, which was substituted as a plaintiff in the case.

Metropolitan Area Transit Authority ("WMATA") alleging that WMATA's paratransit "MetroAccess" service to individuals with disabilities so serious that they cannot access WMATA's bus and subway system, had failed and was failing to meet the standards required by the Americans with Disabilities Act ("ADA") and the Rehabilitation Act of 1974 ("Rehabilitation Act") in its provision of transportation services to the disabled community in the Washington, D.C. metropolitan area.

After three and a half years of vigorous litigation, and over six months of settlement negotiations, the parties have reached a Settlement Agreement that fairly and reasonably compensates the class for the harms that they have allegedly suffered, provides for mechanisms to prevent and resolve  similar claims in the future, and balances appropriately the potential risks and benefits of further litigation for each side. This is a comprehensive settlement of the case, providing class-wide relief valued at over $13 million for the members of the class, a commitment by WMATA to increase significantly its budget for MetroAccess, and supervision and monitoring of MetroAccess's performance through the current and next three fiscal years, compensation for the efforts of the named plaintiffs and other class members involved in the litigation and reasonable fees and expenses incurred by plaintiffs' counsel.

A copy of the proposed Settlement Agreement for which the parties seek Court approval is attached as Exhibit A hereto.

**BACKGROUND**

This case alleges that in providing MetroAccess service to the disabled community in the greater Washington, D.C. area as required by federal law, WMATA. Engaged in a wide variety of alleged discriminatory practices in violation of the ADA. These practices included missed, overly long and or circuitous trips, late pick-ups or arrivals, early trips or arrivals, practices relating to the failure to answer telephone calls promptly or answering calls rudely, overly long periods of telephone callers not being assisted or responded to, failure to respond to complaints in a timely or proper fashion, rude or poorly trained reservation agents, negligent or poorly trained drivers, inadequate or unsafe equipment or vehicles, and any other policy, practice or procedure that renders MetroAccess' provision of services not comparable to that provided by WMATA for its fixed route customers or which is alleged to constitute a "capacity constraint" (as defined by 49 C.F.R. § 37.131(f)(3)) on the provision of paratransit services or any other practice subsumed within the scope of the Second Amended Complaint.

**I.      THE COURT PREVIOUSLY REJECTED SOME OF WMATA'S LEGAL DEFENSES**

Defendants moved to dismiss the initial complaint on June 21, 2005, relying on three principal legal defenses.  First, Defendants asserted that they were entitled to sovereign immunity from the ADA under the Eleventh Amendment. The United States intervened as a plaintiff for the limited purpose of arguing that immunity had not been waived.  The Court concluded that it was unnecessary to reach that question because WMATA was subject to the identical obligations under Section 504 of the Rehabilitation Act as to which sovereign immunity was inapplicable.  See Disability Rights Council v. WMATA, 239 F.R.D. 9, 14-15 (D. D. C. 2006) (hereinafter "DRC v. WMATA").

-3-

Secondly, WMATA argued that plaintiffs lacked standing to bring their complaints because many of plaintiffs' complaints lacked a "legally protected interest" and thus had "no foundation in law."  Plaintiffs argued in opposition that the applicable federal regulations, which prohibit a "pattern or practice" that "significantly limits the availability of services," supported their claims.  The Court concluded that "This reading is not frivolous, and plaintiffs therefore have standing to sue."  DRC v. WMATA at 17-18.

Third, WMATA argued that plaintiffs' complaints fell within the primary jurisdiction of the Federal Transit Administration ("FTA").  The Court disagreed, finding that it did not require the expertise of the agency to resolve the questions before it and because the matter was not currently pending before the FTA.  DRC v. WMATA at 20.

Accordingly, as to the defendants' defenses under the Rehabilitation Act, the Court denied WMATA's motion to dismiss, while granting other portions of WMATA's Motion and reserving other issues for summary judgment or trial.

## II.   PLAINTIFFS WOULD HAVE SUBMITTED SUBSTANTIAL EVIDENCE TO SUPPORT THE ALLEGATIONS OF ITS COMPLAINT

### A.   Plaintiffs Have Submitted Evidence of Systemic Deficiencies with MetroAccess Service

Plaintiffs alleged that there were a panoply of specific, system-wide problems with the management of MetroAccess service that render the system unlawfully dysfunctional, including: a shortage of vehicles to operate the service properly, a lack of experienced drivers and adequate driver training, the absence of sufficient personnel and software necessary to schedule rides or assure timely arrival at pickup locations and the lack of proper customer complaint processing procedures.  See Second Am. Compl. ¶¶ 51-53.  The existence of these systemic problems, they alleged, was

corroborated by studies by WMATA-sponsored task forces and consultants and by WMATA's own admissions.  See, e.g., National Capital Region Transportation Planning Board, Improving Demand Responsive Services for People with Disabilities in the Washington Region, 18-22 (Feb. 6, 2006) (hereinafter "TPB Report") (available at http://www.mwcog.org/uploads/committee-documents).  See Adams Report, infra.

Plaintiffs alleged that the absence of sufficient vehicles and trained drivers to operate the service in accordance with the legal requirements was a particularly serious problem that Defendants failed to remedy for many years.  Two separate reports prepared for WMATA in the fall of 2001 emphasized that WMATA needed more dedicated vehicles to operate the system properly and should rely less on taxi service, a mode of transportation that was frequently unsatisfactory.  Planners Collaborative, Inc., Assessment of ADA Complementary Paratransit Service Capacity Constraints, 60 (Sept. 24-28, 2001) (Final Report); MultiSystems, Inc., RFP No. 23151/CR, MetroAccess Study, 72, 73 (Dec. 28, 2001) (Final Report).  The 2006 TPB Report and the Adams Report demonstrates that this same problem persisted despite the passage of nearly five years.

The Plaintiffs alleged that another systemic flaw was MetroAccess's customer communications systems, including their often-ineffective complaint and reservation process.  See Am. Compl. ¶¶ 51-53.  As highlighted on a number of occasions in the TPB Report, customer complaints had not been properly investigated, tracked or responded to over a period of several years.  TPB Report at vi, viii, 18, 37, 40.  Plaintiffs alleged that WMATA has admitted recently that there are not enough telephone lines to provide meaningful responses to individual complaints and that the system lacked a

dedicated telephone line or sufficient personnel to assist customers with immediate needs.  Lyndsey Layton, <u>Metro Sees "Crisis" in Van Service</u>, Wash. Post, Jan. 20, 2006 at B1 (<u>available at</u> http://www.washingtonpost.com); TPB Report at 41. ort] ; <u>see</u> *Adams Report*, <u>infra</u>.

The Plaintiffs placed particular emphasis on a report by Kevin Adams of Adams Consulting, a WMATA-funded study of the MetroAccess system as of late 2006—that is, after MV Transportation, WMATA's new MetroAccess contractor, had been operational for nearly a year.  *See* Adams Consulting, "Technical Report evaluating MetroAccess Service Enhancements and Staffing" December 8, 2006. A copy of this report is appended as Exhibit D hereto.  In this Report, Mr. Adams found that MV's staffing and training was insufficient in reservations, road supervision and other areas and proposed significant staff increases.  Adams Report at 1-3.  He further found that MV "experiences very high employee turnover resulting in on the job inexperience and a need for constant training."  <u>Id</u>. He likewise concluded that number of MetroAccess vehicles was insufficient.  In addition, he found that telephone call volume was at times too large for the staff to handle adequately and that customer wait times increased significantly during the peak call-in periods.

