IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

EQUAL RIGHTS CENTER, et al.,

   Plaintiffs

v.

WASHINGTON METROPOLITAN AREA
TRANSIT AUTHORITY, et al.

   Defendants.

CA 04-0498 (HHK)

## SETTLEMENT AGREEMENT

WILEY REIN LLP

Thomas W. Brunner # 170480
Todd A. Bromberg #472554
Keith Watson #140269
1776 K St., N.W.
Washington, D.C. 20006
(202) 719-7000

WASHINGTON LAWYERS'
COMMITTEE FOR CIVIL RIGHTS
AND URBAN AFFAIRS
E. Elaine Gardner #271262
11 Dupont Circle, N.W., Ste 400
Washington, D.C. 20036
(202) 319-1000
Attorneys for Plaintiffs

WASHINGTON METROPOLITAN AREA
TRANSIT AUTHORITY

Carol B. O'Keeffe #445277
General Counsel

Bruce P. Heppen #252171
Associate General Counsel
(202) 962-2569

David J. Shaffer #413484
Assist-ant General Counsel
(202) 962-2820

600 Fifth St., N.W.
Washington, D.C. 20001
Attorneys for Defendants

# TABLE OF CONTENTS

Page

I.      INTRODUCTION ...................................................................................................... 1

II.     DEFINITIONS .......................................................................................................... 3

III.    RELEASE AND MORATORIUM............................................................................. 7

      A.      Release of Claims .......................................................................................... 7

      B.      Moratorium on Claims ................................................................................... 7

      C.      Claims Exempt from Release and Moratorium .............................................. 8

IV.     GENERAL PROVISIONS ........................................................................................ 8

V.      EQUITABLE CLASS-WIDE RELIEF ..................................................................... 9

      A.      General Service Enhancements....................................................................... 9

      B.      Data Expert ................................................................................................... 13

      C.      Service Expert .............................................................................................. 15

      D.      MetroAccess Advisory Task Force .............................................................. 17

      E.      Floating Reserve ........................................................................................... 17

      F.      Extra Board Vehicles ................................................................................... 18

      G.      Future Monitoring of Services ..................................................................... 18

      H.      Future Rider Vouchers ................................................................................. 19

VI.     OTHER RELIEF...................................................................................................... 20

      A.      Class Wide Rider Vouchers ......................................................................... 20

      B.      Monetary Compensation .............................................................................. 20

VII.    REASONABLE ATTORNEYS FEES AND COSTS .............................................. 21

VIII.   DISPUTE RESOLUTION ...................................................................................... 21

      A.      Alternative Dispute Resolution .................................................................... 21

      B.      Court Resolution ........................................................................................... 23

IX.     PROCEDURES GOVERNING PRELIMINARY COURT APPROVAL AND
      FAIRNESS HEARING ............................................................................................ 24

      A.      Joint Motion ................................................................................................. 24

      B.      Notice ........................................................................................................... 25

      C.      Objections to this Settlement Agreement ..................................................... 25

      D.      Fairness Hearing ........................................................................................... 26

      E.      Best Efforts of Counsel................................................................................. 26

      F.      Opt-Outs and Voidability............................................................................. 27

i

## TABLE OF CONTENTS

**Page**

X.    OTHER PROVISIONS ............................................................................................. 28

    A.    Counterparts ................................................................................................ 28

    B.    Entire Agreement ........................................................................................ 28

    C.    Non-Waiver ................................................................................................. 29

    D.    Headings ..................................................................................................... 30

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

EQUAL RIGHTS CENTER, et al.,

   Plaintiffs

   v.

WASHINGTON METROPOLITAN AREA
TRANSIT AUTHORITY, et al.

   Defendants.

CA 04-0498 (HHK)

## SETTLEMENT AGREEMENT

This Settlement Agreement ("Agreement") is entered into this ____ day of December

2007, by and between the **Class Representatives**, Settlement Class, and **Defendants** in *Equal*

*Rights Center et al. v. Washington Metropolitan Area Transit Authority*, a lawsuit filed as a class

action (the "Action") and pending in the United States District Court for the District of Columbia

(the "Court").

## I.   INTRODUCTION

**WHEREAS,** on March 29, 2004, plaintiffs Disability Rights Council of Greater

Washington, Inc.,[1] and Justin Chappell, Victor Deskin, Marquette Henderson, Marsha Johnson,

Victoria Smith, Mary Wright, Darnise Henry Bush, Dorothy Crawford, Mary Williams, Pamela

Awkerman, Edward McEntee and Michelle Vadnais, individually and on behalf of a class of

---

[1]   The Disability Rights Council later merged into the Equal Rights Center, which was substituted as a plaintiff in this case.

similarly situated individuals, initiated the Action in this Court alleging that Defendant

Washington Metropolitan Area Transit Authority ("**WMATA**") had violated and was continuing

to violate the Americans with Disabilities Act, 42 U.S.C. § 12131 *et seq*. ("ADA"), Section 504

of the Rehabilitation Act of 1973, 29 U.S.C. § 794 *et seq*. ("Rehab Act"), and 42 U.S.C. § 1983

(collectively, "the Acts"), in its provision of services by **MetroAccess**, **WMATA**'s paratransit

service to the disabled community.

      **WHEREAS,** on March 6, 2006, the above-referenced plaintiffs filed a Second Amended

**Complaint** adding two additional plaintiffs, Ellen Rickerson and Anna Brow, and defendant

General Manager of **WMATA** in his official capacity, alleging that he had violated 42 U.S.C.

§ 1983 by denying plaintiffs their civil rights under color of law.

      **WHEREAS,** the plaintiffs filed a motion for class certification on December 1, 2004,

which **Defendants** opposed.  On December 14, 2006, the Court granted the motion,

conditionally certifying a class of all **MetroAccess** customers, under Fed. R. C. P. 23(b)(2), but

bifurcated the liability and damages phases of the Action.  *Disability Rights Council v. WMATA*,

239 F.R.D. 9 (D.D.C. 2006).  The Court ruled that it would decide whether to maintain the class

for damages if there were a finding of liability.

      **WHEREAS,** the **Parties** engaged in an extensive period of discovery in which

**Defendants** took the depositions of the named plaintiffs and 16 other members of the class and

produced extensive documentation; and plaintiffs deposed numerous **MetroAccess** employees

and other high level employees of **WMATA** and a member of its Board of Directors and

produced extensive documentation.

      **WHEREAS,** the **Parties** have engaged in over six months of intense settlement

discussions at arms' length.

**WHEREAS, WMATA** denies that it has violated any law, regulation or standard or that it has harmed plaintiffs or the class in any way, and that this Agreement should not be construed as an admission of liability.

**WHEREAS,** in the interest of avoiding the expenses, delay and inconvenience of further litigation of the issues raised in the Action, with a mutual interest in improving **MetroAccess** service, and in reliance on the representations contained herein;

**NOW, THEREFORE,** it is stipulated and agreed that in consideration of the promises and mutual covenants set forth in this Agreement, the entry by the Court of an Order certifying the class, and a final order and judgment dismissing the Action with prejudice and approving the terms and conditions of the settlement as set forth in this Agreement, as required by the Federal Rules of Civil Procedure, the Action will be settled and compromised under the terms and conditions contained herein.

## II.  DEFINITIONS

1.  **"Active MetroAccess Customers"** shall mean a customer of **MetroAccess** whose eligibility for paratransit services with **WMATA** is valid and in effect on the date of **Final Court Approval**.

2.  **"Alleged Discriminatory Practices"** shall mean missed, overly long and or circuitous trips, **Late Trip**s or arrivals, early trips or arrivals, practices relating to the failure to answer telephone calls promptly or answering calls rudely, overly long periods of telephone callers not being assisted or responded to, failure to respond to **complaints** in a timely or proper fashion, rude or poorly trained reservation agents, negligent or poorly trained drivers, inadequate or unsafe equipment or vehicles, or any other policy, practice or procedure that renders **MetroAccess'** provision of services not comparable to that provided by **WMATA** for its fixed route customers or which is alleged to constitute a "capacity constraint" (as defined by 49 C.F.R.

§ 37.131(f)(3)) on the provision of paratransit services or any other practice subsumed within the

scope of the Second Amended Complaint. **WMATA** does not concede that the matters

described in this paragraph, if proven, constitute a violation of the ADA or the Rehabilitation

Act.

3.　　**"Class Representatives"** shall mean Plaintiffs Justin Chappell, Victor Deskin,

Marquette Henderson, Marsha Johnson, Victoria Smith, Mary Wright, Darnise Henry Bush,

Dorothy Crawford, Mary Williams, Pamela Awkerman, Edward McEntee, Michelle Vadnais,

Ellen Rickerson, and Anna Brow.

4.　　**"Contractor"** shall mean MV Transportation or any other company serving as a

prime contractor to **WMATA** in connection with **MetroAccess**.

5.　　**"Contract"** shall mean the **MetroAccess** operating **contract** or **contracts** (as

currently amended) between **WMATA** and its prime **Contractor** #C-05108, as modified by

Modification #011 and as may be subsequently modified by **WMATA**.

6.　　**"Complaint"** shall mean an oral or written customer **complaint of Alleged**

**Discriminatory Practices** made to **WMATA** or its **Contractor**, but does not include complaints

about **WMATA**'s policies or procedures in general or eligibility determinations.

7.　　**"Defendants"** shall mean **WMATA** and the General Manager of **WMATA** in his

official capacity.

8.　　**"Duration of the Settlement Agreement"** shall mean the period of time

beginning on the date of **Final Court Approval** and ending three years later; provided, however,

that any matter referred to mediation under Section VIII.A.5. during the **Duration of the**

**Settlement Agreement** shall survive the expiration of the agreement and be resolved in

accordance with the procedures of Section VIII.A.6.,7. and 8. and with VIII.B.

9.    **"ERC"** shall mean Plaintiff Equal Rights Center.

10.   **"Final Court Approval"** shall refer to that date, following the conduct of a Fairness Hearing and approval of this Settlement Agreement by the Court, on which any and all objections to the Settlement Agreement have been denied or resolved, and Entry of Judgment has been entered in the District Court and after all appeals or the time for any potential appeals have been exhausted.

11.   **"Late Trip"** shall mean a trip which arrives at the pick up location after the scheduled 30-minute pick up window.

12.   **"MetroAccess"** shall mean **WMATA**'s paratransit service for people with disabilities, including but not limited to, the Contractors and Subcontractors that provided or may provide such services.

13.   **"Missed Trip"** shall mean a trip for which the vehicle never arrives, or arrives excessively late such that the passenger may decline the trip without being defined as a "no-show."

14.   **"Parties"** shall mean **ERC**, the **Settlement Class** and **Defendants**.

15.   **"Pattern of Poor Service"** shall mean incidents of **Poor Service** in 15% or more of a customer's total trips or five different trips within a 30-day period.

16.   **"Peak Periods of Service"** shall mean the hours from 5:00 a.m. to 9:30 a.m. and from 3:00 p.m. to 7:00 p.m. on weekdays, or as subsequently modified by **WMATA** for its fixed route system.

17.   **"Performance Standards"** shall mean, solely for the purposes of this Settlement Agreement, the criterion that measure the following factors concerning MetroAccess service provided to members of the Settlement Class: (a) on-time performance = 92%; (b) the sum of

**Missed Trips** and excessively **Late Trips** = 1.5%; (c) telephone response times = 92% ;and (d) incidence of Complaints = 5 complaints per 1000 trips requested.  Compliance with these standards shall be calculated as provided in Attachment D, which is an extract from the **Contract** as modified; however, Attachment D shall not be amended to reflect any future Contract modifications except by mutual consent of the **Parties**.

18.     **"Plaintiff Class," "Members of the Class," "Class Member(s)" or "Settlement Class"** shall refer to disabled individuals who are, were or may become customers of **MetroAccess** at any time from March 29, 2001 through the **Duration of the Settlement Agreement**.

19.     **"Poor Service"** shall mean one or more of the following:  service that fails to meet **Performance Standards**; significant discourtesy or safety lapses by **Contractor** employees; or responses to **Complaints** in a manner inconsistent with this Agreement or the **Contract**; or service that fails to meet service standards established under Section V.C.6. below.

20.     **"Preliminary Court Approval"** shall refer to that date following submission of this Settlement Agreement to the District Court by the **Parties**, but prior to the conduct of a Fairness Hearing, on which the District Court grants initial approval of the Settlement Agreement as fair and authorizes the mail-out of the Fairness Hearing Notice described in Section IX.B.

21.     **"Reasonable Attorneys' Fees and Costs"** shall mean the amount of fees, expenses and costs to be paid consistent with the standards governing the payment of attorneys fees, expenses and costs under 42 U.S.C. § 1988, 42 U.S.C. § 12133, 29 U.S.C. § 794(a), 28 U.S.C. § 1711 *et seq.* and Fed. R. Civ. P. 54(d).  The **Parties** agree that the attorneys' fees and

costs payment set forth in Section VII are consistent with these standards, and that **WMATA** will not challenge nor in any way impede the approval of this payment.

22.     **"Reasonable Efforts"** In assessing the reasonableness of **WMATA**'s efforts, appropriate account shall be taken of budgeted enhancements required by this Agreement and additional costs to implement the proposals at issue.  (*See* Section V.A.2. and VIII.A.1.)

## III.    RELEASE AND MORATORIUM

### A.     Release of Claims.

Except as provided in Section III.C, this Agreement resolves and releases all claims that were brought by any member of the **Settlement Class** that were alleged in the Second Amended **Complaint**.  **Class Members** are forever barred from filing suit asserting any claims released under this Settlement Agreement through **Final Court Approval**, except as provided in Section VIII.B.4. below.

