# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

<table>
<tr><td>

**EQUAL RIGHTS CENTER, et al.,**

**Plaintiffs,**

**v.**

**WASHINGTON METROPOLITAN
AREA TRANSIT AUTHORITY, et al.,**

**Defendants.**

</td><td>

**Civil Action 04-00498  (HHK)**

</td></tr>
</table>

## MEMORANDUM OPINION

Following a fairness hearing, as required by Fed. R. Civ. P. 23(e), this court approved the

Settlement Agreement reached in this case [# 186] and indicated that a full explanation for its

decision would be forthcoming.  This court's explanation follows.

## I.  BACKGROUND

In 2004, the Disability Rights Council of Greater Washington[1] and thirteen named

plaintiffs brought this action against the Washington Metropolitan Area Transit Authority

("WMATA") on behalf of approximately 18,000 class members.  The complaint alleged that

MetroAccess, WMATA's public paratransit service,[2] failed to meet the standards required by the

Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131, *et seq.*, section 504 of the

Rehabilitation Act of 1973, 29 U.S.C. § 794, and the Civil Rights Act, 42 U.S.C. § 1983.  ERC

---

[1]  The claim was originally brought by the Disability Rights Council of Greater
Washington ("DRC"), which merged with the Equal Rights Center ("ERC") during the course of
the litigation.  ERC subsequently replaced DRC as plaintiff.

[2]  MetroAccess provides scheduled van service for disabled persons who cannot
otherwise use WMATA's public bus and subway system.

argues that plaintiff class members were subjected to a range of discriminatory behavior due to their disabilities, including missed or overly long trips; off-schedule pick-ups and arrivals; telephone reservation agents who were rude to MetroAccess customers, did not answer calls, or were otherwise poorly trained; long telephone wait times; lack of response to customer complaints; and inexperienced, poorly-trained drivers.  ERC claims that such practices rendered WMATA's MetroAccess service inferior to that provided on its fixed-route bus and subway lines.

After more than three and a half years of contentious and complex litigation and six months of settlement negotiations, the parties reached a Settlement Agreement ("the Agreement") [# 177-3], which they presented to the court for class certification and final settlement approval.  This court certified the class and granted preliminary approval of the Agreement on February 8, 2008 [# 180], subject to a fairness hearing held on May 22, 2008.

A.      The Settlement Agreement

The Agreement grants relief of approximately $14 million to the plaintiff class.  Focusing primarily on prospective and injunctive relief, the Agreement contractually requires WMATA to improve its service and to adhere to specific performance standards.  In particular, the Agreement provides four forms of relief:  1) free ride coupons for active MetroAccess customers; 2) specific performance and service commitments by WMATA and MetroAccess; 3) independent monitoring of MetroAccess performance through the current and following three fiscal years; and 4) monetary compensation for the named plaintiffs and other class members who were deposed during the course of this action.  The Agreement also provides for reimbursement of a portion of plaintiffs' legal fees and expenses.  The court addresses each form of relief in turn.

2

1.      **Class Members Will Receive Free Ride Vouchers for Past Alleged Poor Service as Well as Any Instances of Future Poor Service**

Under the Agreement, WMATA will provide ten coupons for free rides to each of the 18,665 currently-active MetroAccess customers[3] as compensation for the alleged past service deficiencies.  Because the current cost of a MetroAccess ride is $2.50, WMATA estimates the value of the coupons to exceed $466,000.  The Agreement provides that if MetroAccess customers continue to experience poor services in the future, WMATA will reimburse them by providing two free ride coupons for each late or missed trip.[4]  Customers will also be entitled to two free ride vouchers for each "pattern of poor service"[5] documented, up to a maximum of twenty free ride vouchers.

2.      **WMATA Will Contractually Require Specific Performance Standards and Service Improvements**

The Agreement focuses primarily on injunctive rather than compensatory relief because the parties agree that the class will be better served by future improvements to the MetroAccess infrastructure, rather than through monetary compensation for past alleged deficiencies.  The vast majority of the settlement amount — $12 million — will result in an increase in MetroAccess's

---

[3]  Although the 18,665 number was current as of December 2007, the exact number of class members will be determined after the date of final approval of the Settlement Agreement.