Mr. Adams also determined the incidence of MetroAccess customer complaints was unusually high and opined that the high complaint levels were likely to continue until the problems he identified were addressed. Many of the detailed recommendations of the Adams Report, along with WMATA's commitment to address them, are found in Appendix A to the Settlement Agreement.

**B.      Plaintiffs Presented Numerous Individual Instances of Unsatisfactory Service in Support of their Systemic Allegations**

In 2006, Defendants took the depositions of all but one of the 13 named plaintiffs as well as 16 additional members of the class.  Although many of the deponents testified that service had improved under the new contractor for MetroAccess,[2] they also testified about numerous and continuing instances of unsatisfactory MetroAccess service and the serious impacts of these deficiencies on their personal lives.  A sampling of this testimony is as follows:

1.      Plaintiff Justin Chappell resides in Laurel, Maryland, and uses MetroAccess to commute five days a week to and from work in Washington, D.C. and to attend events such as community meetings.  Mr. Chappell testified that he consistently experienced problems with MetroAccess's lack of punctuality.  As a result, he alleged that he was frequently late for work, and in particular is late for a meeting every Wednesday morning with his supervisors.  He believes his tardiness negatively affected his relationships with his co-workers.  Mr. Chappell made up missed time at work at his own expense.  In addition, when the MetroAccess van was extremely late, he sometimes paid for a lift-equipped taxicab to get to or from work.

Mr. Chappell further testified that the problems caused by MetroAccess's lateness were greatly compounded by the failure of the dispatchers to provide accurate information.  He stated that MetroAccess's timeliness problems were further compounded for him by the fact that MetroAccess sometimes negligently sent a taxicab without a wheelchair lift or a van without an operational lift.  Mr. Chappell cannot use a

---

[2]  The original and first amended complaints were filed while service was provided by WMATA's contractor, LogistiCare.  On January 15, 2006, service began to be provided by MV Transportation under a new contract.

taxicab without a wheelchair lift because he cannot transfer between the wheelchair
seat and the taxicab seat, and his wheelchair will not fit in the trunk of a taxicab.  As a
result, Mr. Chappell testified that he often had to wait another several hours for a
replacement van.

2.      Plaintiff Marquette Henderson lives in Fort Washington, Maryland,
and used MetroAccess to get to and from his job, which is located at Bolling Air Force
Base in the District of Columbia.  Mr. Henderson is visually impaired and had a
subscription for pickup at 6:45 each morning, Monday through Friday, to enable him to
arrive at his job by 8:00 a.m.  Even though Mr. Henderson's subscription reservation
allowed an hour and fifteen minutes for a drive that takes approximately 20 minutes if
driven directly, Mr. Henderson was significantly late to work two or three times each
week.  Nearly all of his MetroAccess rides arrived more than 15 minutes late.  In
January 2004, Mr. Henderson was written up for tardiness by his employer and he
worried that he was in danger of being terminated from his job because of his inability to
arrive at work on time.  In addition, Mr. Henderson's bonuses were discontinued and his
wages were reduced as a direct result of his poor attendance and punctuality.  Mr.
Henderson's income is critical to his family's financial stability.  He testified that on
approximately four days per week, the arrival of Mr. Henderson's ride home from work
was an average of 60 minutes late.

3.      Plaintiff Marsha Johnson resides in Silver Spring, Maryland, and
uses MetroAccess to attend church and conduct errands.  Ms. Johnson has polio and is
mobility impaired, requiring the use of a wheelchair, Ms. Johnson testified that she
found that using MetroAccess was sometimes a harrowing experience, entailing

constant worry that she was going to be stranded.  Her fear was based on past

experiences.  For example, she testified that a significant number of her MetroAccess

rides were late.  From October 30, 2003 until December 20, 2003, Ms. Johnson took

twelve MetroAccess rides, 58 percent of which were late.  Five of the 12 rides were

more than 30 minutes late and two were more than an hour late.  This inability to

schedule reliable service requires Ms. Johnson to build a substantial amount of time into

any pickup schedule to increase the likelihood that she would obtain service.  This

typically entails ordering rides substantially before they were needed, in order to

increase the likelihood that she would be on time for her appointments if her

MetroAccess ride was significantly late.

       4.       Plaintiff Victoria Smith resides in Landover, Maryland, and uses

MetroAccess paratransit every day of the week to commute to and from work, attend

church services, shop, and visit friends.  Ms. Smith is blind.  Ms. Smith estimated that

50 percent of her MetroAccess rides over a five-year period had been late and that her

average waiting time was approximately forty-five minutes to one hour.  As a result, Ms.

Smith was docked pay by her employer several times for tardiness.

       5.       Plaintiff Mary Wright resides in Bowie, Maryland, and uses

MetroAccess to commute to and from work, medical appointments, shopping, church,

and social visits with friends.  Ms. Wright is legally blind.  Ms. Wright's place of

employment is located about a 25-minute drive from her home.  Despite this relatively

short distance, Ms. Wright has been forced to wait an unreasonable and often

unpredictable period of time for a MetroAccess vehicle, because of driver or dispatcher

errors.  Although Ms. Wright could have left her house a half hour before she must

arrive at work if she could depend on reliable transportation services, she has been forced to schedule her morning pickup time two hours early to allow for MetroAccess drivers' consistent lateness. Ms. Wright's MetroAccess was often required to travel substantially out of her way, so that drivers could an pick up passengers from locations that are far from her route.  Because Ms. Wright does not work a consistent schedule, she must schedule each of her trips separately.  To reduce the number of scheduling errors by MetroAccess, she called to confirm the time and location of each of her rides in advance.  Despite these efforts, the lack of reliable paratransit service has caused Ms. Wright enormous stress about transportation to and from work.  She asked her friends, neighbors and family members to provide her with transportation so that she did not have to endure the interminable delays she experienced when she uses MetroAccess.

6.     Plaintiff Darnise Henry Bush resides in Washington, D.C. and uses MetroAccess paratransit to commute to and from work, shopping, church and other activities.  Ms. Bush is mobility impaired, requiring the use of a cane or scooter.  Ms. Bush testified that she consistently found that a significant number of her rides failed to arrive within fifteen minutes of the pickup time assigned by the MetroAccess dispatcher.  The inconvenience Ms. Bush has experienced due to MetroAccess's lack of punctuality was, according to her testimony, further compounded by her inability to get reliable information from the MetroAccess dispatch office regarding when her ride would arrive. As a result, Ms. Bush has been forced to cancel her trip and miss a day of work.