### B.     Moratorium on Claims.

Plaintiffs further agree that, for the **Duration of the Settlement Agreement, Class Members** (i) will not initiate a class action seeking relief such as that sought in the Second Amended Complaint; and (ii) except as provided in Section VIII, will not initiate any action against **WMATA** asserting claims arising out of **Alleged Discriminatory Practices;** provided, however, this moratorium shall be inapplicable to any claims or rights listed in Section III.C. below.  Any action subject to this moratorium which is filed after this moratorium and seeks damages arising during this moratorium shall be adjudicated under the **Performance Standards** (*see* Section II.17); provided, however, that this provision shall be inapplicable to any action seeking damages which arise after this moratorium.  The applicable Statute of Limitations for actions subject to this moratorium shall be tolled during the period of this moratorium.  This

moratorium is made in consideration of **WMATA**'s compliance with the relief described in Section V for the **Duration of the Settlement Agreement**.

### C.   <u>Claims Exempt from Release and Moratorium.</u>

Nothing in this Section III or elsewhere in this Agreement shall:  (1) constitute a release of claims that arise after the **Duration of the Settlement Agreement**; (2) constitute a release of personal injury or other individual rights or claims that are personal in nature; (3) constitute a release of any right to assert individual demands for reasonable modifications of practices and procedures applicable exclusively to that individual; (4) prohibit the United States Department of Transportation or the United States Department of Justice from pursuing alleged violations of the Acts; (5) prohibit any individual (including but not limited to any of the **Class Representatives** or members of the **Settlement Class**) from filing an individual administrative complaint with any federal, state or local government agency that has jurisdiction over **WMATA** or **MetroAccess**; or (6) constitute a release of claims preserved pursuant to Section VIII.B.4. below regarding a breach of **WMATA**'s financial obligations under this Agreement.  The moratorium described in Section III.B. shall be inapplicable to any claims or rights preserved in this Section III.C.

## IV.   <u>GENERAL PROVISIONS</u>

A.   This Agreement constitutes a contract between the **Parties** and shall not be deemed to be an Order of the Court or a Consent Decree.

B.   Solely for the purposes of this Agreement, the **Parties** agree that **WMATA**'s compliance with the **Performance Standards** shall constitute compliance with the ADA and Rehabilitation Act.

C.   To the extent any of the expenditures set forth in this Agreement are subject to **WMATA**'s procurement policies and procedures or require budgetary action in a future year,

**WMATA** agrees to submit and obtain approval for such procurements on an expedited basis and will include the request in its proposed annual budget.

D.     In the event that this Agreement is voided by either Party, or is not approved by the Court, this Agreement shall be inadmissible in any suit, and the rights and claims of the **Parties** shall be preserved without prejudice.

E.     Except for the purposes of this Settlement Agreement, nothing in this Agreement shall be deemed an admission or waiver by any party as to any statutory liability or as to any factual or legal issue.

F.     If the **Data Expert, Service Expert** or the **Mediator** identified in Section VIII.A is unwilling or unable to serve or continue serving as such, the **Parties** shall promptly select a mutually-agreeable replacement; neither Party's agreement in this regard shall be unreasonably withheld.  Unless the **Parties** agree otherwise, the **Data Expert** and the **Service Expert** shall have no other contractual relationship with any **Party** for the **Duration of the Settlement Agreement.**

## V.     EQUITABLE CLASS-WIDE RELIEF

### A.     General Service Enhancements.

1.     In addition to the service enhancements already budgeted for **WMATA**'s 2008 fiscal year, **WMATA** shall augment **MetroAccess**'s budget by three million dollars ($3,000,000) in each of fiscal years 2009 and 2010 over the amount in fiscal year 2007, and commits to expend these amounts to implement specific recommendations from four expert and advisory group reports in the manner indicated in Attachment A and to achieve **Performance Standards**.  Attachment A reflects adopted recommendations from the Best Practices Working Group Recommendations (dated June 15, 2006); Council of Government (COG) Report (dated February 15, 2006); TransSystem "Technical Memorandum" Recommendations (dated June 30,

2006); and Adams Report Recommendations (dated December 8, 2006). These commitments are divided into three categories: (1) commitments that **WMATA** has already implemented and agrees to maintain; (2) commitments which **WMATA** agrees to implement and maintain within the **Duration of the Settlement Agreement**; and (3) commitments that **WMATA** will make good faith efforts to make progress towards achieving in consultation with the **Service Expert**, but which shall not be binding upon **WMATA**.

      2.      **WMATA** shall use **Reasonable Efforts** to comply with the proposals made by the **Data Expert** and **Service Expert** in reports described in Sections V.B and V.C of this Agreement. In the event that **WMATA** does not agree to implement or does not implement the **Data Expert** or **Service Expert**'s proposal, Plaintiffs' Counsel may utilize the dispute resolution mechanism set forth in Section VIII of this Agreement.

      3.      **WMATA** will provide **ERC**, **Service Expert**, and **Data Expert** copies of all non-privileged documents that constitute notice to its **Contractor** that it is not in compliance with the **Performance Standards** or other customer service-related provisions of the **Contract** or documents that warn the **Contractor** that failure to cure certain conditions will result in a failure to comply with the **Performance Standards** or such other customer service related **Contract** provisions. In the event **WMATA** alleges that any such documents are privileged, **WMATA** will provide Plaintiffs' counsel with a privilege log in accordance with the Federal Rules of Civil Procedure within 30 days of receiving or authoring such document. All documents provided to **ERC** and Plaintiffs' counsel will be covered by the Confidentiality Agreement previously approved by Magistrate Judge Facciola.

      4.      **<u>Complaint Processing Enhancements</u>**.

          a.      In addition to existing budgetary commitments for fiscal year 2008, and in addition to the general service enhancements for fiscal years 2009 and 2010

10

described above in Section V.A.1., **WMATA** shall augment **MetroAccess'** budget by five

hundred thousand dollars ($500,000) in each of fiscal years 2009 and 2010 over the amount in

fiscal year 2007 for the purpose of improving its system for processing **Complaints** and to

achieve **Performance Standards**.

   b. **WMATA** shall respond to all **Complaints** as follows:  If initial

contact is by telephone, during the call, the **WMATA** agent will attempt to resolve the

**complaint** with information available from its records.  If further investigation is required, the

agent will advise the customer that the investigation will be continued and that the matter will be

brought to the attention of the appropriate management personnel.  In these circumstances, the

customer will receive a call back within 2 business days.  If the initial contact was made by mail

or e-mail, a response will be sent in the same format within 2 business days after receipt of the

**Complaint**.

   c. **WMATA** shall respond to any customer whose **Complaint** about

multiple incidents of poor service constitutes a **Pattern of Poor Service** as follows:  the response

shall be in writing (or in an alternative format as directed by the customer in **WMATA**'s

customer information sheet).  Each response will identify the nature and date of the **complaint**;

make a determination as to why the alleged **Pattern of Poor Service** has occurred; and describe

any measures **WMATA** or its **Contractor** is taking to correct the same.  **WMATA** shall provide

the written responses described above by first class mail or e-mail (as designated by the rider)

within 30 days after receiving **Complaints** consisting of a **Pattern of Poor Service**.  Provided,

however, that in any calendar month in which **Complaints** exceed 15 per 1,000 trips, **WMATA**

shall provide such written responses within 45 days.  Copies of each response shall be provided

to the **Service Expert** and the **ERC**.

       d.     **WMATA** shall also provide to ERC full remote access to reports in the Trapeze computer system to allow ERC to monitor individual **Complaints**, **Complaint** processing, compliance with **Performance Standards** and individual incidents of **Poor Service.** This data shall only be used for the purpose of monitoring this Settlement Agreement and will be subject to the Confidentiality Agreement signed by Magistrate Judge Facciola. To the extent that such access and information (including computer programs) is within the exclusive control of a **Contractor** or requires a computer program modification, **WMATA** shall cooperate with **ERC**'s efforts to obtain all such data and information, and such computer modification requests; provided that **WMATA** shall not be required to make expenditures for computer program modifications or other costs incurred for this purpose by it or its **Contractor**.  If **ERC** is required to pay for such computer program modifications, funds in the **Floating Reserve** may be used for this purpose.

       e.     The **Service Expert** and **ERC** may request, and **WMATA** will provide, copies of all documents **WMATA** reviews or generates in investigating each alleged **Pattern of Poor Service**, together with a copy of the **Contractor's** files related to the **Complaints** to the extent copies are within **WMATA**'s possession or control.  All documents provided to **ERC** and Plaintiffs' Counsel will be covered by the Confidentiality Agreement previously approved by Magistrate Judge Facciola.

       f.     **WMATA** shall publish on its **MetroAccess** website a monthly report that sets forth the total number of **Complaints** broken down by the type of **Poor Service**, to include at a minimum, **Late Trips**, vehicle no-shows, **Missed Trips**, excessive trip lengths, **Complaints** about reservations or "Where's My Ride" services and miscellaneous (*e.g.* rude or unsafe service) **Complaints** about **Poor Service.**

5.      **Communications Enhancements**.

a.      In addition to the service enhancements described in Section V.A.1., **WMATA** shall augment **MetroAccess'** budget by five-hundred thousand dollars ($500,000) in each of fiscal years 2009 and 2010 over the amount budgeted for fiscal year 2007 for the purposes of improving the communications systems used by **WMATA** and its **Contractor** in operating the **MetroAccess** program, receiving and responding to customer communications, accepting and managing reservations, and improving its communications capabilities and services in areas such as unreasonably long telephone hold times, failure to timely or adequately answer the telephone or communications with vehicle operators.

b.      Following **Final Court Approval**, substantive benchmarks for these communication enhancements shall be proposed on an expedited basis by the Service Expert, with in-put from **WMATA** and **ERC**.  The Service Expert shall include proposals regarding communications enhancements in a report.

**B.     Data Expert.**

1.      Counsel for the **Parties** have jointly selected an expert, Russell Thatcher, to determine the accuracy, reliability and validity of the data used to assess compliance with **Performance Standards**.

2.      **WMATA** shall provide the **Data Expert** and Plaintiffs' Counsel with all reconciled monthly reports, setting forth performance-related data that is currently reflected in monthly reports provided by the **Contractor** to **WMATA**, and other data and information sufficient to undertake the tasks describe in Section V.B.1.  This includes information in the possession of the **Contractor** to which **WMATA** has access.

3.      In addition to the budgetary commitments for fiscal year 2008, and in addition to the general service enhancements described above in Section V.A., **WMATA** shall

13

budget and pay the **Data Expert** fees and expenses to total in the aggregate $60,000 for work to be performed from **Preliminary Court Approval** and thereafter through **Duration of the Settlement Agreement**, provided, however, that no more than 25% of the Data Expert's fees shall be paid prior to **Final Court Approval**.

    4. The **Data Expert** shall review and issue four reports assessing performance-related data to ensure its accuracy, reliability and validity, in particular reviewing and making proposals relating, but not limited to:

      a. System data flaws resulting in trips being incorrectly entered as "no shows," including investigation of whether all automated systems using MDTs have separate buttons for "**Missed Trip**s."

      b. Misclassification of late, missing and cancelled rides as "on time," including investigation of the alleged practices of classifying late rides as "on time" by rebooking late rides and recording arrival time of substitute vehicle and classifying missed rides as "on time" when rider elects not to board excessively late vehicle.

      c. Practice of logging pick-up arrival time prior to vehicle arrival.

      d. Practice of classifying all cancelled rides and early rides as "on time."

      e. Misstatements of arrival times.

      f. Arrival of an unusable vehicle classified as "on time" ride.

    5. The **Data Expert** shall submit four reports on the following dates:  90 days after **Preliminary Court Approval**, on the first and second anniversaries of the first report, and 90 days prior to the end of the **Duration of the Settlement Agreement**.

6.      Each report will:  (a) assess the validity, accuracy and reliability of the data reported by **WMATA** and the **Contractor**; (b) propose corrective measures for any deficiencies observed; and (c) set forth the estimated costs and a timeline to implement the proposals.

7.      The **Data Expert** will provide **ERC, WMATA** and the **Service Expert** with a copy of a draft report at least thirty (30) days prior to issuing each final report.  Each party may submit comments on the draft report within 14 days after receipt.  Each party will copy the other **Parties** on any submissions that are made in response to the draft report, and the Data Expert will promptly arrange for a conference call with all **Parties** to discuss any proposed changes to the draft report.

**C.      Service Expert.**

1.      A **Service Expert** shall be selected to undertake the tasks described in this Section V.C.4. and V.H.2.  The parties shall select a mutually-agreeable individual to be the **Service Expert**; neither Party's agreement in this regard shall be unreasonably withheld.

2.      **WMATA** shall provide the **Service Expert** and Plaintiffs' Counsel with data, reports and other information that relates to the quality of service provided to **MetroAccess** customers and other data and information sufficient to undertake the tasks describe in Section V.C.1.  This includes information in the possession of the **Contractor** to which **WMATA** has access.

3.      In addition to the budgetary commitments for fiscal year 2008, and in addition to the general service enhancements described above in Section V.A., **WMATA** shall budget and pay the **Service Expert** fees and expenses to total in the aggregate $110,000 for work to be performed from **Preliminary Court Approval** and thereafter through **Duration of the**

**Settlement Agreement**, provided, however, that no more than 25% of the **Service Expert's** fees shall be paid prior to **Final Court Approval**.