[4]  A "late trip" is defined in the Agreement as a trip that arrives at the pick-up location after the scheduled thirty-minute pick-up window, and a "missed trip" is one in which the MetroAccess vehicle either never arrives at the pick-up location, or which arrives so excessively late that the customer gives up waiting or refuses to take the ride [# 177-3].  The court understands a "pick-up window" to be the period of time surrounding a scheduled pick-up, such that a thirty-minute window includes fifteen minutes before and fifteen minutes after the scheduled pick-up time.

[5]  The Agreement defines a "pattern of poor service" as "incidents of poor service in 15% or more of a customer's total trips or five different trips within a 30-day period" [# 177-3].

3

budget, divided into $4 million segments for the fiscal years 2008, 2009, and 2010, and will be used to implement over 130 recommendations proposed by a number of performance studies sponsored by plaintiffs in 2005 and 2006 [# 177-7].  These recommendations broadly address the deficiencies raised in plaintiffs' complaint, such as improving procedures for the training, staffing, and retention of MetroAccess telephone agents, procurement of additional vehicles, redesigning the customer complaint and response department, improving communication within MetroAccess departments, and reliably documenting MetroAccess performance data.

Additionally, the Agreement sets forth a comprehensive alternative dispute resolution component in order to avoid future litigation to the greatest extent possible.  Disputes that arise during the Agreement period will be subject to the ADR scheme.  The parties agree that, rather than a consent decree, the Agreement is to be treated as an enforceable contract, and access to the court will require the initiation of a new lawsuit alleging a breach of the contract.  In consideration of the terms of the Agreement, the class members will release all claims brought in the current action and adhere to a three-year moratorium on filing similar claims in the future. The release and moratorium do not extend, however, to personal injury claims, or other specific personal claims.

**3.     WMATA Will Implement a Monitoring and Compliance Program at Its Expense**

The Agreement provides for the hiring of two independent experts selected jointly by the parties: a data expert and a service expert.  The data expert will verify the accuracy of performance data provided by WMATA and compile the information into annual reports.  The data expert may propose changes to address any issues that the data suggest are not in

compliance with the terms of the Agreement.  The service expert[6] will monitor both WMATA's compliance with the terms of the Agreement and MetroAccess performance based on the reports provided by the data expert.  In addition, the service expert will submit reports to the parties annually for the duration of the Agreement, identifying problems with MetroAccess performance and the service expert's proposed solutions to these problems.

The Agreement also provides three additional monitoring mechanisms to ensure WMATA's compliance to the terms of the Agreement.  First, an independent task force will meet with WMATA's Board of Directors periodically to assess the progress of changes to MetroAccess service under the Agreement.  Second, WMATA has agreed to pay ERC up to $100,000 for the first year and up to $75,000 for each subsequent year of the Agreement to cover expenses associated with monitoring WMATA's compliance with the Agreement.  Finally, plaintiffs agree to release their claims against WMATA only on the condition that WMATA perform its obligations under the Agreement.  Plaintiffs thus retain the power to bring another claim of discriminatory practices against WMATA should it not live up to its end of the bargain.

### 4.    WMATA Will Provide Compensation to Those Directly Involved in the Litigation and Pay a Portion of the Plaintiffs' Legal Fees

The Agreement provides for three separate forms of compensation to the parties who devoted time and resources to this litigation.  First, WMATA will pay each of the thirteen named plaintiffs $5,000.  Second, the sixteen class members who were deposed but not named in the complaint will receive $1,000.  Finally, plaintiff ERC will receive $65,000 for its efforts in support of the litigation.

---

[6]  The service expert, Sharon Moore, was present at the fairness hearing.

5

In addition, WMATA will pay plaintiffs' counsel $964,000 for their professional services and expenses incurred in prosecuting the class action.  This amount reflects over 9,000 hours of attorney and paralegal work and over $80,000 worth of copying and court-reporting expenses.