7.     Plaintiff Dorothy Crawford resides in Washington, D.C. and uses MetroAccess five days per week to get to and from work.  She has a subscription

reservation to pick her up at her home at 7:00 a.m. and at work at 5:30 p.m., Monday through Friday.  Ms. Crawford also uses MetroAccess to get to medical appointments and for errands.  Ms. Crawford has Non-Specific Interstitial Pneumonitis ("NSIP"), a condition that affects her ability to breathe. Ms. Crawford relies on an oxygen tank to ease her breathing.  In September 2003, she ran out of oxygen because her MetroAccess ride was approximately an hour late and unduly long in duration.  Ms. Crawford realized she was running low on oxygen when she boarded the vehicle after the lengthy wait and warned the driver about the situation.  Instead of adjusting his route to drop her off more quickly, the driver continued following his normal schedule.  The ride took approximately 45 minutes (whereas her ride from work to home normally takes 20 minutes) because the driver picked up and dropped off another passenger before taking Ms. Crawford home.  By the time the driver reached Ms. Crawford's destination, her supply of oxygen had run out.  Ms. Crawford experienced difficulty breathing and broke out in coughing fits when she got out of the vehicle and walked unaccompanied up the steps to her apartment.  Ms. Crawford has come close to running out of oxygen on several other occasions more recently while waiting for MetroAccess.

8.     Plaintiff Mary Williams resides in Washington, D.C., and uses MetroAccess to commute to and from work, church, medical appointments, shopping and social engagements.  Ms. Williams suffers from lupus, complications from diabetes such as diabetic neuropathy, and chronic obstructive pulmonary disease.  Ms. Williams estimated that MetroAccess was approximately one hour late about 15 percent of the time.

9.     Plaintiff Pamela Awkerman resides in Falls Church, Virginia, and

uses MetroAccess for transportation to work, medical appointments, civic meetings, shopping, and personal engagements.  Ms. Awkerman has low vision, or "tunnel vision." Ms. Awkerman's place of employment is located within Falls Church and she relies on MetroAccess to commute to and from her job three days per week.  Ms. Awkerman consistently finds her MetroAccess rides to be problematic in term of timeliness.   These untimely rides require Ms. Awkerman to wait for an extended period of time, make costly alternative last-minute travel arrangements, or simply abandon her social and professional obligations.  Because of the chronic lateness of her rides, Ms. Awkerman schedules her rides to arrive well in advance of the time she would if the service were reliable.

10.     Plaintiff Edward McEntee resides in Fairfax County, Virginia and uses MetroAccess for transportation to and from his job in Arlington, Virginia, and also for medical appointments, social engagements and errands.  Mr. McEntee is mobility impaired, requiring the use of a wheelchair.  From November 7, 2003 until January 12, 2004, Mr. McEntee testified that he took 82 MetroAccess rides, 28 percent of which were late or never arrived.  Of the 82 rides, he testified that five were more than 15 minutes late, nine were more than 30 minutes late, five were more than an hour late, two were more than 25 minutes early, and two never arrived.

11.     Plaintiff Michelle Vadnais resides in Reston, Virginia, and uses MetroAccess for transportation to and from work.  Ms. Vadnais has cerebral palsy and is mobility impaired.  Ms. Vadnais is employed in Reston, Virginia, three days per week. Ms. Vadnais testified that a substantial number of her rides either arrived substantially early, failed to arrive within the fifteen-minute allowable window of the scheduled pickup

time, or simply never showed up.  For example, between September 29, 2003 and November 4, 2003, Ms. Vadnais took 15 rides, 40 percent of which she estimates were late or vehicle "no shows."  The unpredictability of her rides was particularly frustrating because her job is only a five-minute drive from her home.

12.     Plaintiff Ellen Rickerson resides in Fairfax, Virginia and uses MetroAccess to attend classes, to travel to the ENDependence Center of Northern Virginia ("ECNV") and to visit with friends and attend other social engagements.  Ms. Rickerson has cerebral palsy and is mobility impaired, requiring the use of a wheelchair. Ms. Rickerson has a subscription reservation to take her to and from class twice a week, to travel to the ECNV, and to attend social engagements.  Ms. Rickerson experienced problems with MetroAccess's lack of punctuality.  At one point, Ms Rickerson estimated that 80percent of her rides were late.  Ms. Rickerson also testified that she has encountered drivers who are rude and unprofessional. In February 2004, Ms. Rickerson was being driven by MetroAccess to the ECNV when she noticed that the van had already passed the center.  When she informed the driver, he became angry and continued to take her to the wrong location.  Only when Ms. Rickerson refused to get out of the vehicle did the driver radio the dispatcher who instructed the driver to take Ms. Rickerson to the correct location.

13.     Plaintiff Anna Brow resides in Springfield, Virginia and uses MetroAccess every day to attend a sheltered workshop in Alexandria, Virginia.  Ms. Brow's mother, Virginia Brow testified that Ms. Brow has the mental capacity of a two-year old child and cannot be left unattended to wait for MetroAccess rides. MetroAccess's consistent tardiness, therefore, has caused great inconvenience for Ms.

Brow and her entire family.  On March 11, 2004, Virginia Brow requested that

MetroAccess drop off her daughter at a different location than her home.  Virginia Brow

had meticulously followed the official MetroAccess scheduling procedure to request this

one-time change.  The MetroAccess driver, however, mistakenly took Ms. Brow to her

home and dropped her off at her house where no one was home to take responsibility

for her.  A neighbor, who understands Ms. Brow's disability, was outside her home and

saw the MetroAccess vehicle getting ready to leave Ms. Brow unattended.  The

neighbor immediately took responsibility for Ms. Brow and contacted Virginia Brow, who

returned home.

*          *          *

If this matter had not settled, plaintiffs were prepared to offer the foregoing

testimony and the testimony of many other class members who have received, and

continue to receive, service from MetroAccess that, they contend, is unsatisfactory and

inconsistent with WMATA's legal obligations.

### III. __WMATA WOULD HAVE INTRODUCED SUBSTANTIAL EVIDENCE OF PROGRESS TOWARDS SOLVING PROBLEMS WITH THE METROACCESS SYSTEM IN ADDITION TO THE LEGAL ISSUES IT PRESENTED.__

If this matter had not settled, one of WMATA's major defenses to prospective

relief and current liability would have been the doctrine of mootness, as articulated in

the Supreme Court 's decision in Los Angeles v. Lyons, 461 U.S. 95 (1983).  In Lyons

the plaintiffs challenged the use of a "choke hold" by the Los Angeles police

department.  During the pendency of the litigation, the City ceased use of the chokehold

and the Supreme Court ruled that the challenge to its use was, therefore, moot.  The

-14-

Court observed, "[past] exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief." Id. at 102.

Similarly, WMATA would have presented substantial evidence that, since 2004 when the complaint was filed in this action, WMATA has significantly improved the provision of its MetroAccess services, thus rendering plaintiffs' allegations moot.  The principal evidence in support of this defense and which would have been used by WMATA to support its Motion for Summary Judgment, was set forth in two reports by its litigation experts:  *Report on WMATA's MetroAccess Service and Its Compliance with the Americans with Disabilities Act, KFH Group, Inc, March 28, 2007* (the"KFH Report") (Exhibit B hereto) and *WMATA ADA Paratransit–Fixed Route Comparability Study,* and the accompanying *Statistical Report on the Paratransit Study Prepared in the Matter of Disability Rights Council, et al v. Washington Metropolitan Area Transit Authority , Charles R. Mann, Ph.D., March 28, 2007 (*the *"Mann Report")(Exhibit C hereto).*  Each of these reports is summarized below.