       4.     The **Service Expert** shall submit four reports on the following dates:  90 days after **Preliminary Court Approval**, on the first and second anniversaries of the first report, and 30 days prior to the end of the **Duration of the Settlement Agreement**.  These reports will: (a) assess the status of **WMATA's** implementation of recommendations set forth in Attachment A of this Agreement; (b) assess whether **MetroAccess** service is in full compliance with the **Performance Standards**; (c) assess whether **WMATA** has implemented the **Service Expert's** proposals made in prior reports submitted under this Agreement; (d) propose corrective measures to address deficiencies noted in these assessments; and (e) set forth the estimated costs and timeline for any proposed corrective measures.  In addition, the **Service Expert's** Reports will assess whether in each of fiscal years 2008, 2009 and 2010, **WMATA has** expended at least a total of $4 million over its fiscal year 2007 paratransit budget of $56,343,400 for the enhancements described in this Section V.A. and, if not, shall propose how the shortfall should be expended in the future.  The **Service Expert** may also consider the recommendations of **WMATA**, its **Contractor**, the **ERC**, the **Data Expert**, any other public body, and any committee or group formed to advise or improve **WMATA** or **MetroAccess**.

       5.     The **Service Expert** will provide **ERC**, **WMATA** and the **Data Expert** with a copy of a draft report at least thirty (30) days prior to issuing each final report.  Each party may submit comments on the draft report within 14 days after receipt.  Each party will copy the other **Parties** on any submissions that are made in response to the draft report, and the **Service Expert** will promptly arrange for a conference call with all **Parties** to discuss any proposed changes to the draft report.

6.      On an expedited basis following **Final Court Approval**, service standards in addition to **Performance Standards** shall be established by the **Parties**, in consultation with the **Service Expert**, in regard to excessively early trips; excessively long trips; use of vehicles unsuitable for the customer's disability and excessive telephone queue times during **Peak Periods of Service**. **WMATA**'s performance in these areas will be monitored by the Service Expert and measured for achievement of these standards. In no event, however, shall **WMATA**'s failure to meet these additional service standards be construed to be a breach of this Agreement or the subject of proceedings to enforce them or complaint to the Court.

### D.      MetroAccess Advisory Task Force.

**WMATA** shall create a policy task force, the majority of whom are not **WMATA** employees, consultants or **Contractors**, to ensure that riders have direct input, and to advise the **WMATA** Board of Directors on matters related to **MetroAccess**. The **ERC** will be entitled to at least one representative on such task force. The task force will establish such procedures as it deems proper.

### E.      Floating Reserve.

Within 60 days after **Final Court Approval**, **WMATA** will set aside in the Fiscal Year 2009 paratransit budget the sum of one hundred, eighty thousand dollars ($180,000), as a budgeted reserve account ("Floating Reserve"), to be spent over the **Duration of this Agreement** for the benefit of improving **MetroAccess** service. This **Floating Reserve** shall be used for additional expert fees or for additional expenditures for **MetroAccess** to achieve compliance with proposals of the **Data Expert** or **Service Expert**, as the **ERC** requests. In the event that **WMATA** fails to distribute funds from the account as requested, Plaintiffs' Counsel may utilize the dispute resolution mechanism set forth in Section VIII of this Agreement. Expenditures under this section are in addition to the expenditures listed in Section V.A. above.

F.     **Extra Board Vehicles.**

Within 60 days after **Final Court Approval**, **WMATA** will establish an "extra board" of vehicles and operators ("**Extra Board Vehicles**"), who will be dedicated to prevent excessively **Late** or **Missed Trips**.  At least one **Extra Board Vehicle** will be assigned to the District of Columbia, one to Virginia, and one to Maryland.  Dispatch of **Extra Board Vehicles** will be centrally controlled by **Contractor** dispatchers located in Silver Spring, Maryland, with the highest priority being accorded to those customers who identify a health issue associated with the ride.  The next degree of priority will be accorded to those who are returning to their homes from off-site locations.  Expenditures under this work plan are not covered by the expenditures listed in Section V.A. or the **Floating Reserve.**

G.     **Future Monitoring of Services.**

1.     In addition to the budgetary commitments for fiscal year 2008, and in addition to the general service enhancements described above in Section V.A., **WMATA** shall reimburse **ERC** up to three hundred twenty-five thousand dollars ($325,000) for the purposes of monitoring **WMATA** and **Contractor's** compliance with the terms of this Agreement and with the **Contract.**  These payments shall be only made after **Preliminary Court Approval** and shall not include expenses incurred before **Preliminary Court Approval.**  No more than 25% of these reimbursements shall be made prior to **Final Court Approval.**

2.     These reimbursements shall be made quarterly as documented by **ERC**. Any remaining amounts for each fiscal year shall carry over to the next fiscal year or be applied to the **Floating Reserve** in each fiscal year, as **ERC** may choose.

3.     On a quarterly basis, **ERC** shall provide **WMATA** with non-privileged daily time entries and records of expenses; such records will be in accordance with **ERC's** then current procedures and rates for outside consulting work.

18

4.      **WMATA** shall provide **ERC** with access to all data, reports and other information provided to the **Data Expert** or **Service Expert** and will cooperate with any reasonable efforts **ERC** may undertake to utilize anonymous testers/riders on **MetroAccess** vehicles.  **ERC** shall timely provide **WMATA** with a copy of any and all documents created, generated or assembled by **ERC** in connection with the use of anonymous testers.

H.      <u>**Future Rider Vouchers.**</u>

1.      **Defendants** shall provide each member of the **Settlement Class** two (2) coupons for a free one-way trip for each **Late Trip** or **Missed Trip** that occurs during the **Duration of the Settlement Agreement**, within 30 days after each such trip.

2.      In addition, **Defendants** shall issue each member of the **Settlement Class** two (2) coupons valid for a free one-way trip to each class member who experiences a **Pattern of Poor Service** that occurs during the **Duration of the Settlement Agreement**, within 30 days. Provided, however, that no individual **MetroAccess Customer** will be entitled to receive, during the **Duration of the Settlement Agreement**, more than 20 coupons (*i.e.* 10 instances) for multiple **Patterns of Poor Service** unless the **Service Expert** first verifies that such patterns did take place and specifically authorizes each such additional issuance of coupons.  The **Service Expert** will, upon such verification, investigate the cause(s) of such patterns and prepare a brief memorandum proposing solutions to prevent further instances of a **Pattern of Poor Service** for that customer.  The memorandum and **WMATA's** responses thereto will be provided to the ERC.

3.      **WMATA** shall mail out a notice regarding the submission of complaints regarding a **Pattern of Poor Service** and the provisions for free coupons arising from such patterns at the same time it mails out class-wide coupons pursuant to Section VI.A.  For the **Duration of the Settlement Agreement,** a copy of the notice also will be provided to new

customers when they are determined to be eligible for MetroAccess service and will be included in customer handbook if it is otherwise revised during the **Duration of the Settlement Agreement**.

## VI.   OTHER RELIEF

### A.   Class Wide Rider Vouchers.

Forty-five days following **Final Court Approval, Defendants** shall issue and mail each **Active MetroAccess Customer** by first-class mail to their home address as registered with **MetroAccess**, ten (10) coupons for free one-way trips on **Metro Access**. **Defendants** represent that the number of **Class Members** who are **Active MetroAccess Customers** is approximately 18,266 and that the value of this relief exceeds $450,000. Said coupons are not transferable or alienable and shall be used within 18 months of issuance, after which they shall become void.

### B.   Monetary Compensation.

1.    **Defendants** shall pay **ERC** sixty-five thousand dollars ($65,000) within 30 days of **Final Court Approval** in compensation for the diversion of **ERC**'s resources alleged to have occurred by reason of bringing this Action.

2.    **Defendants** shall pay to each of the **Class Representatives** (or their personal representative or estate) five thousand dollars ($5,000) in compensation for efforts in furthering the purposes of this action. **WMATA** will make these payments within 30 days of **Final Court Approval**, as directed by Plaintiffs' counsel.

3.    **Defendants** shall pay to each member of the **Settlement Class** who was deposed (or their personal representative or estate), as compensation for their efforts in support of this action , one thousand dollars ($1,000) within 30 days of **Final Court Approval**, as directed by Plaintiffs counsel. A list of the names of these individuals is included in Attachment B.

4.      It shall be the responsibility of Plaintiffs' counsel to provide such tax information and addresses to **WMATA** as necessary to make these payments and plaintiffs recognize that no monetary relief can be paid to any person or entity who fails to provide such information.  Plaintiffs recognize that failure to provide information in a timely fashion may delay **WMATA**'s ability to make the payments within the 30 day deadlines established above.

5.      The payments described in this Section VI.B are subject to Court review and approval prior to **Final Court Approval**.

## VII.    REASONABLE ATTORNEYS FEES AND COSTS

**Defendants** shall pay to counsel for plaintiffs, collectively, or separately, as they jointly may designate, the sum of $964,000 in full satisfaction for all claims for **Reasonable Attorneys Fees and Costs** through **Final Court Approval** within 30 days thereof.  Of this amount, approximately $190,293.00 shall be deemed compensation for that portion of the settlement that constitutes coupons, and approximately $773,707.00 shall be deemed compensation for that amount of the Settlement that provides for all other relief.

## VIII.   DISPUTE RESOLUTION

### A.      Alternative Dispute Resolution.

1.      Within 30 days after issuance of a report by the Service Expert or Data Expert, **WMATA** will notify Plaintiffs' counsel as to whether and the extent to which it (1) adopts and agrees to implement the recommendation; (2) needs further time to evaluate the proposal; (3) advises the Plaintiffs that **WMATA** is already implementing the recommendation; or (4) refuses to adopt the recommendation.  If **WMATA** responds that it needs more time to evaluate the proposal, then it shall provide Plaintiffs with a timetable for its review and decision. In the event Plaintiffs contend that **WMATA** has failed to use **Reasonable Efforts** to address the

21

**Service Expert** or **Data Expert's** proposals in any report issued by either expert, the **Parties** will submit such dispute to the following Alternative Dispute Resolution ("ADR") procedure

2. If Plaintiffs contend that **WMATA** has failed to implement and maintain the commitments described in Category 1 and 2 of Attachment A, the **Parties** will submit the dispute to this ADR procedure.

3. The **Parties** will attempt in good faith to resolve their differences by negotiation regarding any dispute.  In the event either party declares a deadlock in negotiations, the party declaring the deadlock will give a written notice of deadlock to the other party and therein set forth its position regarding the dispute at issue.

4. Within 21 days thereafter, the other party will reply in writing to the noticing party regarding the dispute.

5. Within 21 days of the Reply, either side may submit the dispute to expedited mediation; the **Parties** have jointly selected John Bickerman as the mediator. **WMATA** will pay for the costs of the mediator.

6. In the event that the **Parties** cannot resolve their disagreement through mediation within 30 days after submission, either party may pursue the remedies set forth below in Section VIII.B.

7. The **Parties** may by agreement modify any of the deadlines set forth above.

8. Plaintiffs shall be barred from initiating any Court action pending completion of the ADR procedure provided herein relating to any dispute subject to this Section VIII.A.

**B.** **Court Resolution.**

1. In the event that any party alleges a material breach of this Agreement, that party will provide the other **Parties** with a notice of material breach. In the event that the **Parties** are or were unable to resolve the issues in the notice of material breach within 60 days, **Parties**' Counsel may petition the Court for additional relief.

2. **WMATA's** failure to comply with **Performance Standards** for less than six consecutive months shall not constitute a material breach of this Agreement.

3. The **Parties** understand and agree that the provisions of this Settlement Agreement are subject to continued budgetary approval by the **WMATA** Board of Directors and by the continued level of support by the **WMATA** signatories: Maryland, Virginia and the District of Columbia. Notwithstanding the above, a failure of **WMATA** to budget for the provisions of this Settlement Agreement or to make payments as required herein will be treated as a material breach of this Agreement and subject to court enforcement proceedings set forth in Section VIII above. In the event of natural disasters, local or national emergencies or similar occurrences, the agreements and covenants herein shall be suspended until such time as such events permit the continued compliance with this Settlement Agreement through all of **WMATA's** reasonable efforts.

4. In the event **WMATA** fails to make a payment or take other action required in this Agreement and the Court does not order specific performance to fully satisfy such obligation pursuant to the Court resolution process described herein, the Release of Claims set forth in Section III shall be deemed prospectively inapplicable to **Alleged Discriminatory Practices**; provided, those asserting such claims may only utilize evidence of such alleged practices occurring after January 15, 2006.

5.      In addition, in the event that the **Parties** are unable to resolve the issues raised in the ADR proceedings set forth above in Section VIII.A, Plaintiffs' Counsel may petition the Court for additional relief.

6.      Any petition to the Court will take the form of a new suit for breach of contract before this Court and will be referred to Judge Henry H. Kennedy, with his consent.  The petition does not have to be filed in the same fiscal year to which the notice of deadlock or notice of material breach was provided, but the suit shall be filed within 180 days of the submission of a notice of material breach or the completion of ADR procedures set forth in Section VIII.A.  In response to a breach-of-contract suit brought pursuant to this Section VIII.B., **Defendants** shall not contend that the Court is without jurisdiction or authority to require the payment of damages or to compel specific performance because of sovereign immunity or otherwise.

7.      Plaintiffs will be entitled to receive their **Reasonable Attorneys' Fees and Costs** to the extent they prevail in whole or part in any such proceeding, in accordance with the standards of 42 U.S.C. Section 1988.

## IX.   PROCEDURES GOVERNING PRELIMINARY COURT APPROVAL AND FAIRNESS HEARING

### A.     Joint Motion.

No later than December 13, 2007, the **Parties** will file a Joint Motion seeking prompt **Preliminary Court Approval** and the scheduling of a Fairness Hearing pursuant to Fed.R.Civ.P. 23(e) and 28 U.S.C. §§ 1711 *et seq*.  The joint motion shall also request that the **Settlement Class** be unconditionally certified under Fed.R.Civ.P. 23(b)(2) and recommend that the Court approve the Settlement Agreement as fair, adequate and reasonable as contemplated by Fed.R.Civ.P. 23(e) and 28 U.S.C. § 1712(e).