**B.**     **Notice to Class Members of Proposed Settlement and Class Response**

The court's Order of February 8, 2008, directed the parties to provide notice to class members with regard to class certification and the proposed Agreement [# 180].  Under the terms of the Agreement, WMATA agreed to bear the costs of such notice and proceeded to notify the class members through various channels.  First, WMATA sent a court-approved Notice of Fairness Hearing and a complete copy of the Settlement Agreement to the known home address of over 28,000 current and former MetroAccess customers [# 185-3].  Second, the Notice of Fairness Hearing was posted on the MetroAccess portion of WMATA's website for at least sixty days.  Third, a summary of the Notice was posted in all dedicated MetroAccess vehicles for at least thirty days.  In case members had questions or objections to the settlement, the Notice provided an address and telephone number where plaintiffs' counsel could be reached.

Plaintiffs' attorneys received and responded to over 350 phone calls, and received eight letters of comment or objection.  Of these letters, two were categorized as objections [# 185, Exs. D-1, D-2].

## II.  ANALYSIS

Under Rule 23(e) of the Federal Rules of Civil Procedure, no class action may be settled without the approval of the court.  Fed. R. Civ. P. 23(e).  The court is charged with determining that the settlement is fair, that the parties and their counsel have adequately represented all class members, and that the relief agreed upon is reasonable.  *In re Vitamins Antitrust Litig.*, 305 F. Supp. 2d 100, 104 (D.D.C. 2004) ("*Vitamins*").  The court must also ensure that class members receive sufficient notice of the proposed settlement, and that the agreement was not the result of collusion between the parties or parties' counsel.  *Thomas v. Albright*, 139 F.3d 227, 231 (D.C. Cir. 1998).

In determining whether a settlement is fair, adequate, and reasonable, courts in this Circuit examine the facts and circumstances unique to each case.  *Blackman v. District of Columbia*, 454 F. Supp. 2d 1, 8 (D.D.C. 2006) ("[T]here is no obligatory test that the Court must use to determine whether a settlement is fair, adequate, and reasonable."); *Ball v. AMC Entm't, Inc.*, 315 F. Supp. 2d 120, 125 (D.D.C. 2004) (same).  The trial court exercises its discretion when approving or rejecting a settlement, but it must keep in mind that private resolution of claims is strongly favored over litigation.  *Pigford v. Glickman*, 185 F.R.D. 82, 103 (D.D.C. 1999) ("The Court should scrutinize the terms of the settlement carefully, but the discretion of the Court to reject a settlement is restrained by the 'principle of preference' that encourages settlements."), *aff'd,* 206 F.3d 1212 (D.C. Cir. 2000).  The factors courts in the D.C. Circuit have examined when determining the fairness of a class settlement include:  a) the terms of the settlement in relation to the strength of plaintiffs' and defendants' arguments; b) the existence of arms' length negotiations; c) the status of the litigation at the time of the Agreement; d) the

representations of experienced counsel; and e) the class reaction to the Agreement. *Vitamins*, 305 F. Supp. 2d at 104; *see also*, *e.g.*, *Cohen v. Chilcott*, 522 F. Supp. 2d 105, 118-19 (D.D.C. 2007) (relying on the same factors in approving a class action settlement). Finally, the court has a duty to ensure that claims for attorneys' fees and expenses are reasonable. *Vista Healthplan, Inc. v. Warner Holdings Co. III., Ltd*., 246 F.R.D. 349, 363 (D.D.C. 2007) (*citing Swedish Hosp. Corp. v. Shalala*, 1 F.3d 1261, 1265 (D.C. Cir. 1993)).

Upon review of the Agreement, the comments and objections of class members, and the responses by the parties thereto, the court concluded that the Agreement between ERC and WMATA adequately represents and reasonably compensates the plaintiff class.

## A.      The Terms of the Agreement in Relation to Strength of Plaintiffs' Case

The court's primary role in approving a class action settlement is to weigh the relief granted in the Agreement against the relative strength of plaintiffs' case. *Thomas*, 139 F.3d at 231; *Pigford*, 206 F.3d at 1217. Here, plaintiffs allege a series of systemic deficiencies in MetroAccess service, including: a shortage of vehicles, poorly trained drivers, unacceptably long delays in customer pick-up and transit times, an insufficient number of telephone operators to handle the reservation process, and a lack of proper customer complaint procedures. Plaintiffs submitted evidence in the form of numerous depositions by customers who were affected by the system's shortcomings, data compiled by independent investigators, and WMATA's own service reports and admissions. This evidence supports the claim that MetroAccess was operating in violation of the ADA and the Rehabilitation Act of 1974.