In the *KFH Report.* WMATA's expert concluded that:

> In the Washington, D.C. region, the service environment, known as an uncontrollable factor in the paratransit industry, adds to the challenges posed by the requirements and parameters of ADA paratransit.  The Washington, D.C. metropolitan region is large, with increasing traffic and congestion.  Based on research, our region has the third worst traffic in the nation, and ranks second in the nation on the rate of growth of congestion.  Research also finds that the reasons for congestion are increasingly from unpredictable causes: more than half of congestion and possibly more than 80% is caused by such events as collisions, bad weather, and vehicle breakdowns. These are events that cannot be predicted in advance, affecting the provision of more than 4,500 paratransit trips each day.
>
> Despite the challenges posed by the ADA regulations and the local operating environment, data from the past calendar

year show that performance of WMATA's paratransit service is comparable to that of other similar large urban ADA paratransit programs, including two systems – those in Denver and Seattle – that have been identified in a federal research project as among selected paratransit systems "believed to be in compliance with ADA requirements regarding capacity constraints." Additionally, regarding the ADA criteria for establishing comparability to fixed-route service, WMATA's policies and performance over the past calendar year show that the paratransit service exceeds or is comparable to WMATA's fixed-route service.

While the early few months of the new contractor in 2006 were typical of a major transition in that performance was impacted, WMATA's paratransit service has improved since that time, as would be expected. In particular, with a focus on improving on-time performance, WMATA's current on-time performance is above 90%, a threshold at which performance is considered "good" for the paratransit industry. Significantly, the percentage of trips more than 30 minutes beyond the on-time window has decreased. During the early months of CY 2006, this percentage was more than 2% in January and February, 1.4-1.6% over the next three months, and by December 2006, this percentage was just below 1%.

*KFH Report* at 32–33.

In addition to the *KFH Report*, WMATA conducted a thorough field study, comparing the performance of MetroAccess to its fixed route service by sending testers into the field to ride buses and trains on routes with identical starting and ending points to randomly selected MetroAccess rides. The study was designed and conducted by Charles R. Mann, Ph.D., and a well-credentialed statistician in the area of discrimination analysis. Dr. Mann's study concluded that: "Paratransit service was faster than fixed route service for 80.37% (86 of 107) of the paired trips. The level of significance was found to be less than .00005 (1 in twenty thousand). Thus, there is statistical reason to believe that paratransit service is faster than fixed route service more often than not at the .00005 level of significance." *Mann Report* at ¶ 24.

Dr. Mann also found that  "the on-time rate of paratransit service to be higher

than the on-time rate of fixed route performance . . . for trips with an initial segment of

travel by bus for which fixed route service exists as defined by KFH. . . .  Id. ¶ 29.  In

summary, Dr. Mann found " statistically significant support (at levels below .05 or 1 in

20) for conclusions that paratransit service is on-time more often than fixed route

service and that paratransit service is faster than fixed route service"  Id. ¶ 30.

Thus, WMATA 's experts found that MetroAccess's performance was a good as

or better than similar metropolitan areas and faster and more frequently on time than

WMATA's fixed route service.  These objective standards would have formed the basis

of WMATA's defense that it was in compliance with the FTA's standards under the ADA

and Rehabilitation Act.  However, plaintiffs planned to challenge the validity on these

findings through cross-examination.

In addition, WMATA would have introduced evidence to refute the claims of

individual plaintiffs regarding the service problems they experienced.  This includes

computer-generated records created by MetroAccess contractors which is at variance

with the claims of the individual testimony, especially in regard to on-time performance

and missed trips.  WMATA also planned to present evidence that the plaintiffs did not

keep consistent records of all their trips within a particular period of time and thus the

credibility of their claims regarding a percentage of service being late or early  was

subject to challenge.

**IV.    THE COURT SHOULD CONFIRM A SETTLEMENT CLASS UNDER FED. R.
CIV. P. 23(B)(2).**

In DRC v. WMATA, supra, this Court previously considered the issue of whether

to certify  this case as a class action under Fed. R Civ. P 23(b).  The Court certified  the

case under (b)(2), subject to reconsideration following the  damages portion of the case, which it bifurcated.  The Court stated it was so ruling "to allow for a more robust record to be developed, which will assist the court in its later assessment of the certification questions as to plaintiffs' legal remedies."  DRC v. WMATA, at 29.  Now, with a proposed Settlement Agreement in place that provides comprehensive injunctive relief and ancillary monetary relief to the settlement class, a sufficient record exists upon which the Court can make a final and unconditional determination regarding class certification.

Under Section II of the proposed Settlement Agreement, the settlement class is defined as follows:  "disabled individuals who are or may become customers of MetroAccess at any time from March 29, 2001 through the duration of the Settlement Agreement."  Accordingly, the class as defined includes not only active MetroAccess customers whose numbers exceed 18,000, but also all those who were customers at any time since 2001 and those who become eligible to use MetroAccess in the future through-out the three-year duration of the settlement.

To be certified, a class action must not only satisfy the prerequisites of Federal Rule of Civil Procedure 23(a), but must also fulfill at least one of the three subparts of Rule 23(b).  As shown below, these prerequisites are satisfied as to the settlement class in this case.

A.    **The Proposed Class Meets the Standards of Rule 23(a).**

Rule 23(a) requires that the parties show:

(1) that the class is so numerous that joinder of all members is impracticable; (2) that there are questions of law or fact common to the class; (3) that the claims or defenses of the representative parties are typical of the claims or defenses of

> the class; and (4) that the representative parties will fairly
> and adequately protect the interests of the class. *Fed. R.
> Civ. P. 23(a)*. In addition, plaintiffs also bear the burden to
> show that the class falls within at least one of the three
> categories set forth in *Rule 23(b)*, . . . .

DRC v. WMATA at 24-25.

The parties agree that the Court properly found that this case met the

requirements of Rule 23(a).  DRC v. WMATA at 49-50.  First, there are over 18,000

current customers of MetroAccess  the common questions of law and fact are illustrated

by the Court's December 2006 Opinion and in the testimony of the class

representatives, as set forth above.  Additionally, proposed class actions seeking

injunctive and declaratory relief, such as this one, "by their very nature" present

common questions of law and fact. 7A Charles Alan Wright & Arthur R. Miller, Federal

Practice and Procedure § 1763, at 226 (3d ed. 2005).  In its Order granting initial

conditional certification, the Court properly found that:

> This case presents a common issue: whether MetroAccess
> is comparable to WMATA's fixed-route service, as measured
> by WMATA's compliance with the ADA's prohibition against
> patterns or practices that "significantly [limit] the availability
> of  service to ADA paratransit eligible persons." 49 C.F.R.
> § 37.131(f); see also id. § 37.121(b) (comparability to be
> measured by compliance with regulations setting forth
> paratransit requirements). Moreover, the resolution of this
> issue will not involve a series of individualized inquiries.
> Evidence regarding individual experiences with the
> MetroAccess service will be produced, but that evidence will
> be assessed in the context of a comprehensive inquiry into
> WMATA's systems, patterns, and practices. And, as the
> plaintiffs seek primarily broad-based injunctive relief, this
> issue is particularly appropriate for class action litigation.

Id. at 26-27.

Third, the typicality requirement frequently merges into the commonality

requirement.  Gen. Tele. v. Falcon,  457 U.S. 147, 157 n.13 (1982), aff'd, 815 F.2d 317

(5th Cir. 1987).  Plaintiffs' deposition testimony, as set forth above,  represents issues that are typical of the class as a whole.