**B.**     **Notice.**

1.      Attachment C hereto is a proposed "Notice of Class Action, Class Certification, Proposed Settlement Agreement and Fairness Hearing" ("Hearing Notice"), which the **Parties** will jointly request that the Court approve in granting **Preliminary Court Approval**. Within thirty (30) days after **Preliminary Court Approval** of this Agreement, **WMATA** will send by first-class mail to the address registered with **MetroAccess** of each member of the **Settlement Class** a copy of this Agreement and the Hearing Notice.  **WMATA** will also post a copy of the Hearing Notice prominently on its **MetroAccess** website for a 60 day period. In addition, **WMATA** will post a summary of the notice, as shown in Attachment E, in each of its dedicated **MetroAccess** vehicles for a 30 day period and include it in its customer newsletter. This notice shall also be made available in Spanish and in an alternative format (including email) for the visually impaired to those customers that **WMATA** has record indicating a visual impairment.  Subject to the Confidentiality Agreement signed by Magistrate Judge Facciola, Plaintiffs' counsel will be provided with the names and address of all members of the **Settlement Class** upon the execution of this Agreement, and will be permitted to obtain information sufficient to determine that all members of the **Settlement Class** have been properly identified. The Notice will bear the address and phone number of Plaintiff's counsel and direct **Class Member** inquiries to that counsel.

2.      The **Parties** agree and will jointly request that the Court determine that these efforts constitute reasonable notification to the **Settlement Class** members.

**C.**     **Objections to this Settlement Agreement.**

Any person who wishes to object to the terms of this Agreement must submit a written statement to the Court at the address printed herein below, with copies to defendant's counsel and to plaintiffs' counsel on or before a date set by the Court, not more than sixty (60) days from

the date of Notice of **Preliminary Court Approval**. The statement shall contain the individual's

name, address and telephone number and email address, if any, along with a statement of his or

her objection(s) to this Agreement and the reason(s) for the objection(s).

> CLERK, United States District Court for the District of Columbia
> 333 Constitution Ave., N.W.
> Washington, D.C. 20001
> Re:   Equal Rights Center v. WMATA, No. 04-0498
>
> WMATA
> 600 Fifth St., N.W.
> Washington, D.C. 20001
> Attn:   David J. Shaffer
> Re:   Equal Rights Center v. WMATA
>
> WILEY REIN LLP
> 1776 K St., N.W.
> Washington, D.C. 20006
> Attn:   Todd Bromberg
> Re:   Equal Rights Center v. WMATA

### D.   Fairness Hearing.

A Fairness Hearing shall be conducted no earlier than 90 days after **Preliminary Court**

**Approval**, but as soon thereafter as the Court's schedule permits.  Counsel for the **Parties** shall

file responses to any objections received within 21 days after the due date for filing objections.

Persons who file an objection to this Settlement Agreement may appear in person to present their

objections at the Fairness Hearing.  No one who has not filed an objection may be heard at the

hearing.

### E.   Best Efforts of Counsel.

Counsel for the **Parties** shall jointly use their best efforts to obtain prompt **Preliminary**

**Court Approval** and **Final Court Approval** of this Settlement Agreement and will represent to

the Court that, in their professional opinion, the Agreement is reasonable and fair to the

**Settlement Class.** The **Parties** will also represent to the Court that they have bargained for the terms in this Agreement at arm's length and without any collusion whatsoever.

      F.        **Opt-Outs and Voidability.**

      1.      In their Joint Motion and at any hearing seeking Preliminary Court Approval, the Parties will request prior to authorizing submission of notice to **Class Members**, that the Court to determine whether or not the **Settlement Agreement** should include a provision barring exclusions, or opt-outs, of individual **Settlement Class** members from class membership and, in the absence of such a bar, whether or not opt-out rights should be limited to claims for damages. Additionally, WMATA will timely file a motion requesting that the Court limit the ability of **Class Members** to opt-out of this **Settlement Agreement**. The **Settlement Agreement** will be deemed modified to reflect the Court's determination of the opt-out issues and **the Parties** will be bound thereby, except as set forth below.

      2.      Following **Final Court Approval**, this Settlement Agreement shall be deemed void and of no further effect if the applicable party notifies the other **Parties** and the Court within 14 days after the following:

      a.      By **Defendants**, if the Court grants requests by more than 50 members of the Settlement Class to be excluded (i.e., opt-out) from the class to pursue claims for non-equitable relief or damages, exclusive of any person who expressly informs the Court that (s)he seeks to opt-out in order to preserve an individual claim exempted from the Release under Sections III.C.2 and 3.

      b.      By **Defendants**, if the Court grants any request by a member of the **Settlement Class** to be excluded (i.e., opt-out) from the Class to pursue claims for injunctive or other equitable relief subject to the Release and Moratorium herein.

c.      By Plaintiffs, if any appeal is taken of **Final Court Approval** by any person or entity which is or becomes a party to this Action.

d.      By either Party, if the Court modifies the provisions of this **Settlement Agreement** in any material respect except as provided in this Section.

3.      Each party reserves the right to object to any individual request by a member of the **Settlement Class** to be excluded (*i.e.*, opt-out) from the class.

## X.      <u>OTHER PROVISIONS</u>

### A.      <u>Counterparts.</u>

This Settlement Agreement may be executed in one or more counterparts and each executed copy shall be deemed an original, which shall be binding upon all **Parties** hereto.

### B.      <u>Entire Agreement.</u>

Except as disclosed to the Court pursuant to F.R.Civ.P. Rule 23(e)(2), this Settlement Agreement, including all attachments hereto, constitute the entire agreement between and among the **Parties** with respect to the subject matter hereof and supersedes all prior agreements, written or oral, with respect thereto.

### C.      <u>Non-Waiver.</u>

The waiver by any party hereto to any term, condition or covenant of this Agreement or of the breach of any term, condition, covenant or representation herein, in any one instance shall not operate as or be deemed to be a waiver of the right to enforce any other term, condition or representation nor shall any failure by any party at any time to enforce or require performance of any provision hereof operate as a waiver of or affect in any manner such party's right at a later time to enforce or require performance of such provisions or of any other provision hereof.

D.    **Headings**.

The headings in this Agreement are for the convenience of the **Parties** only and shall not

limit, expand, modify, amplify or aid in the interpretation or construction of this agreement.

For the Plaintiffs:                         For the Defendants:

EQUAL RIGHTS CENTER                WASHINGTON METROPOLITAN AREA
                                    TRANSIT AUTHORITY


By: _____          By: _____
    Bruce E. Kahn, Director             John B. Catoe, Jr., General Manager

Dated: _____       Dated: __12/11/07_____


WILEY REIN LLP


By: _____          By: _Carol B. O'Keeffe_____
Thomas W. Brunner # 170480          Carol B. O'Keeffe #445277
Todd A. Bromberg #472554            General Counsel
Keith Watson #140269                Bruce P. Heppen #252171
1776 K St., N.W.                    Associate General Counsel
Washington, D.C. 20006              (202) 962-2569
(202) 719-7000                      David J. Shaffer #413484
                                    Assistant General Counsel
WASHINGTON LAWYERS' COMMITTEE        600 Fifth St., N.W.
FOR CIVIL RIGHTS AND URBAN AFFAIRS  Washington, D.C. 20001
E. Elaine Gardner #271262           (202) 962-2820
11 Dupont Circle, N.W., Ste 400     Attorneys for Defendants
Washington, D.C. 20036
(202) 319-1000
Attorneys for Plaintiffs


Attachments:

A.    Commitments

B.    List of deponents

C.    Notice of Fairness Hearing

D.    Extract from MV Contract, Section 5.2

E.    Summary of Notice of Fairness Hearing

12735003.2

D.    **Headings**.

The headings in this Agreement are for the convenience of the **Parties** only and shall not

limit, expand, modify, amplify or aid in the interpretation or construction of this agreement.

For the Plaintiffs:                                        For the Defendants:

EQUAL RIGHTS CENTER                          WASHINGTON METROPOLITAN AREA
                                                                  TRANSIT AUTHORITY


By: _____           By: _____
      Bruce E. Kahn, Director                          John B. Catoe, Jr., General Manager

Dated: _____        Dated: _____


WILEY REIN LLP


By: _____           By: _____
Thomas W. Brunner # 170480             Carol B. O'Keeffe #445277
Todd A. Bromberg #472554                 General Counsel
Keith Watson #140269                         Bruce P. Heppen #252171
1776 K St., N.W.                                  Associate General Counsel
Washington, D.C. 20006                       (202) 962-2569
(202) 719-7000                                    David J. Shaffer #413484
                                                        Assistant General Counsel
WASHINGTON LAWYERS' COMMITTEE    600 Fifth St., N.W.
FOR CIVIL RIGHTS AND URBAN AFFAIRS  Washington, D.C. 20001
                                                        (202) 962-2820
By: _____
E. Elaine Gardner #271262
11 Dupont Circle, N.W., Ste 400
Washington, D.C. 20036
(202) 319-1000

Attorneys for Plaintiffs                           Attorneys for Defendants

Attachments:

A.      Commitments

B.      List of deponents

C.      Notice of Fairness Hearing

D.      Extract from MV Contract, Section 5.2

E.      Summary of Notice of Fairness Hearing


30

# Attachment A

*Summaries of recommendations are provided for reference purposes only.*
*Refer to the specified pages in the full report for details*

**CODE KEY**
**1 – Commitments that WMATA (MA) has already implemented and agrees to maintain.**
**2 - Commitments that WMATA (MA) agrees to implement and maintain within the Duration of the Settlement.**
**3 - Commitments that WMATA (MA) will make good faith efforts to make progress towards achieving in consultation with the Service Expert (but not binding on WMATA under the Settlement Agreement.**
**4 - Recommendations as to which WMATA declines to commit.**

| # | Issue | Recommendation | Report | Commitment | Code |
|---|-------|----------------|--------|-----------|------|
| 1 | Customer Service & Communication | Specify a "Customer First" focus in mission statement, management strategies, personnel training, and staff meetings. | **Best Practices** #1A, page 4 (Priority) | This has been implemented and will continue to be standard procedure. Commit to make modifications and to add personnel (see **Adams** Report and MV Contract Modifications) who will oversee this. | 1 |
| 2 | | Clearly communicate all policies and allow customer comments on proposed new policies. | **Best Practices** #1D, page 5 (Priority) | Commit to Advisory Task Force to include users (below). Commit to continue to publish the MetroAccess newsletter (begun in May 2006). | 2 |
| 3 | | Host a Disability Awareness Event within one year. | **Best Practices** #11, page 8 | This has been implemented and agreed to by the Board. It has been scheduled for November 2007. | 2 |
| 4 | Advisory Task Force | Ensure that users have direct input. Establish a new user group that includes people with a wide range of disabilities, providers, and decision makers. | **COG** #B-3, page 42 | Commit to implement and maintain a new Metro Access Policy Advisory Task Force per Section V.D of the Settlement Agreement. | 2 |
| 5 | | Structure the group to ensure diversity of membership. | **COG** #B-3, page 42 | This has been implemented and will continue to be maintained  – see structure above | 2 |
| 6 | | Involve the user group in planning and implementation. | **COG** #B-3, page 42 | This involvement will be implemented for issues relating to customer service and will continue to be standard procedure. | 2 |
| 7 | | Involve the user group in monitoring customer satisfaction through performance reports, a "mystery rider" program, and regular surveys. | **COG** #B-3, page 42 | A customer satisfaction survey by an outside consultant is underway and will be completed, with reports issued on a quarterly basis. The possibility will be investigated of upgrading the telephone system so that a survey can be added at the end of calls. Performance reports,  "mystery rider" programs, and surveys will be performed subject to annual funding. | 3 |

*Summaries of recommendations are provided for reference purposes only.*
*Refer to the specified pages in the full report for details*

ATTACHMENT A
Commitment to Implementation
Page 2 of 18

| # | Issue | Recommendation | Report | Commitment | Code |
|---|-------|----------------|--------|------------|------|
| 8 | Fleet | Increase spare vehicle ratio to 15% by increasing the current dedicated fleet from 374 to 391 and adding 17 new vans. Increase of 34 vans. | **Adams** Fleet Replacement p. 1-15 **Best Practices** #5B, page 6 (12% recomm.) | This has been implemented.  The purchase of 65 new vehicles (more than Recommendation) is currently in progress, with more to be purchased in 2008. | 2 |
| 9 | | Develop a four-year life cycle replacement policy. | **Adams** Fleet Replacement p. 1-15 | This has been implemented and will continue to be standard procedure, except for 75 vehicles exempted from this replacement policy. | 2 |
| 10 | | Allow flexibility in retirement schedule to consider miles and condition of each vehicle. Review 2002 fleet to evaluate units with useful life remaining, and include them in fleet. | **Adams** Fleet Replacement p. 1-15 | The Recommendation of a Four Year replacement policy has been implemented and will continue to be standard procedure, except for 75 vehicles exempted from this replacement policy due to their miles and condition.  WMATA reserves the right to extend the useful life of this fleet at any time. | 2 |
| 11 | | Evaluate the MV fleet for condition, performance, and ability to meet the life cycle. | **Adams** Fleet Replacement p. 1-15 | This has been implemented and will continue to be standard procedure.  Evaluations will continue to be performed by Metro Office of Bus Maintenance. | 2 |
| 12 | | Monitor peak vehicle requirements and increase # of spare vehicles as necessary and increase the number of spare vehicles as necessary to maintain the 15% ratio of spare vehicles. | **Adams** Fleet Replacement p. 1-15 | Both of these recommendations have been implemented and will continue to be standard procedure. | 2 |
| 13 | | Buy vans rather than sedans to increase spare vehicles because they are more versatile. | **Adams** Fleet Replacement p. 1-15 | This has been implemented and will continue to be standard procedure | 2 |