In defense of these claims, WMATA was prepared to argue that plaintiffs' claims were mooted by a report that showed WMATA had begun improvements to the MetroAccess system

after plaintiffs filed their lawsuit in 2004 [# 177-4].  Furthermore, independent experts retained

by WMATA found that MetroAccess's performance was as good as or better than equivalent

services in similar metropolitan areas around the country and was often faster than WMATA's

fixed-route service, suggesting that WMATA was in compliance with the ADA and

Rehabilitation Act of 1974 [#177-5].

During the fairness hearing, counsel for both parties explained the risks involved in

proceeding to trial, and acknowledged the fact that neither side had a clear advantage.  Where the

parties face significant risks in continuing to trial, the court views the settlement in light of these

considerations.  *Vista Healthplan, Inc.*, 246 F.R.D. at 362.  Here, the Agreement represents a

reasonable compromise between the relief plaintiffs believe they could have been awarded at

trial, and the amount of liability to which WMATA was willing to expose itself in order to

conclusively dispose of the matter.

**B.     Arms' Length Negotiations**

Second, the court presumes that a settlement is fair, adequate, and reasonable when "a

class settlement [is] reached in arms' length negotiations between experienced, capable counsel

after meaningful discovery." *Blackman*, 454 F. Supp. 2d at 8 (D.D.C. 2006) (quotation omitted);

*Vitamins*, 305 F. Supp. 2d at 104.  Here, the parties engaged in six months of vigorous

negotiations before a mutually agreeable settlement was reached.  No evidence has been

presented to the court to suggest any collusion between the parties nor any reason to doubt the

fairness of the Agreement.  To the contrary, during the fairness hearing both counsel for both

sides averred — and this court acknowledged — that the current litigation has been unusually

contentious, and that settlement negotiations were similarly antagonistic, often requiring a

9

mediator to intervene.  Accordingly, the court found that the Agreement was reached after arms'

length negotiation, and that it is thus "presumptively fair, adequate, and reasonable." *Vitamins*,

305 F. Supp. 2d at 104.

**C.      The Status of the Litigation at the Time of Settlement**

In determining whether a proposed class action settlement is fair, adequate, and

reasonable, courts have a duty to ensure that the settlement does not "come too early to be

suspicious nor too late to be a waste of resources," and that it is at "a desirable point in the

litigation to reach an agreement without further delay, expense, and litigation." *Id.* at 105.  Here,

the court found that the Agreement is in the interest of class plaintiffs because its approval would

immediately provide the injunctive relief plaintiffs had been seeking for four years.  The court

was also convinced that the Agreement is based on comprehensively researched factual grounds;

both parties have conducted extensive discovery amounting to more than fifty depositions and

over ten thousand pages of discovery documents [# 178-2].  Further, because the parties agreed

to settle before proceeding to a jury trial, a settlement of claims now would not amount to a

needless waste of judicial resources.  *Id.*

**D.      The Opinion of Experienced Counsel**

The opinion of experienced counsel "should be afforded substantial consideration by a

court in evaluating the reasonableness of a proposed settlement." *In re Lorazepam & Clorazepate

Antitrust Litig.*, 2003 WL 22037741, at *6 (D.D.C. June 16, 2003) ("*Lorazepam*").  The attorneys

for both parties stated in their Joint Motion that they believe the Agreement is a fair resolution to

the case [# 177-2].  Counsel for both sides are experienced and well-respected members of the

legal community and deserve the Court's consideration of their opinion.  *Vitamins*, 305 F. Supp.

2d at 106.  Although the court does not defer blindly to the views held by counsel, it notes that

after three and a half years of active litigation and six months of negotiations, all parties involved

in the Settlement view it as fair and reasonable.

**E.      The Fairness Hearing and Class Reaction to the Agreement**

The reaction of the class to the proposed Settlement is an indicator of class acceptance of

the Agreement.  *Thomas*, 139 F.3d at 233.  Although the court has a duty to consider objections

raised by class members in its fairness analysis, the court should not reject a settlement merely

because some class members complain that they would have received more had they prevailed

after a trial.  *Id.*; *see also Cohen*, 522 F. Supp. 2d at 118-19 (concluding that class members

approve a class action settlement when, after receiving notice, relatively few members object to

its terms); *In re Lorazepam & Clorazepate Antitrust Litig.*, 2003 WL 22037741, at *6 (D.D.C.