Lastly, it is  undisputed that the named class representatives have adequately represented the class and that class counsel has also fairly and adequately represented the interests of the class.  Each of the named plaintiffs has been deposed and provided documentary evidence to support their claims.  The parties also agree that experienced class counsel has vigorously represented the interests of the class in over three and a half years of litigation.

    **B.**    **Plaintiffs' claims satisfy the requirements of Rule 23(b)(2)**

Certification should also be granted under Fed. R. Civ. P. 23(b)(2) with respect to the make-whole relief and future monetary relief to the class as a whole as described in the proposed Settlement Agreement.  Class certification under Rule 23(b)(2) is warranted in this case where "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole."  Fed. R. Civ. P. 23(b)(2).  Plaintiffs are not  complaining simply that they have occasionally been subjected to inadequate transportation services on an individual basis.  They allege that WMATA has systematically failed to provide reliable transportation services to the disabled community in accordance with federal law.  While this failure would be necessarily demonstrated in part by examples of how such day-by-day failings affected the individual class members, their central complaint is that WMATA's failure is systemic and violates the rights of all members of the class.

The Court found here that

The gravamen of the complaint, under each law allegedly violated here, is that WMATA has failed to provide a comparable paratransit service to its fixed-route services. This is a universal claim, the metric for which is systemic, rather than specific: either the system provided to the putative class members is comparable, or it is not. Unlike the typical discrimination claim, the individualized claims are not so much that the plaintiffs have suffered targeted, personalized discrimination, but rather that they have been individually discriminated against via systems-level violations of the ADA (and, derivatively, the Rehabilitation Act and § 1983).  This distinction cautions against following in lockstep the analyses of decisions like Love and Falcon. Moreover, the court notes that imposing (at this or at any other stage in this litigation) an obligation that plaintiffs identify a "policy" giving rise to their ADA claims would actually go beyond the ADA's legal requirements for establishing a violation of the Act under DOT regulations, any operational pattern or practice that limits availability of paratransit services, whether resulting from a formal policy or not, constitutes a violation of the Act's comparability requirement. 49 C.F.R. § 37.131(f).

DRC v. WMATA at 26.

Courts have noted that certification pursuant to subsection (b)(2) is particularly appropriate where the defendant has acted in a uniform manner towards the members of the class, such that class-wide injunctive relief is the appropriate remedy to redress the defendant's wrongdoing.  As this Circuit observed, certification pursuant to Rule 23(b)(2) "is particularly well-suited . . . where 'a party is charged with discriminating unlawfully against a class.'" In re Veneman, 309 F.3d 789, 792 (D.C. Cir. 2002).  A class of cases found to fall squarely within the category authorized by subpart (b)(2) are civil rights cases, which seek broad declaratory or injunctive relief for a large class whose composition periodically changes.  In drafting subpart (b)(2) of Rule 23, the Federal Rules Advisory Committee "cited civil rights cases as the chief category of action for which the (b)(2) category was created."  Indeed, cases seeking injunctive relief to

correct violations under the ADA and Rehabilitation Act are routinely granted class certification.[3]

The fact that, in addition to a equitable relief, the plaintiffs here also sought and obtained some money damages  is no bar to certification under subdivision (b)(2). "[C]ertification under Rule 23(b)(2) is not limited to actions requesting only injunctive or declaratory relief, but may include cases that also seek monetary damages." Thomas v. Christopher, 169 F.R.D. 224, 239 (D.D.C. 1996), aff'd in part and rev'd in part on other grounds, 139 F.3d 227 (D.C. Cir. 1998).  Hence, courts generally permit (b)(2) classes to recover monetary relief in addition to declaratory or injunctive relief, at least where the monetary relief does not predominate.  See Eubanks v. Billington, 110 F.3d 87, 92

---

[3]  See, Marcus v. Kansas Dept. of Revenue, 206 F.R.D. 509 (D. Kan. 2002) (certifying class of plaintiffs in suit alleging that fee charged by state for disabled parking placards and identification cards violated Title II of the ADA; Alexander A v. Novello, 210 F.R.D. 27 (E.D.N.Y. 2002) (allowing plaintiffs with psychiatric disabilities suing defendant for failure to provide placement in treatment facilities with reasonable promptness in violation of Title II of the ADA to proceed on behalf of a similarly situated class); Nat'l Org. on Disability v. Tartaglione, No. 01-1923, 2001 WL 1258089, at *1 (E.D. Pa. Oct. 22, 2001) (certifying a class of plaintiffs claiming that city commissioners denied them equal access to polling places in violation of ADA Title II and Section 504 of the Rehabilitation Act); Siddiqi v. Regents of Univ. of Cal., No. C 99-0790, 2000 WL 33190435, at *1 (N.D. Cal. Sept. 6, 2000) (certifying a class of hearing impaired students who alleged that defendant failed to provide equal access to the benefits of the programs, services and activities of the school in violation of Title II of the ADA and the Rehabilitation Act); Duprey v. Conn. Dept. of Motor Vehicles, 191 F.R.D. 329 (D. Conn. 2000) (granting plaintiffs' motion for class certification in a suit alleging that the state violated Title II of the ADA by charging a fee to obtain windshield placards for handicapped-designated parking spaces); Anderson v. Dept. of Public Welfare, 1 F. Supp. 2d 456 (E.D. Pa. 1998) (allowing class certification for plaintiffs claiming that mandatory managed care provided to persons with impaired mobility did not comply with Title II of the ADA); Kathleen S. v. Dept. of Public Welfare, No. 97-6610, 1998 U.S. Dist. LEXIS 2027, at *1 (E.D. Pa. Feb. 25, 1998) (granting motion for class certification in action against defendant for failure to provide services to institutionalized plaintiffs in the most integrated setting in contravention of Title II); Thrope v. Ohio, 173 F.R.D. 483 (S.D. Ohio 1997) (granting plaintiffs' motion for class certification in a suit alleging that the state violated Title II of the ADA by charging a fee to disabled persons for obtaining vehicle placards); Civic Ass'n of Deaf v. Giuliani, 915 F. Supp. 622 (S.D.N.Y. 1996) (allowing a class action in plaintiffs' suit to enjoin removal of alarm boxes from city streets as an alleged violation of Title II of the ADA and Section 504 of the Rehabilitation Act); McKay v. County Election Comm'rs, 158 F.R.D. 620 (E.D. Ark. 1994) (certifying class of plaintiffs claiming defendant denied accessibility to polling places for disabled voters in violation of Title II of the ADA).  For a sampling of cases granting class certification in cases alleging violation of Title III of the Americans with Disabilities Act, see Assoc. for Disabled Ams. v. Amoco Oil Co., 211 F.R.D. 457 (S.D. Fla. 2002); Access Now, Inc. v. Ambulatory Surgery Ctr. Group, Ltd., 197 F.R.D. 522 (S.D. Fla. 2000); Colo. Cross-Disability Coal. v. Taco Bell Corp., 184 F.R.D. 354 (D. Colo. 1999); Guckenberger v. Boston Univ., 957 F. Supp. 306 (D. Mass. 1997); Arnold v. United Artists Theatre Circuit, Inc., 158 F.R.D. 439 (N.D. Cal. 1994).