*Summaries of recommendations are provided for reference purposes only.*
*Refer to the specified pages in the full report for details*

ATTACHMENT A
Commitment to Implementation
Page 3 of 18

| # | Issue | Recommendation | Report | Commitment | Code |
|---|---|---|---|---|---|
| 14 | Staffing – Reservations | Add 14 personnel to Reservations/Where's My Ride (WMR) program to bring total to 45.8 full-time employees. | **Adams** Staffing - Reservations p. 1-10 | The increase of total Reservation staff to 41 full time employee (FTE) positions has been implemented. This number will become the new baseline, onto which increases will be made each year (see Item 22) MA has shifted WMR function from Reservations to Dispatch, where operators can talk to driver. (see Item 65) | 1 |
| 15 | | Raise number of dispatchers from 22 to 37 | **Adams** Staffing - Reservations p. 1-10 | The increase in number of dispatchers to 46 FTE to handle the WMR function has been implemented. | 1 |
| 16 | | Reservation supervisors | **Adams** Staffing - Reservations p. 1-10 | Commit to increase to 2 FTE Reservation supervisors (one for @ shift) | 2 |
| 17 | | Dispatch floor supervisors | **Adams** Staffing - Reservations p. 1-10 | The increase to 5 FTE dispatch floor supervisors has been implemented. | 1 |
| 18 | | Additional reservations staffing | **Adams** Staffing - Reservations p. 1-10 | Commit to add the following additional staff: No Show Policy Review Clerks   2 FTE Drive Cam manager and assistant  2 FTE Drug & Alcohol testing assistant  1 FTE | 1 |
| 19 | | To maintain a constant staff of 45.8 FTEs with a turnover rate of 122%, MV must hire and train 5 to 6 reservationists per month until extremely high turnover is brought under control. | **Adams** Staffing - Reservations p. 1-10 | This has been implemented and will continue to be standard procedure. | 1 |

*Summaries of recommendations are provided for reference purposes only.*
*Refer to the specified pages in the full report for details*

| # | Issue | Recommendation | Report | Commitment | Code |
|---|-------|----------------|--------|------------|------|
| 20 | Staffing – Scheduling & Dispatch | Provide sufficient scheduling and dispatch staff to ensure effective service. | **Best Practices** #4A, page 5 (Priority) | See specific commitments, below. | 1 |
| 21 | Staffing - Scheduling | Increase the number of schedulers to provide 7 schedulers, 1 manager, and 2 new schedule analysts. | **Adams** Staffing - Scheduling p. 1-10 to 1-11 | This has been implemented and will continue to be standard procedure. Number of schedulers has been increased to 7 FTE (includes one as supervisor). WMATA has waived fifteen months of $30,000 productivity penalties to compensate for adjustments to scheduling staff, but did not waive SERVICE penalties. | 1 |
| 22 | Staffing – Dispatch | Increase staff to 37. | **Adams** Staffing - Dispatch P. 1-11 | This recommendation has been implemented and increased – dispatch staffing has been increased to 46. This staffing increase will be maintained. | 1 |
| 23 | | Consider absenteeism when planning work schedules. | **Adams** Staffing - Dispatch P. 1-11 | This has been implemented and will continue to be standard procedure. | 1 |
| 24 | | Take immediate steps to bring dispatch turnover under control. | **Adams** Staffing - Dispatch P. 1-11 | This has been implemented and will continue to be standard procedure. | 1 |
| 25 | | Rotate dispatchers through field operations. | **Adams** Staffing Dispatch P. 1-11 | Commit to investigate this subject to staffing. | 1 |
| 26 | Staffing – Road Supervision | Hire 5 new road supervisors. | **Adams** Staffing Road Supervision p. 1-12 | MV has committed to hire 6 new road supervisors. | 2 |

*Summaries of recommendations are provided for reference purposes only.*
*Refer to the specified pages in the full report for details*

ATTACHMENT A
Commitment to Implementation
Page 5 of 18

| # | Issue | Recommendation | Report | Commitment | Code |
|---|-------|----------------|--------|------------|------|
| 27 | Staffing – Road Supervision, cont'd. | MV to better coordinate the schedules of road supervisors with subcontractors and other dedicated service providers. | **Adams** Staffing Road Supervision p. 1-12 | Commit to implement this recommendation by Spring of 2008. | 2 |
| 28 | | Road supervision agents need to stop being used as replacements for absentee drivers; fixing the staffing problems would help with this. | **Adams** Staffing Road Supervision p. 1-12 | This has been implemented and will continue to be standard procedure. MV now has enough drivers, as it recently hired approximately 45 new drivers. Commit to maintain sufficient staffing at the Main Garage. | 1 |
| 29 | Staffing – Wage and Benefits | Ensure that pay remains competitive | **Adams** Staffing Wage & Benefits p.1-12 **Best Practices** #4B, page 6 | Wages have been adjusted to become competitive. | 1 |
| 30 | | Equalize wages for reservationists and drivers and make other changes to promote a career path within MV | **Adams** Staffing Wage & Benefits p.1-12 | This recommendation is left to MV. Wages will be competitive, while not exactly equal. | 1 |
| 31 | Staffing – Turnover | MV to develop a staffing requirement, turnover, and training report for positions that have high turnover and review these reports weekly or biweekly with WMATA | **Adams** Staffing Turnover p.1-12 **Best Practices** #4C, page 6 | This has been implemented and will continue to be standard procedure. | 2 |
| 32 | | Use exit interviews to identify factors driving high turnover. Develop and implement specific remedial actions to reduce turnover rate. | **Adams** Staffing Turnover p.1-12 | This has been implemented and will continue to be standard procedure. | 2 |
| 33 | | Review sizing of extraboard staff for MV and for each dedicated service providers. | **Adams** Staffing Turnover p.1-12 | This has been implemented and will continue to be standard procedure. | 1 |

*Summaries of recommendations are provided for reference purposes only.*
*Refer to the specified pages in the full report for details*

ATTACHMENT A
Commitment to Implementation
Page 6 of 18

| # | Issue | Recommendation | Report | Commitment | Code |
|---|---|---|---|---|---|
| 34 | Staffing – Turnover, cont'd. | MV to analyze its approach to hiring, supervisor training and employee relations in comparison to others in the area to see if there is a need for improvement. Report findings and action plan to MA. | **Adams** Staffing Turnover p.1-12 | This has been implemented and will continue to be standard procedure. | 1 |
| 35 | Staffing - general | Ensure that MV has adequate, experienced, and stable staffing within three months. | **Best Practices** #4, page 5 | See specific commitments, above. | 1 |
| 36 | | Increase the number of MetroAccess staff. | **Best Practices** #5A, page 6 | See specific commitments, above. | 1 |
| 37 | Reservation/ Dispatch | Supervisors to randomly monitor reservationists and dispatchers. | **Best Practices** #1A, page 4 (Priority) | This has been implemented and will continue to be standard procedure.  Telephone system will continue to record all calls. It will continue to be monitored daily by sampling approximately 100 calls a week (about 1% of the daily calls). These recordings will also be used to investigate complaints about call takers. Commit to retain the recordings for six months. | 2 |
| 43 | | Test advance technology such as web-based reservations thoroughly and fully train consumers and employees in its use before implementation. | **Best Practices** #1B,  page 5 (Priority) | Beta testing will be completed by the end of 2007 on accessible web based reservation software, using blind testers. After the Beta testing, Metro will publish literature and have presentations at public meetings on the new web based reservation system | 2 |
| 44 | | Further utilize scheduling and software strategies immediately | **Best Practices** #2, page 5 | "Itinerary Planning Analysis" and PLAN software has been purchased and will be utlized per MV contract modification. | 1, 2 |
| 38 | | WMATA to reduce 14-day reservation window to 7 days. | **Best Practices** #2A, page 5 | This was implemented in October 2006 and will continue as standard procedure. | 1 |
| 39 | | MV to keep drivers in familiar geographic areas | **Best Practices** #2B, page 5 | This has been implemented and will continue to be standard procedure, to be followed to the maximum extent possible. | 1 |

*Summaries of recommendations are provided for reference purposes only.*
*Refer to the specified pages in the full report for details*

**ATTACHMENT A**
**Commitment to Implementation**
**Page 7 of 18**

| # | Issue | Recommendation | Report | Commitment | Code |
|---|-------|----------------|--------|------------|------|
| 40 | Reservation/ Dispatch, cont'd. | MV to assign template manifests by area to individual schedulers to encourage familiarity with streets and enhance route efficiency. | **Best Practices #2C, page 5** | This has been implemented and will continue to be standard procedure.  Schedulers will continue to be trained to follow this procedure. | 1 |
| 41 | | MV to stress that reservation agents should educate riders about the pick-up window.  WMATA should monitor agent compliance. | **TransSystems** Page 18 | This has been implemented and will continue to be standard procedure. | 1 |
| 42 | | Capture appointment times during the trip booking, scheduling, and dispatching processes. | **TransSystems** Page 18 | This has been implemented in part and will continue to be standard procedure.  More emphasis will be given to agents to enter arrival time when booking the trip. | 1 |
| 43 | | Reconsider the pick-up time information communicated to taxis.  Consider providing scheduled pick-up time on the forms, or including both the scheduled time and the window times. | **TransSystems** Page 20 | Commit to provide this information, but limited control as to what goes onto taxi voucher form. | 2 |
| 44 | | MV to stress how important it is that reservation agents check to make sure that the selected address is in the correct community. | **TransSystems** Page 32 | Commitment to implement. | 2 |
| 45 | | Monitor the reassignment of trips and ensure that the original scheduled time is preserved. | **TransSystems** Page 32 | Commitment to implement. | 2 |
| 46 | | More information will be included on manifests | **Adams** Operational Changes P. 1-9 | In lieu of this recommendation, more information will be included on drivers' computers – see below. | 1 |

*Summaries of recommendations are provided for reference purposes only.*
*Refer to the specified pages in the full report for details*

**ATTACHMENT A**
**Commitment to Implementation**
**Page 8 of 18**

| # | Issue | Recommendation | Report | Commitment | Code |
|---|-------|----------------|--------|------------|------|
| 47 | Reservation/ Dispatch, cont'd. | More information will be collected on vehicular needs of passengers, including through the certification process | **Adams** Operational Changes P. 1-9 | Software will be customized to accommodate more information on riders' disabilities.  Programming Department will continue to work on the development of this customization. | 3 |
| 48 | | Use text messaging as a means of communication. | **Adams** Staffing Dispatch P. 1-11 | Commit to investigate means of implementing this recommendation. | 3 |
| 49 | | Develop standard operating procedures that take advantage of dispatch technology | **Adams** Staffing - Dispatch P. 1-11 | Commitment to implement, but require additional time. | 2 |
| 50 | | Greater use of Automated Vehicle Locator (AVL) technology in monitoring vehicles. | **Adams** Staffing - Dispatch P. 1-11 | Commit to utilize AVL as appropriate. | 1 |
| 51 | Passenger Assistance/ Door-to-door service | Enact a door-to-door policy. | **Best Practices** #7, 7A, page 7 (Priority) **COG** #A-3, page 26 **Adams** Operational Changes Pages 1-9 | This will be implemented by July of 2008, and will continue thereafter to be standard procedure.  Delay in implementation has been due to need to receive comments from public, and need to educate riders and staff before transition. | 2 |
| 52 | | Train drivers on door-to-door assistance. | **Best Practices** #7B, page 7 | This will be implemented as part of the door-to-door transition and will continue thereafter to be standard procedure | 2 |
| 53 | | Train dispatchers on door-to-door service requirements. | **Best Practices** #7C, page 7 | This will be implemented as part of the door-to-door transition and will continue thereafter to be standard procedure | 2 |

*Summaries of recommendations are provided for reference purposes only.*
*Refer to the specified pages in the full report for details*

ATTACHMENT A
Commitment to Implementation
Page 9 of 18

| # | Issue | Recommendation | Report | Commitment | Code |
|---|-------|----------------|--------|------------|------|
| 54 | Passenger Assistance/ Door-to-door service, cont'd. | Develop a safety policy and passenger assistance policy to clarify what users can expect from the service. | **Best Practices #8, page 7** | A Safety Policy and Passenger Assistance Policy will be implemented with the new door-to-door service. These policies will be outlined in the new User Guide. These policies will be addressed in the MV Contract Modification. | 2 |
| 55 | | Cut no-show wait time from 10 to 5 minutes. | **Adams** Operational Changes Pages 1-9 | This will be enacted with the door-to-door operational change. | 2 |
| 56 | | Establish a detailed system for measuring and carefully tracking dwell time. | **Adams** Operational Changes Pages 1-9 | This will be implemented and will continue to be standard audit protocol, subject to the recommendations of the Experts. | 2 |
| 57 | | Reduce and more effectively monitor no-show wait time. | **Adams** Staffing Dispatch P 1-11 | Will be implemented as part of new door-to-door service. | 2 |
| 58 | WMR (Where's My Ride) | Provide Where's My Ride (WMR) agents with access to Trapeze so that they can respond to customers more quickly. | **Adams** Staffing - Reservations p. 1-10 | WMR function has been moved from Reservation to Dispatch. The switch of WMR from Reservation to Dispatch has resolved this, as Dispatch already has Trapeze and has training in the program. This has therefore been implemented and will continue to be standard procedure. | 1 |
| 59 | | Extend WMR operational hours after normal business hours, and ensure that consumers know about this option | **Adams** Staffing - Reservations p. 1-10 **Best Practices #1-C, page 5** | This has been implemented and will continue to be standard procedure.  The switch of WMR from Reservation to Dispatch has resolved this, as Dispatch is available almost 24 hours a day, and certainly during all the hours where a vehicle is out. | 1 |
| 60 | | Relocate Critical Trip Management (CTM) to reside with WMR agents to improve customer responsiveness and efficiency of WMR. | **Adams** Staffing - Reservations p. 1-10 | This has been implemented and will continue to be standard procedure. The CTM team has been absorbed into WMR, which was moved into Dispatch. (see above). | 1 |