June 16, 2003) ("[T]he existence of even . . . relatively few objections certainly counsels in favor

of approval[.]").  Here, only two letters of objection were submitted out of a class of

approximately 18,000 members, which the court finds to be a strong indicator of class approval.

The first letter of objection, by David Donald Piper, stated that Mr. Piper was not given

fair notice of the lawsuit when it was filed so that he could join as a named party, and that notice

of the Agreement came too late for him to seek free legal help [# 181-5].  The court takes note of

Mr. Piper's disappointment in not having been included as a named plaintiff but does not find

that as a consequence he received inadequate representation as an unnamed class member.

The nature of class action litigation is such that one or more members of a class may sue

as representative parties on behalf of the entire class.  Fed. R. Civ. P. 23(a).  Indeed, when the

court certifies a class, its primary goal is to ensure proper representation of unnamed parties

11

whose rights may be affected by the outcome of the litigation. *Blackman*, 454 F. Supp. 2d at 7-8. Furthermore, the Agreement provides for broad monetary and injunctive relief which will benefit all class members, including Mr. Piper. As for Mr. Piper's second complaint — that he was not given adequate time to seek free legal help — the court acknowledges that plaintiffs' counsel contacted Mr. Piper via email and informed him that he would be given additional time to prepare his objection letter [# 185]. Counsel received no further communications from Mr. Piper.

The second objection letter, from David A. Boston, stated that the relief proffered in the Agreement was insufficient because it did not adequately compensate MetroAccess customers and it did not correct a number of deficiencies in the system. Specifically, Mr. Boston claimed that the Agreement did not address WMATA's "no-show" policy,[7] that the practice of customer "add ons" would continue to result in unreasonably long and circuitous trips,[8] and that without independent oversight, WMATA would have no incentive to end the alleged discriminatory practices. Mr. Boston suggested the court void the settlement contract and begin negotiations anew, appointing a special guardian to oversee WMATA's compliance to the terms of the Agreement. Mr. Boston's concerns are valid, but the Agreement already has mechanisms in

---

[7] One of the alleged shortcomings of the MetroAccess system was that a lack of procedures for properly documenting poor service created a perverse incentive for van drivers to wrongly categorize late or missed trips (which were not reimbursable) as customer "no shows" instead. Customers categorized as "no shows" were penalized, while the van subcontractors still collected reimbursement from MetroAccess for these trips.

[8] The term "add ons" refers to MetroAccess customers who were manually added to a driver's manifest mid-day. Plaintiffs alleged that MetroAccess's lack of driver oversight often resulted in drivers changing course to pick up customer "add ons" at the expense of passengers already on-board the vehicles.

place to independently monitor WMATA's compliance, verify the accuracy of its performance data, and gather input from MetroAccess customers.

At the fairness hearing, three witnesses voiced their objections.  First, Mr. Boston reiterated the concerns stated in his letter.  As noted, the court determined that the Agreement sufficiently addresses Mr. Boston's objections.  In addition to the objections in his letter, Mr. Boston stated at the hearing that the monetary compensation awarded to class members was insufficient and unfair.[9]  Mr. Boston's objection misses a key feature of the Agreement. As counsel for both parties agree, improving future MetroAccess service is more beneficial to the class than compensating for past deficiencies.  Accordingly, the vouchers, valued at approximately $466,000, represent only three percent of the total relief of $14 million which is to be invested in MetroAccess infrastructure improvement.

The second witness, Monwell Gaskins, raised two objections at the fairness hearing.  First, Mr. Gaskins suggested that all class members should receive the same compensation awarded to the thirteen named plaintiffs, because all class members, including himself, are similarly situated to the named plaintiffs.  This is not the case.  Named plaintiffs receive incentive awards to compensate for the time and effort expended in assisting litigation, rather than to compensate for past wrongs.[10]  Second, Mr. Gaskins stated that the passenger manifests

---

[9]  The Agreement provides compensation to class members in the form of coupons for ten free MetroAccess rides, currently worth twenty-five dollars.