(D.C. Cir. 1997) (citations omitted); <u>DeBoer v. Mellon Mortg. Co.</u>, 64 F.3d 1171, 1175

(8th Cir. 1996); <u>Chang v. United States</u>, 217 F.R.D. 262, 273 (D.D.C. 2003); <u>Taylor v.</u>

<u>District of Columbia Water & Sewer Auth.</u>, 205 F.R.D. 43, 49 (D.D.C. 2002); <u>Pigford v.</u>

<u>Glickman</u>, 182 F.R.D. 341, 350-51 (D.D.C. 1998); <u>Brown v. Artery Org., Inc.</u>, No. 86-

3285, 1987 WL 9044, at *4 (D.D.C. Mar. 19, 1987) (citations omitted).  As a leading

authority on civil procedure has explained,

> At this point, it is simply important to note that the main focus
> in determining the applicability of subdivision (b)(2) is
> whether the injunctive relief that is being sought is deemed
> to be the primary relief, with money damages being only
> incidental.  A suit predominately seeking money damages
> does not qualify under this portion of the rule.  But
> certification under Rule 23(b) may be allowed in actions
> involving some damages as long as they are incidental, such
> as back pay claims in employment-discrimination suits
> seeking to end certain practices of the employer.

7AA Charles Alan Wright & Arthur R. Miller, <u>Federal Practice and Procedures</u> § 1775, at

61-70 (3d ed. 2005) (emphasis added and internal footnotes omitted).

## C.   <u>A Settlement Class Is Appropriate under Rule 23(b)(2).</u>

In assessing class certification in this case, reference to the proposed Settlement

Agreement is relevant.  As one court observed in approving a class action settlement in

a similar case involving the Metropolitan Transit Authority in San Antonio, Texas:

> The rule that a court should consider a proposed settlement,
> if one is before it, when deciding certification issues makes
> good sense.  Settlements and the events leading up to them
> add a great deal of information to the court's inquiry and will
> often expose diverging interests or common issues that were
> not evident or clear from the Complaint.

<u>Neff v. VIA Metro. Transit Auth.</u>, 179 F.R.D. 185, 192 (W.D. Tex. 1998)

(quotations and citations omitted).  However, the Supreme Court has cautioned that a

settlement, "though a relevant factor, does not inevitably signal that class certification should be granted more readily than it would were the case to be litigated." Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 620 n.16 (1997).

As detailed below, the proposed Settlement Agreement in this case confirms that the settlement class as defined therein should be certified under Rule 23(b)(2).

## V.   THE SETTLEMENT AGREEMENT COMPRISES A REASONABLE AND FAIR BALANCE OF THE RISKS AND BENEFITS OF FURTHER LITIGATION

### A.   The Settlement Agreement Provides Comprehensive Retroactive and Prospective Relief to the Class.

The proposed Settlement Agreement contains sets forth  main areas of relief for the class:  (1) coupons for free rides for all active MetroAccess customers; (2) specific performance and  service commitments on the part of MetroAccess; (3) monitoring of MetroAccess's performance and data compilation and retention through the current and following three fiscal years; and (4) monetary relief to the named plaintiffs and other class members deposed in this action.  The Settlement also provides for reimbursement of a fraction of the fees and expenses incurred by plaintiffs' attorneys.

Each of these areas is summarized below, although this summary is not intended to supersede or modify any provisions of the proposed Agreement.

#### 1.   Class Members will Receive Coupons for Free Rides  to Compensate for Alleged Poor Service

##### a.   Free Rides For Alleged Past Service Deficiencies

WMATA will provide 10 coupons for free rides to each of approximately 18,000 currently active customers of MetroAccess.  The value of these coupons exceeds $450,000.[4]

---

[4]   The exact number of current MetroAccess customers entitled to these coupons will not be known

          b.    <u>Free  Coupons for Future Poor Service.</u>

WMATA will provide free ride coupons to class members (whether or not currently active) for poor service during  the three-year Duration of the Settlement Agreement,  in two respects.  First, for each Late Trip, WMATA will provide two coupons for a free ride.  Second, for each "Pattern of Poor Service" WMATA will provide two coupons, up to a maximum of 20 coupons (i.e., 10 instances) of poor service for the Duration of the Settlement Agreement.  Coupons in excess of these 20 will be provided upon verification by the Service Expert that such a Pattern has taken place for that customer.

Thus, the proposed Settlement Agreement provides that members of the class will be retrospectively and prospectively compensated for their claims of service deficiencies.

        2.    <u>WMATA will contractually require  specific performance standards and implement numerous recommendations to improve performance.</u>

One of the key provisions of the Settlement Agreement is WMATA's commitment to contractually require its MetroAccess contractor to adhere to specified  performance standards and to implement many of the recommendations proposed by four performance-related studies undertaken in 2005 and 2006.

These recommendations  are summarized in Attachment A to the Settlement Agreement**.**  They relate to areas such as the training and staffing of the MetroAccess telephone reservations  and dispatching center, additional vehicles, improved

---

until the date of Final Court Approval.  The current figure as of the date of this filing is 18,665. Since customers are currently charged $2.50 for each ride, the coupons  represent a value of  $466,375.00 if the number of active customers remains unchanged as of the date of Final Court approval.

processing of customer complaints, and validation of performance data. The attachment

categorizes WMATA's commitments into three categories: (1) items that have been

accomplished prior to finalization of the Settlement Agreement and which will be

monitored to ensure continued commitment; (2) items that WMATA has committed to

perform during the Duration of the Agreement; and (3) items that WMATA will strive to

achieve during the Duration of the Agreement, but which will not be binding upon

WMATA thus will not give rise to a new complaint in federal court.

These commitments are to be implemented by substantial additions to the

MetroAccess  budget for three fiscal years.  WMATA has already moved forward with a

total of approximately $4 million in service enhancements for its fiscal year 2008,[5] and

has agreed to continue these enhancements for each of fiscal years 2009 and 2010.  Of

this $4 million per year, $3 million is targeted towards general service enhancements

that will be used to implement specific recommendations from the four aforementioned

studies, as  indicated in Attachment A to the Settlement Agreement, and additional

budgetary commitments towards implementing increased standards of performance as

now required by recent amendments to the MV contract.

The additional $1 million for fiscal year 2008 has already been committed for

enhancing complaint processing capabilities; enhancing MetroAccess's communications

systems to improve receiving and responding to customer communications and

accepting and managing reservations; and improving the communications capabilities

and services in the areas such as unreasonably long telephone hold times, and the

failure to timely or adequately answer the telephone or properly communicate  with

---

[5]    WMATA's fiscal year 2008 runs from July 1, 2007 to June 30, 2008.

drivers.  This commitment will be sustained for fiscal years 2009 and 2010. See Section V.A of the proposed Settlement Agreement.

Important to WMATA's forward-looking obligations is the parties' joint commitment to Alternative Dispute Resolution of any disputes concerning compliance with  the Agreement, the performance standards  or the commitments  detailed in attachment A to the Agreement.  An comprehensive ADR component is built into the Settlement to avoid future litigation to the greatest extent possible. That is, the settlement is to be reflected in an enforceable contract, not a consent decree, and access to the Court to resolve disputes requires the initiation of a new lawsuit alleging breach of contract. See Section VIII of the proposed Settlement Agreement.