*Summaries of recommendations are provided for reference purposes only.*
*Refer to the specified pages in the full report for details*

ATTACHMENT A
Commitment to Implementation
Page 10 of 18

| # | Issue | Recommendation | Report | Commitment | Code |
|---|-------|----------------|--------|------------|------|
| 61 | WMR (Where's My Ride), cont'd. | Review the IVR message for automated WMR info to see if it can be simplified to reduce the number of calls. | **Adams** Staffing - Reservations p. 1-10 | This has been implemented and will continue to be standard procedure. The message has been moved on the telephone tree, and further enhanced by the move of WMR to Dispatch. | 1 |
| 62 | | Consider WMR accepting text messages from clients, identifying client ID and # and time of request. | **Adams** Staffing - Reservations p. 1-10 | Commit to investigate possible means of accepting text messages, including modification of new COM program to take text messages. | 3 |
| 63 | | Hold focus groups with frequent callers to figure out why people call Where's My Ride so frequently, figure out ways to reduce number of Where's My Ride calls; try to make it easier to check automated information to reduce strain on staff. Develop an educational campaign aimed at reducing WMR call volume. | **Adams** Staffing - Reservations p. 1-10 | Commit to identifying causes of WMR calls and reducing frequency. | 3 |
| 64 | No Show/ Late Cancellation Policy | Adopt a user-friendly late cancellation policy and monitor no-shows within 6 months. | **Best Practices** #6, page 6; **COG** #A2, page 26 | This has been implemented and will continue to be standard procedure. | 1 |
| 65 | | Revise the current late cancellation policy to allow cancellation two hours prior to pick up time. | **Best Practices** #6A, page 6 | This has been implemented and will continue to be standard procedure. | 1 |
| 66 | | Forgive first no-show and send a copy of the no-show policy. | **Best Practices** #6B, page 7 | There is no Board authority to forgive first no-show, but commit to enhanced warning mechanism, progressive discipline and current dispute and appeal process. Commit to explore percentage based approach to no-show/late cancellation formula. | 4, 3 |

*Summaries of recommendations are provided for reference purposes only.*
*Refer to the specified pages in the full report for details*

ATTACHMENT A
**Commitment to Implementation**
**Page 11 of 18**

| # | Issue | Recommendation | Report | Commitment | Code |
|---|-------|----------------|--------|-----------|------|
| 67 | No Show/ Late Cancellation Policy, cont'd. | Review chronic no-shows. | **Best Practices** #6C, page 7 | This has been implemented and will continue to be standard procedure. | 1 |
| 68 | | Emphasize that a late cancellation is better than a no-show. | **Best Practices** #6D, page 7 | This has been implemented and will continue to be standard procedure.  Increased efforts will be made to get this information to all riders. | 2 |
| 69 | Complaints | Institute complaint backlog and major complaint category reports. Begin keeping a series of weekly reports to track complaints. Clearly define complaint categories to improve response. | **Adams** Contract Oversight & Monitoring p. 1-14 | This has been implemented as of April 2007 through institution of the new Complaint Processing Program, which will continue to be maintained, per Section V.A.4 of the Settlement Agreement.   The new Complaint Processing Program has eliminated backlog. | 1 |
| 70 | | Post information about the complaint process in all paratransit vehicles. | **COG** #B-2, page 40 | This has been implemented and will continue to be standard procedure.  User Bill of Rights and complaint telephone number has been and will remain posted in all MA vehicles. | 1 |
| 71 | | Install Trapeze COM (complaint) system. | **Adams** Customer Service pp. 1-14 to 1-15 Strong Recomm. | This has been installed and will continue to be utilized. | 1 |
| 72 | | Develop plans for investigating each complaint. | **COG** #B-2, page 40 | Commit to continue the new Complaint Processing Program, initiated in April 2007.  The Program includes investigation of each complaint. | 1 |
| 73 | | Link complaint investigation to direct observation of employees, vehicles, and records. | **COG** #B-2, page 40 | This has been implemented and will continue to be standard procedure.  The three additional service monitor/road supervisors funded by the JARC initiative will be maintained. | 1 |
| 74 | | Categorize and track complaints. | **COG** #B-2, page 40 | Computer software (COM) has been procured and installed to enable this categorization to be implemented. | 1 |

*Summaries of recommendations are provided for reference purposes only.*
*Refer to the specified pages in the full report for details*

**ATTACHMENT A**
**Commitment to Implementation**
**Page 12 of 18**

| # | Issue | Recommendation | Report | Commitment | Code |
|---|-------|----------------|--------|------------|------|
| 75 | Complaints, cont'd. | Provide a meaningful response to each complaint. | **COG** #B-2, page 40 | This has been implemented and will continue to be standard procedure. See new Complaint Processing Program, above at Item 78. | 1 |
| 76 | | Prioritize complaints that involve immediate customer needs. | **COG** #B-2, page 40 | This has been implemented and will continue to be standard procedure. Riders who are still being served in a trip will be given priority through WMR. | 1 |
| 77 | | Transfer 5 of the 11 WMATA Customer Service Representative (CSR) agents to MetroAccess and add 2 investigation agents. | **Adams** Customer Service p.1-14 to 1-15 | In lieu of this recommendation, have given all eleven WMATA CSR agents access to and training on Trapeze, as well as training on MA policies and procedures. Every CSR agent can now immediately pull up records for each MA caller. Added one new investigation agent. | 1 |
| 78 | | Upgrade MA Customer Service Coordinator to Customer Service Manager. | **Adams** Customer Service p.1-14 to 1-15 | Commit to implement upon approval of the new organizational chart. | 2 |
| 79 | | Review staffing after one year. | **Adams** Customer Service p.1-14 to 1-15 | Commit to implement. | 1 |
| 80 | | MA and MV management to create weekly and monthly reports that identify key problems and trends. | **Adams** Customer Service p.1-14 to 1-15 | This has been implemented and will continue to be standard procedure. | 1 |
| 81 | | Develop a complaint reduction strategy. | **Adams** Customer Service p.1-14 to 1-15 | This has been implemented through the new Complaint Processing Program, and will continue to be standard procedure. | 1 |
| 82 | | Maintain MV customer service staffing year 2 – five CSRs and one manager. Review after year two, reconsider if lower complaint volumes. | **Adams** Customer Service p.1-14 to 1-15 | This has been implemented through negotiation and Contract Modifications with MV. | 1 |

*Summaries of recommendations are provided for reference purposes only.*
*Refer to the specified pages in the full report for details*

ATTACHMENT A
**Commitment to Implementation**
**Page 13 of 18**

| # | Issue | Recommendation | Report | Commitment | Code |
|---|---|---|---|---|---|
| 83 | Training | Provide sensitivity training to reservationists, dispatchers and drivers to provide a better understanding of various mobility needs and sensitivity to customers with disabilities. | **Best Practices #1A, page 4 (Priority)** | This has been implemented and will continue to be standard procedure.  Riders will continue to be brought in to give sensitivity training, and will include riders who are blind, who are wheelchair users, and who are elderly.<br>Commit to give this training at a minimum annually, and on an individual basis if there is a new hire.<br>Commit to give this training to new drivers during classroom training, and to give it to new call center staff. | 2 |
| 84 | | Drivers will be better trained to assist passengers. | **Adams** Operational Changes  Pages 1-9 | This has been implemented and will continue to be standard procedure. Training costs will be covered by JARC funding. | 1 |
| 85 | | Require all staff to undergo Customer Service Representative training. | **Adams** Training - Global: p. 1-13 | This has been implemented, and more training is being developed.  This training will continue to be standard procedure.  All staff will be trained in Customer First, ADA sensitivity, and the new Complaint Processing Program. | 1 |
| 86 | | Hire a full time Call Center Training Manager to coordinate and facilitate all of the training classes | **Adams** Training - Global: p. 1-13 | Commit to add 1 FTE call center training manager | 2 |
| 87 | | Hold more frequent training classes to keep pace with high turnover | **Adams** Staffing Turnover p.1-12 **Best Practices #4C, page 6** | This has been implemented and will continue to be standard procedure. | 1 |
| 88 | | Provide reservation agents training on Trapeze, customer service, and communications, including overriding its recommendations where necessary. | **Adams** Training – Scheduling: p. 1-13 | This will be implemented to ensure that reservation agents are trained to manipulate Trapeze to get better times for riders. Commitment to hire a new call center training manager who will do more to enhance this. | 2 |

*Summaries of recommendations are provided for reference purposes only.*
*Refer to the specified pages in the full report for details*

ATTACHMENT A
**Commitment to Implementation**
**Page 14 of 18**

| # | Issue | Recommendation | Report | Commitment | Code |
|---|-------|---------------|--------|-----------|------|
| 89 | Training, cont'd. | Convert CTM room into a training room. | **Adams** Training Dispatch p.1-13 | Commit to implement. | 1 |
| 90 | | Train in standard operating procedures for utilizing dispatch technologies. | **Adams** Training Dispatch p.1-13 | Commit to develop a new set of Standard Operating Procedures, which will include new door to door service. | 2 |
| 91 | | Train in use of AVL and text messaging. | **Adams** Training Dispatch p.1-13 | Commit to expand use of AVL and text messaging, depending upon technical feasibility. | 3 |
| 92 | | Develop a formal training curriculum. | **Adams** Training - Global: p. 1-13 | Commit to review training curriculum for all staff, and enhance where appropriate. | 2 |
| 93 | | Ensure that trainees receive adequate training. | **Adams** Training - Global: p. 1-13 | Commit to review training curriculum for trainees, and enhance where appropriate. | 2 |
| 94 | | Formal TRAPEZE training | **Adams** Training - Global: p. 1-13 | Commit to review TRAPEZE training curriculum and enhance where appropriate. | 2 |
| 95 | | Reservation agents should receive 40 hours initial training, plus an extra 16 for Where's My Ride agents. All should be cross trained. | **Adams** Training – Reservations p.1-13 | Formal agent training will be enhanced and expanded in duration over 2006 levels.   Cross-training will be considered, as appropriate. | 2 |
| 96 | | Rotate dispatchers into field operations. | **Adams** Training Dispatch p.1-13 | The suggestion to send dispatchers out into the field is under review. | 3 |

*Summaries of recommendations are provided for reference purposes only.*
*Refer to the specified pages in the full report for details*

**ATTACHMENT A**
**Commitment to Implementation**
**Page 15 of 18**

| # | Issue | Recommendation | Report | Commitment | Code |
|---|-------|----------------|--------|------------|------|
| 97 | Data and Reporting | Conduct an independent review of MA in January 2007 using the checklist on pp. 29-35. | **COG** #A-4, page 28 | COG intends to conduct this review to begin in March of 2008. | 2 |
| 98 | | Strengthen contract oversight and monitoring. | **Best Practices** #5, page 6 | Commit to this monitoring, through experts and reports required in this Settlement Agreement. | 2 |
| 99 | | More closely monitor trips coded as no-shows and check the times to ensure they are not missed trips. | **TransSystems** Page 27 | This has been implemented and will continue to be standard procedure. | 1 |
| 100 | | More closely check same-day cancellations. Check a random sample of all types of cancellations to ensure that the request to cancel was made by the rider. | **TransSystems** Page 27 | This has been implemented and will continue to be standard procedure. The phone recording system is now operational and will continue to be maintained. | 1 |
| 101 | | Limit subcontractors' ability to access fields for "actual" pick-up and drop-off times and consider limiting access to final trip coding fields. Prevent subcontractors from changing scheduled pick-up times. | **TransSystems** Page 19 | This has been implemented and will continue to be standard procedure. | 1 |
| 102 | | MV to maintain central control of non-dedicated service. All schedule changes should be made through MV. Develop a method to verify whether trips were performed. | **TransSystems** Page 20 | This will be implemented, and has already been begun to some extent for non-dedicated service except for taxi service, where it is not feasible at this point. | 2 |
| 103 | | Require taxi dispatchers to receive authorization from MV staff to record a rider as a no-show. | **TransSystems** Page 21 | MV staff will be required to confirm taxi no-show records. Expert will continue to develop scope of work for taxis. | 2 |

*Summaries of recommendations are provided for reference purposes only.*
*Refer to the specified pages in the full report for details*

**ATTACHMENT A**
**Commitment to Implementation**
**Page 16 of 18**

| # | Issue | Recommendation | Report | Commitment | Code |
|---|-------|----------------|--------|------------|------|
| 104 | Data and Reporting, cont'd. | Require MV to develop and implement a procedure to verify the accuracy of final trip data from subcontractors | **TransSystems** Page 21 | Commitment to require development and implementation of such a procedure. | 2 |
| 105 | | Require taxis to use individual driver trip forms that include all necessary information. | **TransSystems** Page 21 | Such vouchers are now in use and will continue to be used. | 1 |
| 106 | | Require MV to develop and implement a procedure to check trip information reported by non-dedicated providers and taxis. | **TransSystems** Page 22 | Commitment to continue to implement such a a procedure and to require this information to be shared with WMATA. | 1 |
| 107 | | Use "Daily Reports" for in-house information only. | **TransSystems** Page 22 | This has been implemented and will continue to be standard procedure. | 1 |
| 108 | | Require MV to prepare all-inclusive, fully reconciled service report within 21 days after each month of service | **TransSystems** Page 22 | This report is and will continue to be required of MV, but MV contract permits it to be submitted by the 25th day after each month of service. | 1 |
| 109 | | Require reconciliation of taxi data and conduct an audit of taxi records. | **TransSystems** Page 28 | This has been implemented and will continue to be standard procedure. | 1 |
| 110 | | Closely track coding of trips. Pay special attention to trips coded as no-shows that could be missed trips. Audit MV to make sure that the prior practice of creating new trips with new scheduled times has been discontinued. | **TransSystems** Page 29 | Commitment to implement. | 1 |
| 111 | | Augment existing weekly staff meeting reports to include analytical, trend and goal information. | **Adams** Contract Oversight & Monitoring p. 1-14 | Commit to implement.  Reports have been enhanced considerably.  Contract compliance manager will be responsible for these reports. | 1 |