[10]  The incentive awards of $5,000 and $1,000 granted to named plaintiffs and deposed class members are not uncommon in class action litigation.  "[C]ourts routinely approve incentive awards to compensate named plaintiffs for the services they provided . . . during the course of the class action litigation." *Lorazepam*, 2003 WL 22037741, at *10.  In deciding the propriety of incentive awards, the court considers factors such as the amount of time and effort plaintiffs expended in aiding litigation. *Id.*  Here, the court finds the additional payments granted to named and deposed plaintiffs reasonable, particularly in light of the various disabilities of the

provided to MetroAccess drivers were not descriptive enough, and that passengers were often missed because the drivers were waiting at the wrong entrance to a building.  While it is true that this has been a problem in the past, WMATA has already committed to providing enhanced customer pick-up information under the terms of the Agreement.  Therefore the court found that Mr. Gaskins' objections are adequately remedied by the Agreement.

Finally, the court heard from Carl Schmidt, who raised a similar concern as Mr. Gaskins in that MetroAccess did not provide sufficient passenger information for the drivers to successfully find MetroAccess customers.  Mr. Schmidt also commented that he believed that WMATA should implement some form of incentive system to reward good performance. Plaintiffs' counsel responded to Mr. Schmidt's comments by noting that the parties have already addressed these issues in the Agreement.  Specifically, WMATA has committed to upgrading its dispatch system software to include more complete descriptions of passengers' locations and their individual needs, and it has reworked its contract with transport vehicle providers to include incentives for on-time service and substantial disincentives for late or otherwise unsatisfactory service.

## G.      Reasonableness of Attorneys' Fees

Finally, the court considered the reasonableness of legal fees contemplated by the Settlement Agreement to ensure that the fees would not come at the expense of relief awarded to the plaintiff class.  *See, e.g.*, *Vista Healthplan, Inc.*, 246 F.R.D. at 363.  Courts generally use two methods to determine reasonableness of legal fee awards:  the percentage-of-recovery method and the lodestar method.  *Id.* at 363-64.  Under the percentage-of-recovery method, the court

_____

class members, which made travel to and from depositions and other court proceedings especially difficult.

14

calculates what percentage of total relief comprises attorneys' fees.  Under the lodestar method, the court calculates the value of counsel's labor by multiplying the total hours worked by market rate for such work — the resulting dollar amount is referred to as the "lodestar." *Id.* at 364.  The D.C. Circuit has concluded that the lodestar method is appropriate when calculating fees based on fee-shifting statutes, *Swedish Hosp. Corp.,* 1 F.3d at 1267, while the percentage-of-recovery method applies in cases where a common fund is awarded to the class, *Vista Healthplan, Inc.*, 246 F.R.D. at 364.

The court notes, however that there is no firm test to mandate one method of fee calculation over another. *Swedish Hosp. Corp.*, 1 F.3d at 1267-68 (collecting cases). Furthermore, the court does not arrive at a number based on cold calculations according to a rote mathematical formula.  *Id.*  The reasonableness of attorneys' fees is ultimately subject to the court's discretion, based on the facts and circumstances unique to each case.  *Id.*  Here, the parties assert that if plaintiffs had prevailed at trial, they would have been entitled to claim over $3 million in attorneys' fees.  Because the Agreement contemplates a fee award that is a fraction of this amount, the court found the attorneys' fee award to be reasonable and well within the upper limits established under either method of calculation.[11]

---

[11]  Plaintiffs sought $964,000 in combined attorneys' fees and expenses. According to statements submitted by the parties, this amount is less than one-third of the value of the total time and expense incurred in this action (over $3 million at current market rates) [# 178-2]. Alternatively, using the percentage-of-recovery method, the fee award makes up less than seven percent of the total class award of $14 million.  This court has previously held that reasonable fee awards may range from fifteen to forty-five percent of the total class award. *Vista Healthplan, Inc.*, 246 F.R.D. at 364.  Therefore, under either the percentage-of-recovery or the lodestar method of calculating attorney fees, the fees awarded in the Agreement are more than reasonable.

**III. CONCLUSION**

For the foregoing reasons, the court determined that the Settlement Agreement between

Equal Rights Center and WMATA is fair, adequate, and reasonable.


Henry H. Kennedy, Jr.
United States District Judge

Dated: September 2, 2008