In consideration of this relief, the proposed settlement provides that class members will release all claims they brought in this action and that they will adhere to a three-year moratorium on the filing of similar claims in the future.  The moratorium is applicable to all class members, including those who become eligible to utilize MetroAccess in the future.  However, the release and moratorium are inapplicable to certain rights and claims, including individual personal injury claims and other claims of a personal nature.  In addition, the statute of limitations is tolled as to all future claims subject to the moratorium.  See Section III of the proposed Settlement Agreement.

The proposed Settlement Agreement does not address the issue whether the Court should permit class members to be excluded from, that is to "opt-out" of, the settlement class.  However, the proposed Settlement Agreement provides that if opt-outs are permitted, WMATA may withdraw from the settlement under specified circumstances.  See Section IX.F of the proposed Settlement Agreement.  WMATA will

shortly file a separate motion with respect to opt-outs and, pursuant to a Memorandum of Understanding that the parties will separately disclose to the Court, plaintiffs  take no position on this issue.  The parties have agreed that the proposed Settlement Agreement will be deemed modified to reflect the Court's determination on the opt-out issue.

        3.       <u>A comprehensive Monitoring and Compliance Program will be Implemented at WMATA's expense</u>

        a.       <u>Retention of Independent  Experts</u>

The Settlement Agreement provides for the retention of two independent experts jointly selected by the parties: a Data Expert and a Service Expert.  The Data Expert will review, validate, analyze and provide recommendations on MetroAccess's performance data.  WMATA will provide the Data Expert with monthly reports and other data necessary for this purpose and budget $60,000 to pay for these services provided that no more than 25 percent of the fees may be paid prior to Final Court Approval of the settlement.  Provisions are included for four annual reports by the Data Expert to the parties and proposals for changes as a result of the Data Expert's recommendations.

The Service Expert will  monitor MetroAccess's service  and assess WMATA's compliance with its various performance-related commitments under the Settlement Agreement.  WMATA has agreed to budget and pay this expert $110,000 for these services provided that no more than 25 percent of the fees may be paid prior to Final Court Approval.  All of the expenditures for the experts are in addition to the amounts committed to service, complaint, and communications enhancements as set forth above.

The Service Expert will submit four reports to the parties starting at the beginning of the settlement period and annually thereafter; these reports will contain proposals for actions to remediate any problems the expert identifies. These proposals are subject to the ADR provisions of the Agreement discussed above  if the parties cannot agree on their implementation.

### b.   MetroAccess Task Force

WMATA will set up a Task Force to advise the Board of Directors of WMATA on matters concerning MetroAccess.  Plaintiff ERC is guaranteed at least one representative on this Task Force.

### c.   Floating Reserve

Recognizing that some uncertainties exist with respect to the costs of the commitments in the Settlement Agreement, the costs of monitoring and the fees of the experts, WMATA has agreed to set aside an additional budgetary item of $180,000 as a "Floating Reserve" that plaintiffs may apply as they deem necessary to achieve the purposes of the Agreement.  If WMATA declines to utilize these funds as requested by plaintiffs, any disputes will be subject to the ADR procedures in the Agreement.  Again, these are additional monetary commitments beyond the annual $4 million in service enhancements.

### d.   Extra Board Vehicles

In addition to its scheduled routes each day, WMATA has agreed to establish an "extra board" of vehicles to serve to prevent excessively late, excessively late or missed trips.  One extra vehicle will be on standby in each of the three WMATA jurisdictions

(the District, Maryland and Virginia), with priority being accorded to those customers who identify a health issue associated with the ride.

      e.    <u>Monitoring Costs and Expenses</u>

WMATA has agreed to pay ERC up to $100,000 for the first year of the Agreement and $75,000 in each of the second, third and fourth years of the Agreement to cover the costs of monitoring WMATA's compliance with the Agreement.  These expenses will be reimbursed on a quarterly basis and supported by documentation by ERC.

      **4.**    <u>WMATA Will Provide Monetary  Compensation to those involved in the Litigation</u>

The proposed Settlement Agreement provides for several components of "make-whole" monetary compensation to those who devoted time, assistance and resources to the plaintiffs' pursuit of this action.  The first component is WMATA's payment of $5,000 to each of the 13 named plaintiffs.  Second, each of the 16 members of the class who was deposed but is not a named plaintiff will receive $1,000.00. Thirdly, plaintiff ERC will receive $65,000.  These payments are appropriate given the efforts expended by the recipients in support of this litigation, efforts particularly demanding and time-consuming given their serious disabilities.  <u>See</u> Declaration of Todd Bromberg appended thereto as Exhibit E("Bromberg Dec.") at Para. 10.  Likewise, the staff of the institutional plaintiff ERC also devoted considerable resources to this litigation. <u>See</u> Declaration of E. Elaine Gardner appended hereto as Exhibit F ("Gardner Dec.) at para. 8 and 9. It should also be noted that these payments represent only a small fraction of the $14 million value of the settlement's total  benefits , most which provide class-wide relief, as discussed above.  <u>Id.</u>

5.      WMATA will Pay Some of  Plaintiffs Attorneys Fees and Expenses

In addition, WMATA will pay  plaintiffs attorneys $964,000.00 for their profession

services and expenses incurred in prosecuting the case.  See Section VII of the

proposed Settlement Agreement.  This amount which, includes over $81,500 in

expenses such a copying and court reporter expenses, reflects over 9,000 hours of

attorney and paraprofessional time incurred by Wiley Rein LLP and the Washington

Lawyers Committee since 2004.  At commercial hourly rates, fees for these services

would have been nearly $3 million. Thus, WMATA's fee payment is  less than one-third

of amount that plaintiffs would have sought under the Rehabilitation Act  had they not

settled and had they prevailed in this action  See Bromberg Dec. at  para. 4 to 7

Gardner Dec at para. 2 to 6. See also Boeing Company v. Van Gement, 444 U.S. 472

(1980).

**B.     THE SETTLEMENT AGREEMENT PROPERLY BALANCES THE
        PARTIES' RESPECTIVE RISKS OF LITIGATION.**

Rule 23(e) requires the Court to determine whether the proposed settlement "is

fair, reasonable, and adequate under the circumstances and whether the interests of

the class as a whole are being served if the litigation is resolved by settlement rather

than pursued." In re Vitamins Antitrust Litig., 305 F. Supp. 2d 100, 104 (D.D.C. 2004);

Ball v. AMC Entm't, Inc., 315 F. Supp. 2d 120, 125 (D.D.C. 2004) (stating that courts

must consider the facts and circumstances of each case).  In making this determination,

courts in this jurisdiction have examined the following factors:  (a) whether the

settlement is the result of arm's length negotiations; (b) the terms of the settlement in

relation to the strength of plaintiff's case; (c) the status of the litigation at the time of

settlement; (d) the reaction of the class; and (e) the opinion of experienced counsel.  In

re Vitamins Antitrust Litig., 305 F. Supp. 2d at 104.  A district court has stated that "[b]y

far the most important factor is a comparison of the terms of the proposed settlement

with the likely recovery that plaintiffs would realize if they were successful at trial."

Blackman v. Dist. of Columbia, 454 F. Supp. 2d 1 (D.D.C. 2006).