*Summaries of recommendations are provided for reference purposes only.*
*Refer to the specified pages in the full report for details*

ATTACHMENT A
**Commitment to Implementation**
**Page 17 of 18**

| # | Issue | Recommendation | Report | Commitment | Code |
|---|---|---|---|---|---|
| 112 | Data and Reporting, cont'd. | Begin keeping a series of weekly or monthly reports to track vehicle problems and performance. | **Adams** Contract Oversight & Monitoring p. 1-14 | This has been implemented and will continue to be standard procedure, done on a weekly basis.  MV Maintenance Reports will show breakdown rates and whether maintenance affects service. | 1 |
| 113 | | Develop report of accidents and other incidents per 100,000 miles that provides aggregate data and also is broken down by provider. | **Adams** Contract Oversight & Monitoring p. 1-14 | This has been implemented and will continue to be standard procedure. | 1 |
| 114 | | Develop a DriveCam report showing the number of incidents, broken down by provider and category. | **Adams** Contract Oversight & Monitoring p. 1-14 | This has been implemented per the MV Contract Modification and will continue to be standard procedure. Contract Modification to require an additional two employees to monitor Drive Cam. Report lists incidents by provider, but not by category, as a more descriptive report is preferable. | 1 |
| 115 | | Monitor turnover reports and initiation of training classes aggressively. | **Adams** Contract Oversight & Monitoring p. 1-14 | This has been implemented and will continue to be standard procedure. | 1 |
| 116 | | Prepare a summary page of the MA Contract Compliance report that identifies non-compliance by provider. | **Adams** Contract Oversight & Monitoring p. 1-14 | This will be implemented and will continue to be standard procedure. This is a procedural suggestion. MA already has this information in separate reports on each provider, but does not list it in the summary page. | 2 |
| 117 | | Upgrade the Field Operations Coordinator to Operations Manager. | **Adams** Monitoring p.1-14 | This has been implemented by upgrading Mr. Frye to Operations Manager. | 1 |
| 118 | | Require MV to have better control of non dedicated service.  All schedule changes should be made through MV. | **TransSystems** Page 28 | This recommendation will be submitted to Data Expert for review and more specific recommendation. | 3 |

*Summaries of recommendations are provided for reference purposes only.*
*Refer to the specified pages in the full report for details*

**ATTACHMENT A**
**Commitment to Implementation**
**Page 18 of 18**

| # | Issue | Recommendation | Report | Commitment | Code |
|---|---|---|---|---|---|
| 119 | Materials | Distribute materials in a wide variety of accessible formats. | **Best Practices** #1E, page 5 **COG** #B-1, page 37 | This has been implemented and will continue to be standard procedure. Commit to continue to publish all Users' Guides in accessible formats. Will review all Metro materials, and develop policy on which documents require accessible formatting. | 1 |
| 120 | | Improve materials | **COG** #B-1, page 37 | This has been implemented in part and will continue to be standard procedure, to include new clearer logo | 1 |
| 121 | Experts | Hire an experienced paratransit consultant to evaluate the cost impacts of the recommendations. | **Best Practices** #3, page 5 | This recommendation was implemented and led to **Adams** Report | 1 |
| 122 | | The region should develop a centralized information clearinghouse of accessible transportation services. | **COG** #D2, page 60 | JARC funding will fund a regional accessible transit website. WMATA will contribute to it, but will not own it. | 3 |
| 123 | | Explore more extensive use of SmartTrip cards to collect fares. | **COG** #D-4, page 63 | Methods of prepayment of MA fares to result in cash-free rides will continue to be explored. | 3 |
| 124 | Productivity | Review excessively long trip lengths, scheduling, and routing each evening. | **Adams** Staffing - Scheduling p. 1-10 to 1-11 | Commit to review this information on a regular basis. However these reviews are not seen as necessary on a daily basis at this time. | 3 |

# Attachment B

ATTACHMENT B

| Class Member Deponents who are not named Plaintiffs | |
|---|---|
| David | Boston |
| | |
| | |
| Julie | Carroll |
| | |
| Mary Wescott Tatum | Chappell |
| | |
| Laurie Alice | Eakes |
| Laura | Engler |
| Julius | Fleischman |
| Lucille | Ford |
| | |
| Deborah | Hawkins |
| | |
| | |
| | |
| Tim | Karnath |
| Jeffrey | Krauthamer |
| William | Lee |
| Luther | Marsh |
| | |
| William | Poyner |
| Charla | Ramsey |
| Penny | Reeder |
| | |
| | |
| Gloria | Swieringe |
| | |
| | |
| | |
| | |

12742886.2

# Attachment
# C

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| EQUAL RIGHTS CENTER, *et al.,*<br><br>                    Plaintiffs<br><br>                    v.<br><br>WASHINGTON METROPOLITAN AREA<br>TRANSIT AUTHORITY, *et al.*<br><br>                    Defendants. | CA 04-0498 (HHK) (JMF)<br>The Honorable Judge Henry H. Kennedy |

**NOTICE OF CLASS ACTION, CLASS CERTIFICATION, PROPOSED
SETTLEMENT AGREEMENT, AND FAIRNESS HEARING THEREON**

**TO:    ALL CLASS MEMBERS (METROACCESS CUSTOMERS)**

**THIS NOTICE AFFECTS YOUR RIGHTS.
PLEASE READ IT CAREFULLY.**

This Court wishes to inform you that a proposed settlement has been reached in the above-captioned case.  This lawsuit was filed as a class action and is pending in the United States District Court for the District of Columbia (the "Court") against the Washington Metropolitan Area Transit Authority ("WMATA").  It concerns the paratransit service known as "MetroAccess" which WMATA provides for the community of people with disabilities in the Washington, D.C. metropolitan area.

The Court has reviewed the Settlement and given it preliminary approval.  Before deciding whether to finally approve the Settlement, the Court wishes to inform you of the general terms of the proposed settlement and of your right to object to the Settlement, if you so desire.  If the Settlement is finally approved by the Court and becomes effective after a hearing regarding the fairness of the settlement ("the Fairness Hearing"), the Court's judgment will be final and binding upon you.

## SUMMARY OF THE LITIGATION

On March 29, 2004, plaintiffs Disability Rights Council of Greater Washington, Inc.[1] and various MetroAccess customers, individually and on behalf of a class of similarly-situated individuals, initiated this action alleging that WMATA had violated and was continuing to violate the Americans with Disabilities Act, 42 U.S.C. § 12131 *et seq.* ("ADA") and other federal statutes in its provision of MetroAccess services. The discriminatory practices described in the complaint included:  missed, overly long and circuitous trips; late pick ups; early pick ups; failure to answer telephone calls promptly or answering calls rudely; failure to respond to complaints in a timely or proper fashion; rude or poorly trained reservation agents; negligent or poorly trained drivers; inadequate or unsafe equipment or vehicles; and any policy, practice or procedure that rendered MetroAccess' services not comparable to that provided to WMATA's fixed route customers.

On December 14, 2006, the Court conditionally certified a class of all MetroAccess customers.  Since the filing of the Complaint, the Parties have engaged in an extensive period of discovery in which defendants took the depositions of the named plaintiffs and 16 other members of the class and produced extensive documentation; and plaintiffs deposed numerous MetroAccess employees, high level employees of WMATA and a member of WMATA's Board of Directors and produced extensive documentation.  Recently, the parties have engaged in over six months of intense settlement discussions at arms' length and, to avoid further costs of litigation and to set in place the negotiated improvements to the system, have executed a proposed Settlement Agreement that they and their counsel represent to be fair, reasonable and adequate to protect the interests of all parties, including all members of the class described above.

## INDIVIDUALS COVERED BY THIS LAWSUIT:  THE CLASS

The Court has certified a settlement class defined as all disabled individuals who are, were or may become customers of MetroAccess at any time from March 29, 2001 through the duration of the Settlement. The duration of the Settlement is three years after final court approval. According to the parties, there are over 18,000 class members.

---

[1]   The Disability Rights Council later merged into the Equal Rights Center, which was substituted as a plaintiff in this case.

## SUMMARY OF THE PROPOSED SETTLEMENT

This Notice is only a summary of the Settlement.  A copy of the Settlement is posted at [WMATA WEBSITE POSTING], or by consulting the public file on the case at the Office of the Clerk of the Court, United States District Court for the District of Columbia, 333 Constitution Avenue, N.W., Washington, DC 20001.  If you cannot otherwise obtain a copy of the Settlement, you may contact  class counsel at the number or address set forth below.  Nothing in this Notice is intended to modify the terms of the Settlement.

If you are a class member, this proposed Settlement Agreement will affect you and will modify, extinguish and release certain rights you may have.  The Settlement resolves and releases all claims that were brought in this Action on behalf of the class and imposes a moratorium on similar claims rising through the duration of the Settlement.  It does not resolve or bar personal injury claims or other individual claims of a personal nature that a class member may individually choose to pursue against WMATA.

In consideration for the releases and moratorium, the Settlement obligates WMATA to provide the following as class-wide relief:

- **Improvements to  Metro Access service**, including
  - **increasing the MetroAccess budget by $4,000,000 each year** for three fiscal years, for a total increase of $12,000,000 over three years;
  - **implementing over 130 recommendations** made by experts and riders in several reports;
  - **spending up to $170,000 over three years for** assessment s of performance data and service improvements by two independent experts; and using reasonable efforts to implement the experts' proposals.
  - **improvements to rider complaint processing** and customer communications,  and establishing performance benchmarks;
- **Establishment of a policy task force, including riders,** to advise WMATA's Board of Directors on MetroAccess matters;
- **A Floating Reserve** of $180,000 to improve MetroAccess service;
- **Purchase of extra MetroAccess vehicles** and hiring of extra operators to be available to provide on-time trips, particularly for priority needs;
- **Provision of funding for performance monitoring** by the plaintiff Equal Rights Council for up to $325,000.

3

**Free Ride Vouchers:**  In addition, the Settlement requires WMATA to issue the following **free ride vouchers**, good for one one-way MetroAccess trip each:

- **Ten free ride vouchers** to all active MetroAccess customers (a total estimated value of $450,000) and,

- **Two free ride vouchers** to each customer who experiences late or missed service on a future trip, or a future pattern of poor service during the three-year duration of the Settlement..

**YOU NEED DO NOTHING FURTHER TO RECEIVE THESE RIDE VOUCHERS, WHICH WILL BE ISSUED TO ALL ACTIVE METROACCESS CUSTOMERS FOLLOWING FINAL COURT APPROVAL.**

The Settlement also obligates WMATA to make the following payments to compensate the Named Plaintiffs and those deposed in this Action for their time, effort and expense in pursuing this litigation: $65,000 to plaintiff Equal Rights Council; $5,000 to each named individual plaintiff in the complaint in this Action; $1,000 to each person deposed by the defendants in this Action; and $964,000 in satisfaction of claims for reasonable fees and costs incurred by plaintiffs' counsel.

The parties estimate that the total financial value of WMATA's obligations under the Settlement exceeds $14 million.

The Settlement is subject to final Court approval following the Fairness Hearing, described below.

## COURT FINDINGS AND CLASS CERTIFICATION

The Court, having reviewed the proposed Settlement Agreement and submissions of the Parties, has concluded on a preliminary basis that the Settlement appears fair, reasonable and adequate.  The Court has also concluded that, for the purposes of the proposed Settlement Agreement, the members of the class described above should be unconditionally certified under Fed. R. Civ. P. 23(b)(2).

In their submissions supporting the Settlement Agreement, the Parties requested the Court to determine whether or not the Settlement Agreement should include a provision barring exclusions, or opt-outs, of individual Settlement Class members from the class.  WMATA subsequently filed a motion asking that the Court forbid class members from opting out of the Settlement or, in the alternative, that the Court approve opt-outs as to damages but not for equitable relief.  Plaintiffs have taken no position on this motion. To date, the Court has not ruled on the motion. [In response, the Court ruled as follows: TBD]

4

The Settlement Agreement will be deemed modified to reflect the Court's determination of this issue. Under circumstances specified in the Settlement, the Defendants may withdraw from and deem the Settlement void if the Court authorizes a specified number of Class Members to be excluded (*i.e.*, opt-out) from the class. The Settlement also specifies other circumstances under which Plaintiffs or Defendants may withdraw from the Settlement.

## INQUIRIES AND INFORMATION

Inquiries by Class Members regarding the Settlement Agreement or this Notice should be directed to the attention of attorneys for the Settlement Class at the following address:

> Elaine Gardner
> Washington Lawyers Committee for Civil Rights and Urban Affairs
> 11 Dupont Circle, NW, Suite 400
> Washington, D.C. 20036
> metroaccess@washlaw.org     (202) 319-1011 ext. 231

**DO NOT CALL THE COURT OR THE CLERK'S OFFICE FOR INFORMATION; ONLY CLASS COUNSEL CAN ADVISE YOU CONCERNING THE SETTLEMENT AGREEMENT.**

## NOTICE OF FAIRNESS HEARING

The Court will decide whether to give final approval to this Settlement after a Fairness Hearing. The Fairness Hearing will be held before United States District Judge Henry H. Kennedy at _____ on _____, 2008, in Courtroom No. ____ at the United States Courthouse at the address below.