As one court in Colorado colorfully  put it in assessing a class action settlement

> The Court should consider the vagaries of litigation and
> compare the significance of immediate recovery by way of
> the compromise to the mere possibility of relief in the future,
> after protracted and expensive litigation.  In this respect, "It
> has been held proper to take the bird in the hand instead of
> a prospective flock in the bush."

Oppenheimer v. Standard Oil Co.(Indiana) 64 F.R.D. 597,624 (D. Colo. 1974).

Both plaintiffs and WMATA approached the settlement negotiations with

strengths and weaknesses in their cases.  As describe above, plaintiffs had gathered

significant evidence showing individual  problems with MetroAccess's services, and

several independent studies by outside experts, which corroborated the existence of

systemic deficiencies in MetroAccess's performance over time through 2006.

By contrast, WMATA presented evidence that many of the problems that had

existed when the suit was filed in 2004 had been corrected.  A new contractor was

retained to operate the service in 2006.  Although the first several weeks of transition

between the old and new contractor were problematic, service had improved

significantly by the time WMATA's litigation experts analyzed MetroAccess's service.

Specifically, although the *KFH Report* recognized the unique difficulties WMATA faced

in providing service in three jurisdictions, with the challenging traffic problems in the

Washington, D.C. area, KFH nonetheless rated WMATA's provision of service as comparable, if not superior, to that of other similar metropolitan areas.  Moreover, WMATA had established through a comprehensive field study that it meets the ADA standards of providing service comparable to that of its fixed route service.  See *Mann Report* at ¶ 24.  Indeed, this study concluded that MetroAccess provided <u>superior</u> service to that of bus and rail at  statistically significant levels.  Id. Plaintiffs submitted no expert report to contest these findings although they planned to challenge the KFH study via cross-examination and by reliance on the Adams Report and other studies discussed above.

In addition, this case presented legal issues of first impression involving the standing of plaintiffs to sue for many of their alleged violations; the Court had determined only that plaintiffs' claims were "not frivolous," DRC v. WMATA at 18.  In the absence of settlement, WMATA planned to pursue these issues on summary judgment.

WMATA faced, however, the risk that plaintiffs' case would survive summary judgment and go to a jury.  Both sides faced the reality that the matter would not be resolved promptly, for an appeal to the D.C. Circuit was likely no matter which party prevailed.

For all of these reasons, the parties concluded that settlement was the best approach for both sides and for the disabled community that uses MetroAccess.  It allowed WMATA to move forward with its primary focus being on the service to its customers instead of litigation, and it allowed plaintiffs a negotiated resolution that was far superior to a retrospective-looking monetary judgment and, instead, produced a

forward-looking comprehensive resolution of the systemic problems they alleged continue to render MetroAccess service unlawfully deficient.

Moreover, the parties were represented by experienced class action counsel on both sides and negotiated the settlement at arm's length over a six-month period. Indeed, the settlement process proved so difficult that in its final month the parties agreed to mediate the outstanding issues and utilized the services of John Bickerman, a professional mediator, in this regard. As <u>Newberg</u> has recognized, " the courts respect the integrity of counsel and presume the absence of fraud or collusion in negotiating the settlement, unless evidence to the contrary is offered." 3 <u>Newberg on Class Actions</u> § 11:51 at 158 (2002).[6]

### C. THE PROPOSED NOTICE REQUIREMENTS MEET THE REQUIREMENTS OF RULE 23

Attachment C to the proposed Settlement Agreement is the form of notice about the settlement and class certification that the parties request the Court to sign and cause to be provided to all class members.  The notice summarizes the settlement and court certification findings, explains how comments and objections to the settlement can be submitted to the Court, and schedules a Fairness Hearing to hear from the parties and other interested persons prior to final court approval of the settlement. It should be noted that most of WMATA's commitments under the proposed Settlement Agreement only become effective after the Fairness Hearing and final court approval.

---

[6]    Another court put it as follows: "The settlement agreements are the product of four years of good faith, arduous bargaining between well-experienced counsel.  Having explored the issues raised by their pleading objectively, thoroughly and intelligently and assessed the probabilities of ultimate success, counsel for both sides agree that the settlements are well advised and necessary.  Notwithstanding the court's substantial involvement in the suit over the last five years, the parties' counsel are best able to weigh the relative strengths and weaknesses of their arguments".  <u>In re Chicken Antitrust Litigation</u>, 560 F. Supp. 957, 962 (N.D. Ga. 1980).

WMATA has agreed to provide the requisite notice, to  bear the costs thereof, and in doing so to take account of the challenges of communicating with many in the disabled community. The proposed Settlement Agreement provides that the  Notice will occur in several formats.  First, WMATA will send, by first class mail, the proposed Notice of Fairness Hearing and a complete copy of the Settlement Agreement to the current home address on file with WMATA for each active customer.[7]  Second, WMATA will send the notice in accessible formats  to all customers who are known to have a visual impairment.  Third, the Notice of Fairness Hearing will be posted on the MetroAccess portion of WMATA's website for 60 days.  Fourth, a Summary of the Notice will be posted in all dedicated MetroAccess vehicles for 30 days.  The Notice and the Summary will contain a telephone number which will be established  by plaintiffs' counsel to respond to any questions by members of the class about the proposed Settlement.  A copy of the Summary of the notice is attached as Exhibit E to the proposed Settlement Agreement

Following  notice, the parties propose that class members  have sixty days to file comments or objections to the settlement, that counsel have 21 days to respond to any comments or objections, and that a Fairness Hearing be set not earlier than ninety days from preliminary approval.  These time frames are more than adequate to permit the members of the class to consider the Settlement and present their views to the Court.

## VI.    CONCLUSION

This Settlement Agreement achieves a comprehensive resolution of  long-standing litigation affecting the public interest.  It provides retrospective relief for the

---

[7]    An "active rider" is defined as a customer who has taken a trip on MetroAccess during the last calendar year.

members of the class, but most importantly, it represents a commitment by WMATA to

an infusion of more than $13 million over three years towards improving its service to

the disabled community.  The proposed Settlement Agreement meets all of the

requirements of Rule 23 of the Federal Rules of Civil Procedure.  The parties jointly

request that the Court approve it preliminarily under Fed. R. Civ. P. 23(c) and order that

Notice be sent as outlined in the Settlement Agreement in the form attached hereto.

Respectfully submitted:

**WILEY REIN LLP**

**WASHINGTON METROPOLITAN
AREA TRANSIT AUTHORITY**

_____/s/_____

_____/s/_____

Todd A. Bromberg #472554
M. Evan Corcoran #4400
Keith Watson #140269
1776 K St., N.W.
Washington, D.C. 20006
(202) 710-7000

Carol B. O'Keeffe #445277
General Counsel

_____/s/_____

Bruce P. Heppen #252171
Associate General Counsel
(202) 962-2569

WASHINGTON LAWYERS' COMMITTEE
FOR CIVIL RIGHTS AND URBAN AFFAIRS
E. Elaine Gardner #271262
11 Dupont Circle, N.W., Ste 400
Washington, D.C. 20036
(202) 319-1000

_____/s/_____

David J. Shaffer #413484
Assistant General Counsel
600 Fifth St., N.W.
Washington, D.C. 20001
(202) 962-2820

**Attorneys for Plaintiffs**

**Attorneys for Defendants**

12747837.2