**YOU ARE NOT REQUIRED TO APPEAR AT THE HEARING.** If you are a class member and do not appear, you will be represented by attorneys for the class at no cost to you. You may, if you wish, appear and comment on or object to the Settlement to the extent it might affect you. If you plan to comment on or object to the Settlement, you must file a written statement identifying yourself and any attorney you may retain and state specifically your comments or why you object to the Settlement. Comments or objections for a class member who has had a guardian appointed may be made by said guardian. All such notices must be in writing and received by ___[TBD]___, 2008. All such notices must include: (1) a heading that reads "*ERC v. WMATA*, Civil Action No. 04-0496-HHK;" (2) your name, address, and telephone

number; (3) a specific description of your comments or objections and the reasons therefor; (4) whether you

believe that you are a potential class member; (5) whether you or your attorney intend to appear at the

Fairness Hearing in person and (6) a separate, signed statement certifying that you sent copies of your

comments or objections to attorneys for plaintiffs and attorneys for defendant and the date on which you sent

them. **You must send an original and two copies of your comments or objections to the Court and one**

**copy each to counsel for plaintiffs and counsel for defendant at the following addresses**:

> CLERK, United States District Court for the District of Columbia
> 333 Constitution Ave., N.W.
> Washington, D.C. 20001
> Re:    Equal Rights Center v. WMATA, No. 04-0498
>
> WMATA
> 600 Fifth St., N.W.
> Washington, D.C. 20001
> Attn:   David J. Shaffer
> Re:    Equal Rights Center v. WMATA
>
> WILEY REIN LLP
> 1776 K St., N.W.
> Washington, D.C. 20006
> Attn:   Todd Bromberg
> Re:    Equal Rights Center v. WMATA

If you have filed timely comments or objections, you may appear in person to present your comments

or objections orally at the fairness hearing.  If you wish, you may retain your own attorney at your own

expense to represent you at the hearing.  If, due to your disability, you require accommodations to the

comment/objection process described above, contact Elaine Gardner at the number or email address above.

**YOU MAY NOT APPEAR AT THE FAIRNESS HEARING UNLESS YOU FIRST FILE THE STATEMENT DESCRIBED ABOVE TO ADVISE THE COURT OF YOUR INTENTION TO APPEAR.**

SO ORDERED:

Dated: _____, 2008      _____

                                       UNITED STATES DISTRICT JUDGE

# Attachment D

**WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY**
<u>SUPPLY AND SERVICE CONTRACT</u>                                    <u>RFP-C5108/CR</u>

**5.2.2 Incentive and Disincentives** - *Excerpts*

Incentive and disincentives will be provided in the following categories: on-time performance, missed trips, productivity (customer trips per hour), total complaints, safety (passenger injuries) and telephone response time.  The monthly incentive if all performance standards are attained is $125,000.   The performance standards, incentives, and disincentives included herein are based on anticipated improvements from current performance levels.   While reducing cost per trip is important, the PM must strive at all times to provide service in a manner which also maximizes customer service.

**1.    On-Time Performance**

On-time performance shall be measured based on the difference between scheduled pick-up times as recorded on the vehicles MDC for dedicated providers and recorded on drivers' manifests for non-dedicated providers and taxis. The incentive for on-time performance will not be paid where the on-time performance is not based on documentation provided by the AVL/MDC devices for dedicated vehicles and by WMATA for non-dedicated vehicles and taxis.

**The On-Time Performance portion of the incentive payment will be calculated as follows:**

a.    For dedicated vehicles which shall be equipped with AVL/MDC terminals, on-time performance will be determined <u>solely</u> by the time stamp data captured by the AVL/MDC equipment. The contracts will provide WMATA with the AVL/MDC data in a form specified by WMATA and shall not, in any way, alter, modify, or correct the time stamp data. The AVL/MDC data shall account for no less than ninety-five percent (95%) of trips provided by dedicated vehicles. In the event that the AVL/MDC data accounts for fewer than 95% of trips, the on-time performance incentive payment will not be paid.

b.    For non-dedicated vehicles and taxis, WMATA will verify on-time performance by randomly sampling not less than one percent (1%) and not more than three percent (3%) of non-dedicated vehicle trips.  At no cost to the contractor, WMATA will use its own personnel to randomly observe the exact time that the non-dedicated vehicle arrives for pick-up.   Arrival time shall be documented by digital photograph with time and date.   These

observations shall be the sole basis of determining whether non-dedicated vehicle trips met the on-time performance goal.

c.      In calculating on-time performance, "no shows" shall be counted as "on-time" and "vehicle no shows" or "missed trips" shall be counted as "late."

d.      The average on-time performance for dedicated and non-dedicated vehicles will be computed by adding the total number of dedicated and non-dedicated trips measured in accordance with Section 5.2.2 (1 A and B). To compute the percentage of those trips that arrive within the on-time window, the number of on-time trips in Section 5.2.2, 1A will be added to the number of on-time trips in Section 5.2.2, 1B and that number will be divided by the total number of completed trips plus missed trips.

The PM shall be entitled to earn an incentive payment in the amount of $30,000 if the on-time performance is 95% or greater. Where on-time performance is 92% or lower, WMATA will assess a disincentive in the amount of $30,000. Where on-time performance is less than 93.5%, the PM will meet with WMATA staff to confer about the reasons for lower on-time performance and develop solutions to improve performance.

## 2.     Missed Trips

Missed trip shall mean any trip not performed, other than a "Customer late cancellation" or "Customer No-Show", because the provider did not show or arrived outside the pick-up window and the customer refused the trip or was unavailable to take the trip. Excessively late trip shall mean a trip, which arrives more than 30 minutes outside of the scheduled pick-up window, and the customer accepts the trip.

The contractor shall be entitled to earn an incentive payment of $12,500 per month, if missed trips and excessively late trips do not exceed 1.05% of completed trips for the month. If missed trips and excessively late trips exceed 2.0% of completed trips for the month, the PM will be assessed a disincentive of $12,500. Where missed trips and excessively late trips are greater than 1.5%, the PM will meet with WMATA staff to confer about the reasons for the increased number of missed trips and excessively late trips and develop solutions to improve performance.

*As modified and superceded by MOD.11, Nov. 2007*

**5.3   Missed Trips**

*A missed trip shall be defined as: (a) any trip which is marked as a "no show," but for which the driver failed to wait the required wait time before leaving the pickup location; and/or (b) any trip for which the driver arrived at the pick-up more than 30 minutes outside the scheduled pick-up window ("Excessively Late"), and the customer does not board and take the trip.*

*The PM will be required to adjust its reporting mechanisms to appropriately capture statistics in accordance with this definition. All other aspects of the missed/excessively late trip incentive/disincentive is reduced to $10,000, and the PM will be required to issue two (2) free trip coupons at its own expense to all customers who have experienced a missed or excessively late trip.*

**5.    Complaints Against the PM**

Complaints against the PM will include complaints from or on behalf of customers or the general public concerning the PM or the PM's subcontractors under this agreement. They do not include complaints against WMATA policies or complaints about eligibility determinations. Complaints will not be counted if the PM demonstrates that they are without merit. The PM shall be entitled to earn an incentive payment in the amount of $20,000 if total customer complaints are below one (1) per thousand trips requested. If customer complaints are above five (5) per thousand trips requested, WMATA will assess a disincentive in amount of $20,000. Where total complaints exceed three (3) per thousand trips requested, the PM will meet with WMATA staff to confer about the reasons fro the increased complaints and develop solutions to improve performance.

**6.    Telephone Response Time-Incoming Calls**

Telephone response time shall mean a measure of service efficiency based on the percentage of total calls offered, which are answered within two minutes, with the average talk time no more than two minutes, and the call abandonment rate less than four percent. The PM shall be entitled to earn an incentive payment in the amount of $10,000 if telephone response time is 95% or greater. If telephone response time is 92% or lower, WMATA will assess a disincentive in the amount of $10,000. Where telephone response time is less than 93%, the PM will meet with WMATA staff to confer about the reasons for increased telephone response time and develop solutions to improve performance.

*As modified and superceded by MOD11,  Nov. 2007*

### 5.1    Telephone Response Time

*Telephone response time shall mean a measure of service efficiency.  Service efficiency shall be calculated by dividing the sum of the number of calls answered when holding less than or equal to 2 minutes plus the number of calls abandoned when holding less than or equal to 2 minute by the sum of the number of total calls answered plus the number of calls abandoned after holding more than 2 minutes to the extent to which the number of calls abandoned after holding more than 2 minutes exceeds 4% of the total calls received.  With respect to this paragraph only, "calls" shall mean customer calls for new reservations and inquiries on the status of same-day trips.*

*The PM shall be entitled to earn an incentive payment in the amount of $7,500 if service efficiency for a month is 95% or greater.  If service efficiency is 92% or lower, WMATA will assess a disincentive in the amount of $7,500.  If service efficiency is less than 93%, the PM will meet with WMATA staff to confer on reasons for reduced service efficiency and to develop solutions to improve performance.*

*There shall be no standard for maximum talk time since the objective is to ensure that each call fully satisfies the concerns and needs of the customer.*

### 5.2.3  Disincentive Exceptions

Disincentives will not be assessed if the PM's performance fails to meet the goals due to extraordinary and/or unanticipated occurrences beyond the control and without the fault or negligence of the PM or its subcontractors.  Examples include vehicle recalls, labor strikes, earthquakes, fires and/or floods that result in performance below the stated goals.  Traffic congestion or accidents are not acceptable reasons for poor performance.

Disincentives will also not be assessed if performance below the baseline results from policies imposed by WMATA on the PM and the PM advises WMATA that the new policies will affect performance goals.  The baseline service performance levels will be adjusted to reflect changes resulting from any policy changes required by WMATA, if necessary.  Examples of such potential policy changes could include changing the on-time performance window or dwell time when picking up passengers.

# MONTHLY PERFORMANCE GOALS

| Performance Factors | Incentive | Goal | Disincentive |
|---|---|---|---|
| On-Time Performance | 95% | 93.5% | 92% |
| Customer Service: Complaints | 1/ 1,000 trips | 3/ 1,000 trips | 5/ 1,000 trips |
| Telephone Response Efficiency | 95% | 93% | 92% |
| Excessively Late & Missed Trips | 1.0% | 1.25% | 1.5% |

# Attachment E

# NOTICE OF PROPOSED CLASS ACTION SETTLEMENT
## "METRO ACCESS CLASS ACTION"

A proposed settlement has been reached in the case of Equal Rights Center (ERC) v. WMATA, CA 04-0498 (HHK), which was filed in March, 2004. The case is a class action which concerns the MetroAccess service WMATA and its contractors provide to the community of people with disabilities in the Washington, D.C. metropolitan area. In the case, the plaintiffs alleged that WMATA was violating disability-related federal laws in its provision of MetroAccess services.

 After years of litigation and months of negotiations, the parties have submitted to the court a proposed Settlement Agreement that they and their counsel represent to be fair, reasonable and adequate to protect the interests of all members of the class (all persons who use MetroAccess). The Settlement includes improvements to MetroAccess services, increases to the MetroAccess budget, provisions for monitoring MetroAccess, ten free ride vouchers for every MetroAccess user, two free ride vouchers for certain future instances of poor service, compensation to named plaintiffs and deponents, and plaintiffs' attorney costs and fees.

The U.S. District Court for the District of Columbia has reviewed the Settlement and given it preliminary approval. If the Settlement is given final approval by the Court after the Fairness Hearing described below, the Court's judgment will be final and binding upon you.

A copy of the Settlement and a complete Notice is being sent to the home addresses of all MetroAccess users; is posted at [WMATA WEBSITE POSTING]; and is on file at the Office of the Clerk of the Court, U.S. District Court for the District of Columbia, 333 Constitution Avenue, N.W., Washington, DC 20001. If you need further information or cannot locate a copy of the Settlement please contact:

**Elaine Gardner**
**Washington Lawyers Committee for Civil Rights and Urban Affairs**
**11 Dupont Circle, NW, Suite 400, Washington, D.C. 20036**
**metroaccess@washlaw.org     (202) 319-1011 ext. 231**

**FAIRNESS HEARING:** The Court will decide whether to give final approval to this Settlement after a Fairness Hearing which will be held before Judge Henry H. Kennedy at _____ on _____, 2008, in Courtroom No. ____ at the United States Courthouse, 333 Constitution Avenue, N.W., Washington, DC 20001   **YOU ARE NOT REQUIRED TO APPEAR AT THE HEARING** to be included in the class. If you are a member of the class (i.e. you use MetroAccess) and do not appear, you will be represented by attorneys for the class at no cost to you.

You may, if you wish, appear and comment on or object to the Settlement to the extent it might affect you. **If you plan to comment on or object to the Settlement at the hearing, YOU MUST FILE A WRITTEN NOTICE** identifying yourself, your attorney (if any), and your comments or why you object to the Settlement. Your objections must be mailed by _____, 2008. **YOU MAY NOT APPEAR AT THE FAIRNESS HEARING UNLESS YOU HAVE FIRST FILED A WRITTEN STATEMENT.**

**DO NOT CALL THE COURT OR METROACCESS ABOUT THE SETTLEMENT. ONLY MS. GARDNER AT THE WASHINGTON LAWYERS COMMITTEE CAN ADVISE YOU.**